IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

-v-

SIMON GOGOLACK, et al.

Defendants.
_____

**MEMORANDUM IN SUPPORT OF**
**NON-DISPOSITIVE PRETRIAL MOTIONS**

**ON BEHALF OF**

**JOHN ERMIN;**
**PETER GERACE, JR.; AND**
**HOWARD HINKLE**

Case No.: 23-CR-99

Dated: April 16, 2025

**TABLE OF CONTENTS**

I. BACKGROUND --------------------------------------------------------------------------------------4

    A.   EVENTS PRECEDING THE FILING OF CHARGES IN CASE NO. 23-CR-99 -----------------------------4

        1. Quinn's Involvement in Case No. 19-cr-227 (Bongiovanni et al)-----------------------------4

           a. Lead-up to the Government Targeting Quinn----------------------------------------4

           b. The Government Charges and "Flips" Crystal Quinn -----------------------------5

           c. The Government Publicly Reveals that it "Got" Ms. Quinn ---------------------6

           d. Gerace Had Reason to Believe that Quinn Would Provide Testimony Favorable to Him -----------------------8

           e. The Reporting of Ms. Quinn's Death ----------------------------------------- 10

        2. Death of Quinn and the Investigation Targeting Gerace ---------------------------- 12

    B.   PROCEDURAL HISTORY OF THIS CASE --------------------------------------------------- 15

        1. The Filing of Charges Against Gogolack, Hinkle, Ermin and Others----------------- 15

        2. The Second Superseding Indictment Consolidates the Pending Cases----------------- 16

        3. The Discovery Scheduling Order ------------------------------------------------- 18

        4. Requests for Second Counsel ---------------------------------------------------- 22

        5. The Violation of the Court's Discovery Order ----------------------------------- 23

        6. The Government's Motion for Reconsideration of the Court's Decision to Deny an Exclusion of Time in the Interest of Justice----------------------------------------------------------------------- 24

        7. Sanctions Litigation ----------------------------------------------------------- 25

           a. Defendants Move for Sanctions Based on the Government's Violation of the Court's Order ----------------- 25

           b. Defense for Gerace Responds to the Government's Motion for an Exclusion of Time ------------------------- 26

           c. The Imposition of Sanctions--------------------------------------------------- 27

        8. The February 5, 2025, DOJ Memorandum----------------------------------------- 29

II. MOTIONS REGARDING THE INDICTMENT --------------------------------------------- 31

    A.   MOTION FOR A BILL OF PARTICULARS ----------------------------------------------- 31

        1. Count 1----------------------------------------------------------------------- 35

           a. Double Jeopardy ----------------------------------------------------------- 40

           b. Legal Sufficiency-------------------------------------------------------- 40

        2. Count 2----------------------------------------------------------------------- 41

           a. Duplicity-------------------------------------------------------------- 41

           a. Multiplicity----------------------------------------------------------- 42

        3. Count 3----------------------------------------------------------------------- 42

    B.   MOTION TO STRIKE SURPLUSAGE----------------------------------------------------- 43

III. MOTIONS FOR DISCLOSURE -------------------------------------------------------- 47

    C.   MOTION FOR RULE 12 NOTICE ----------------------------------------------------- 47

    D.   MOTION FOR RULE 16 DISCOVERY ------------------------------------------------- 51

        1. Rule 16.1 Conference and Request for Court Action----------------------------- 51

        2. Discovery is Extremely Voluminous --------------------------------------------- 52

           a. Discovery provided on June 4, 2024 --------------------------------------- 54

           b. Cell Phones-------------------------------------------------------------- 55

           c. Discovery provided on June 24, 2024 -------------------------------------- 59

           d. Discovery provided on March 7, 2025.-------------------------------------- 59

           e. Relevant Jail Calls----------------------------------------------------- 59

      3. *Evidence Related to Quinn's Cooperation* ------------------------------------------------------- *60*
        a. Reports of Proffers and Quinn Grand Jury Testimony ---------------------------------- *60*
        b. Quinn's Pretrial Diversion and U.S. Probation File --------------------------------- *61*
        c. Grand Jury Testimony of Quinn's Attorney --------------------------------------------- *62*
      4. *Testimony and Evidence Obtained from Gerace Attorney 1's Investigator* ------------------- *63*
      5. *Additional Discovery* --------------------------------------------------------------------- *63*
      6. *Discovery is Necessary to Ensure Effective Assistance of Counsel* ---------------------- *66*
  E.   MOTION FOR DISCLOSURE OF GRAND JURY RECORDINGS (RULE 6) -------------------------------- *67*
      1. *Demonstratively False Allegations in the Indictment* ----------------------------------- *68*
      2. *Evidence of Prosecutorial Steering* ------------------------------------------------------ *74*
        a. The Government is Confronted in March 2024 on its Selective Related Case Filings---------- *75*
        b. Despite the Government's Comments in March 2024, the Government Had Immediately Connected the Witness Death Investigation to the Prosecution of Mr. Gerace------------------------------------------ *77*
        c. Grounds for Dismissal------------------------------------------------------------------------ *80*
  F.   MOTION FOR PROMPT DISCLOSURE OF BRADY MATERIAL AND INFORMATION------------------------------ *81*
      1. *The Government Misconstrues its Brady Obligations* --------------------------------------- *89*
      2. *Production of Impeachment Evidence* ------------------------------------------------------ *95*
      3. *Production of Information Inconsistent with the Government's Theory of the Case* ------------- *100*
  G.   MOTION FOR EARLY DISCLOSURE OF JENCKS MATERIAL --------------------------------------------- *101*

**IV. MOTIONS FOR CHANGE OF VICINAGE AND SEVERACE** ---------------------------------------------- **103**

  H.   MOTION FOR CHANGE OF VICINAGE -------------------------------------------------------------- *103*
      1. *Background* -------------------------------------------------------------------------------- *103*
      2. *Basis of District Court's Decision and Order* --------------------------------------------- *107*
      3. *Legal Standard* --------------------------------------------------------------------------- *108*
      4. *Venue publicity v. Vicinage Publicity* --------------------------------------------------- *109*
      5. *The administrative impact of holding trial in Buffalo compared to Rochester.* --------------------------------- *111*
  I.   MOTION(S) FOR SEVERANCE------------------------------------------------------------------------ *112*
      1. *Applicable Law* --------------------------------------------------------------------------- *113*
        a. Fed. R. Crim. P. 8 ------------------------------------------------------------------------- *113*
        b. Fed. R. Crim. P. 14------------------------------------------------------------------------ *115*
      2. *Improper Joinder of Offenses Under Rule 8* ----------------------------------------------- *117*
      3. *Undue Prejudice of Joinder of Offenses* ------------------------------------------------- *122*

**V. MOTIONS FOR OTHER NON-DISPOSITIVE RELIEF** ----------------------------------------------------- **126**

  J.   MOTION FOR PRESERVATION OF ROUGH NOTES AND OTHER EVIDENCE --------------------------------- *126*
  K.   MOTION FOR F.R.E. 404(B), 608 & 609 NOTICE AND EVIDENCE---------------------------------------- *127*
  L.   MOTION TO REVEAL IDENTITY OF INFORMANT(S)----------------------------------------------------- *127*
      1. *The Government is Obliged to Disclose the Identity and Whereabouts of Informants and to Make Them Available to the Defense* --------------------------------------------------------------------------- *129*
      2. *Upon a Proper Showing, the Defendant is Entitled to Pre-Trial Access to Prosecution Witnesses*---------- *133*
  M.   MOTION FOR LEAVE TO JOIN IN CO-DEFENDANT'S MOTIONS-------------------------------------------- *136*
  N.   MOTION FOR LEAVE TO MAKE OTHER PRETRIAL MOTIONS ------------------------------------------- *136*

**VI. CONCLUSION**----------------------------------------------------------------------------------------- **138**

# I. BACKGROUND

## A. EVENTS PRECEDING THE FILING OF CHARGES IN CASE NO. 23-CR-99

The Second Superseding Indictment in this case establishes that Counts 1-3 were developed from an investigation related to the prosecution in US v. Bongiovanni et al, case no. 19-cr-227. The indictment refers to case no. 19-cr-227 at least 26 times.

The background to case no. 23-cr-99 includes events that transpired prior to the filing of any charges in this case in this case as discussed below.

## 1. Quinn's Involvement in Case No. 19-cr-227 (Bongiovanni et al)

### a. Lead-up to the Government Targeting Quinn

Case no. 19-cr-227 commenced with the indictment of former DEA Special Agent Joseph Bongiovanni on October 31, 2019. Case no. 19-cr-227, Docket Item 1. Peter Gerace was charged in the Second Superseding Indictment in that case on February 25 2021, over four years ago. Case no. 19-cr-227, Docket Item 89.

The case was initially scheduled for trial at a status conference on November 30, 2022. At that time, Mr. Gerace had already been on home confinement for nearly two years, so District Court Judge Sinatra indicated that he would consider a motion to downgrade Mr. Gerace's electronic monitoring to curfew. Case No. 19-cr-227, Docket Item 363 at 21-22.

The defense filed a motion to modify the conditions of release. Case No. 19-cr-227, Docket Item 337. The government opposed. Case No. 19-cr-227, Docket Item 350 at 13.

Over the government's objection, Judge Sinatra issued a Modification Order on January 19, 2023, granting the portion of the defense's motion that sought a downgrade to a curfew. Case No. 19-cr-227, Docket Item 361.

Within days of Judge Sinatra granting the defense motion, the government targeted Peter Gerace's close friend, Crystal Quinn.[1]

*b. The Government Charges and "Flips" Crystal Quinn*

On January 24, 2023, only five days after the Court downgraded Mr. Gerace to curfew, the government served Ms. Quinn with a target letter. The subject of the target letter was an incident from November 19, 2019, over three years earlier.[2]

Agents served Ms. Quinn with the target letter at her home and proceeded to question her without counsel present. During questioning, Ms. Quinn provided information that contradicted the government's narrative regarding what occurred in November 2019. Case no. 23-mj-011, Docket Item 1.

On February 3, 2023, the government filed a Criminal Complaint against Crystal Quinn with three counts related to allegations from November 2019 of threatening and

---

[1] As discussed below, the targeting of Ms. Quinn, over two years after Mr. Gerace had been charged, was clearly the first step towards returning a new indictment to use as a mechanism to have Mr. Gerace detained months before his trial date.

[2] That incident had been the subject of multiple public proffers by the government, as far back as May 4, 2021. The government publicly proffered in May 2021 that they had "obtained search warrants for his Facebook account. There has been a witness that received threats through a Facebook account during a scenario where Mr. Gerace was present with the person who was -- we're still investigating it… that that occurred in or about November of 2019." Case No. 19-cr-227, Docket Item 118 at 6-7.

tampering with a witness. Case no. 23-mj-011, Docket Item 1.[3] Attorney Michael D'Amico was retained to represent Ms. Quinn and appeared with her at the initial appearance on February 8, 2023. *See* Case no. 23-mj-011, unnumbered Minute Entry filed February 8, 2023.

At the initial appearance, the Court granted the government's request to unseal the complaint. *Id*.

Now facing criminal prosecution, over the following few weeks, Ms. Quinn began to cooperate. The charges had served as sufficient leverage to get Ms. Quinn to change her original story and agree to the government's narrative. Shortly thereafter, the government agreed to dismissal of charges.

*c. The Government Publicly Reveals that it "Got" Ms. Quinn*

In March 2023, only three months before Mr. Gerace and Mr. Bongiovanni were scheduled to go to trial on case no. 19-cr-227, the government obtained a new indictment against Mr. Gerace related to the November 2019 incident involving Ms. Quinn. *See* case no. 23-cr-37.[4]

The government used the indictment as a vehicle to move for detention on March 24, 2023, despite United States Pretrial Services recommending Mr. Gerace's continued

---

[3] A copy of the complaint, without exhibits, is available on this docket at Docket Item 164-1.

[4] Even though the government had access to the Facebook messages from the November 2019 incident for approximately three years, they did not target Ms. Quinn and charge Mr. Gerace regarding the incident until after Judge Sinatra relaxed his conditions of release.

release.[5] During the detention hearing, the government spent a considerable amount of time proffering to allegations related to the November 2019 incident. The Government proffered that as of 2021, it had two witnesses who described the interaction in November 2019, and although the "initial information was similar in nature," in February or early March of 2023, the Government "got a third witness."[6] [3/24/23 Transcript at 38].

The government's public comments abandoned any secrecy as to Ms. Quinn's anticipated cooperation. Any member of the public or media could easily review the government's public comments in the context of the complaint filed against Ms. Quinn which had been unsealed in early February 2023, less than two months earlier.

The complaint against Ms. Quinn described the incident on November 19, 2019, involving Mr. Gerace and only three other people: (1)"VICTIM"; (2) "PERSON 1"; and (3) "QUINN." For example, Mr. Gerace and all three individuals were referenced in paragraph 26 of the complaint:

> VICTIM stated that after receiving the Facebook Messenger message from the account of PERSON 1, VICTIM researched PERSON l's account and determined, based on a picture

---

[5] Mr. Gerace's probation officer stated pretrial's position: "He is on GPS. He is monitored 24/7. We've done unannounced home contacts; unannounced work contacts; unannounced drug and alcohol tests. All have been negative. We view his maps daily, weekly, monthly, in terms of his GPS mapping. He was on home detention, and then he was switched over to curfew. Since he's been on curfew and even home detention, there's been no occasion of violations, where he's stepped out of the house or had any curfew violations. All tests have been negative, and he's followed all release conditions in terms -- as they've been set forth by this Court. So there has been no non-compliance on our end in terms of his supervision and following the rules set forth by Your Honor." [Case No. 19-cr-227, 3/24/23 Transcript at 46-47].

[6] The government did not tell Judge Sinatra that the third witness (Crystal Quinn) initially contradicted the information it obtained from one of the other witnesses but changed her story after being charged and would soon have her charges dismissed for changing her story to agree with the government's narrative.

posted in PERSON 1 's Facebook account, that PERSON 1 and QUINN were together at the time that the message from PERSON 1's account arrived in VICTIM's Facebook Messenger inbox. Moreover, based on the background of the picture depicting PERSON 1 and QUINN, VICTIM knew that PERSON 1 and QUINN were at P.G's home at the time VICTIM received the threats in her Facebook Messenger inbox. As described herein, VICTIM was a close associate of P.G., has been to P.G.'s home and thus was familiar with his residence.

Case no. 23-mj-00011-HKS, Dkt. # 1 at 12.

Thus, when the government proffered at the detention hearing in March 24, 2023, that it "got a third witness" related to the November incident, it was revealing that Ms. Quinn was cooperating along with the other two individuals referenced in the complaint.

*d. Gerace Had Reason to Believe that Quinn Would Provide Testimony Favorable to Him*

Mr. Gerace considered Ms. Quinn a friend and believed she would be helpful to his defense because she could impeach the credibility of many government witnesses and she could shed light on tactics the government used to secure her cooperation and pressure witnesses to cooperate with the government's narratives.

Ms. Quinn's initial statement to government agents contradicted the theory that the government sought to advance regarding what occurred in November 2019. The publicly available information provided in the complaint, drafted by a Federal agent, included the following allegations:

- I then specified an occasion when QUINN, [PERSON 1], and [P.G.] were in [P.G.]'s basement and threatening texts were sent to [VICTIM]. I observed QUINN smirk when I mentioned VICTIM's true name. (¶ 46)

- QUINN stated that she recalled this instance, which is detailed supra, and confirmed that she was with PERSON 1 and P.G. when the messages were sent to VICTIM. QUINN further stated that the messages were sent via Facebook messenger, and that *QUINN stated that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account*. (¶ 47)(emphasis added)

- Based upon the foregoing, this investigation establishes that QUINN's statement, namely, that the messages were sent via Facebook messenger, and that [PERSON 1] was the one who sent the messages to [VICTIM] using [PERSON 1's] Facebook Messenger account, is false, fraudulent, and fictitious. (¶ 48)

*See* Case no. 23-mj-00011-HKS, Dkt. # 1 at 17-18.

The defense for Mr. Gerace had an interest in calling Ms. Quinn as a witness, regardless of whether she cooperated with the government, because she made statements to the government agents that contradicted the government's narrative.

If her story changed after the government charged her, it would demonstrate the amount of pressure the government can put on individuals to testify consistent with a narrative the government itself provided to the witness.

Tragically, Ms. Quinn died from a drug overdose on or about July 31, 2023. The government subsequently attempted to tie her death to Mr. Gerace.

*e. The Reporting of Ms. Quinn's Death*

After Ms. Quinn died, the mother of Ms. Quinn spoke out, primarily blaming the government for her daughter's death in an interview with the Buffalo News and in affidavits provided to former counsel, Steven Cohen.

> "In my heart, I cannot believe she would commit suicide, but I know that is a possibility," said Sharon Quinn, who works as a clerk with the Depew Police. "Crystal was under *tremendous pressure, extreme pressure* from the FBI to testify. *They told her they would put her in prison if she didn't testify against Peter.* She was so scared that when somebody would knock on our front door, she would run out our back door and hide somewhere."
>
> Dan Herbeck, *Witness who died was under 'extreme pressure' to testify against strip club owner, her mom says*, Aug. 20, 2023, The Buffalo News (available at https://tinyurl.com/BN082023) (emphasis added).

The government has claimed that the mother of Ms. Quinn had her affidavits altered by Mr. Cohen.[7] *See* Dkt. # 24 at 26 ("On or about August 14, 2023, Gerace Attorney 1 made changes or caused changes to be made to the draft affidavits provided by Investigator 1. The changes made or caused to be made by Gerace Attorney 1 supported the narrative that Crystal Quinn had been suicidal prior to her death."). The government has consistently ignored the mother of Ms. Quinn's comments to a reporter at The Buffalo News.

---

[7] Discussions with Mr. Cohen's counsel reveal there is strong proof establishing these allegations to be false.

On September 6, 2023, just weeks after the Buffalo News article which featured comments from Ms. Quinn's mother accusing the government of using "extreme pressure," and coercion with threats of prison, the government moved for unprecedented relief of government-requested intradistrict transfer from Buffalo to Rochester. Case No 19-vr-227, Docket Item 619.

That motion was ultimately denied. Case No. 19-cr-227, Docket Item 663. Although the government did not convince the District Court to order intradistrict transfer, the backdrop to this entire case (*US v Gogolack et al*) is an investigation that was motivated to present a public rebuttal to allegations that the government was responsible for the Ms. Quinn's death.

The government repeatedly used detention hearings and other early court appearances and public filings for defendants in this case to sway public opinion. The government disseminated limited curated information starting in September 2023. Dan Herbeck, *Prosecutors say Wellsville man tampered with government witnesses*, Sept. 14, 2023, The Buffalo News (available at https://tinyurl.com/BN091423); see also Patrick Lakamp, *Pharaoh's witness overdosed on enough fentanyl to kill hundreds*, Nov. 3, 2023, The Buffalo News (available at https://tinyurl.com/BN110323).

In some instances, the information provided to the Courts and the public was inaccurate. *See e.g.* Letter from Joesph M. Tripi, Docket Item 34 (acknowledging inaccurate information during government detention proffer). Many of the allegations presented in

the early court appearance and submissions were presented at a time when the government had not provided discovery which prevented the defense from rebutting its claims on the record.

When the government moved for intradistrict transfer in Case No. 19-cr-227, the Editorial Board for the Buffalo News noted in regard to the coverage of *USA v Bongiovani et al*, "defense lawyers and anonymous sources made up a smidgen of that coverage, compared to the deluge of information mined from the government's public filings." Editorial Board, *Thanks for the compliment, feds – and the stories*, Sept. 12, 2023, The Buffalo News (available at https://tinyurl.com/BN091223).

2. Death of Quinn and the Investigation Targeting Gerace

In *USA v Bongiovanni et al*, the FBI investigated Joseph Bongiovanni, Peter Gerace, Jr. and others alongside other Federal law enforcement agencies. Much of the FBI's involvement in the investigation was documented under a specific Case ID: 58A-BF-3179872.

Almost immediately after Quinn's death was reported, the government decided to pursue an investigation regarding the death, and it categorically identified that investigation as being related to *USA v Bongiovanni et al* and Peter Gerace, Jr.

It was not until discovery was finally received in case no. 23-cr-99, that the defense learned information about the ongoing FBI investigation. At bate stamp 00010744, there is a FD-1057 that indicates that a "sub file" was created for the death investigation of

witness. The Case ID is listed as "58A-BF-3179872-DEATH QUINN," a subset of the CASE ID used in relation to *USA v Bongiovanni et al*.

On the FD-1057, to the right of the Case ID, the investigation was clearly identified as "PUBLIC CORRUPTION AND LCN RELATED." "Public Corruption" refers to charges that were pending against Mr. Bongiovanni and Mr. Gerace in case no. 19-cr-227 and "LCN" is the abbreviation for "La Cosa Nostra," a reference to Italian Organized Crime, to which the government has repeatedly claimed, without evidence, that Mr. Gerace is connected.

---

**58A-BF-3179872-DEATH_QUINN Serial 1**

FD-1057 (Rev. 5-8-10)

UNCLASSIFIED

**FEDERAL BUREAU OF INVESTIGATION**

Electronic Communication

**Title:** (U) Crystal Quinn Death Investigation          **Date:** 08/11/2023

**From:** BUFFALO
                BF-WC-1
                **Contact:** KAMMERAAD JASON ANDREW, 703-632-1000

**Approved By:** SSA ABRAMOWITZ ANDREW M

**Drafted By:** KAMMERAAD JASON ANDREW

**Case ID #:** 58A-BF-3179872-      (U) CRYSTAL QUINN; DEATH INVESTIGATION
                DEATH_QUINN          PUBLIC CORRUPTION AND LCN RELATED

**Synopsis:** (U) Federal witness, Crystal Quinn, in captioned case, died unexpectedly and under suspicious circumstances. The sub file will be utilized to maintain investigative efforts related to the death investigation.

**Details:**

Federal witness Crystal Quinn, in captioned case, died unexpectedly and under suspicious circumstances. The sub file will be utilized to maintain investigative efforts related to the death investigation.

---

The document was dated August 11, 2023, a week and a half after Ms. Quinn's death and almost a week before Mr. Gogolack was charged by criminal complaint. It was over a month before he was indicted and a District Court Judge was assigned.

The early investigation into Ms. Quinn's death focused on Mr. Gogolack. All FBI efforts to investigate Mr. Gogolack were tagged with the Case ID "58A-BF-3179872-DEATH QUINN," the file number used regarding the investigation for *Bongiovanni et al* and Peter Gerace, Jr.

In August 2023, before Mr. Gogolack was even charged by complaint, the government had conducted an interview of Mr. Gogolack following a coordinated state arrest, the government had seized his cell phone and had it delivered to the Regional Computer Forensic Laboratory for extraction, and it had sought a warrant to search Mr. Gogolack's residence. These investigative efforts were documented under the same case ID: 58A-BF-3179872-DEATH QUINN.[8]

---

[8] For example, when Mr. Gogolack's cell phone was seized and collected by Federal agents for extraction, an FBI Receipt of Property form referred to "Case ID: 58A-BF-3179872-QUINN." A 302 drafted on August 11, 2023, indicates that on August 7, 2023, Mr. Gogolack's cell phone was transported to Regional Computer Forensic Laboratory in order to extract the contents of the phones. That 302 was associated with "File # 58A-BF-3179872-DEATH QUINN." The Receipt of Property and the 302 were both provided in the delayed discovery in Case no. 23-cr-99.



**FEDERAL BUREAU OF INVESTIGATION**
**Receipt for Property**

Case ID: 58A-BF-3179872 – Quinn
On (date) 8-2-2023
Approx 10:30p

item (s) listed below were:
☒ Collected/Seized
☐ Received From
☐ Returned To
☐ Released To

The discovery shows that in August 2023, even before Mr. Gogolack was first charged, the government knew the FBI was pursuing the investigation against Mr. Gogolack as part of the investigation and under the same case ID associated with Mr. Gerace and *Bongiovanni et al*.

B.   Procedural History of This Case

1. The Filing of Charges Against Gogolack, Hinkle, Ermin and Others

Mr. Gogolack was charged by complaint on August 17, 2023, and initially appeared on August 23, 2023. Magistrate Judge Case Number ("Magistrate no.") 23-mj-01115-JJM, Docket Item 1, 4. Mr. Gogolack was detained on the government's motion. Magistrate no. 23-mj-01115-JJM, Docket Item 4.

Mr. Gogolack was indicted less than one month later on September 13, 2023. Docket Item 12. An arraignment and detention hearing were held on September 14, 2023. Docket Item 15.

The Magistrate Judge issued a Scheduling Order on September 15, 2023, that ordered "All voluntary discovery shall be completed by October 16, 2023." Docket Item 17 at 1.

Five days later, on September 20, 2023, a superseding indictment was filed against Mr. Gogolack. Docket Item 18. An arraignment on the superseding indictment was held on September 25, 2023. Docket Item 20.

Following the indictment of Mr. Gogolack, other individuals tied to the ongoing death investigation were charged by separate complaints, including: Howard Hinkle (Magistrate no. 23-mj-05219-MJR)[9]; Michael Roncone (Magistrate no. 23-mj-00168-HKS); Scott Barnes (Magistrate no. 23-mj-00166-HKS); and John Ermin (Magistrate no. 23-mj-00167-HKS).

## 2. The Second Superseding Indictment Consolidates the Pending Cases

On January 5, 2024, a Second Superseding Indictment was filed against Mr. Gogolack, which, for the first time, included Mr. Gerace along with all of the defendants listed above. Docket Item 24.

At the arraignment for Mr. Gerace on January 10, 2024, counsel appeared provisionally, and although not yet retained or appointed on this case, counsel made a request for initial discovery disclosure. Docket Item 46 at 13-14.

The government opposed any disclosure until the issue of whether Mr. Gerace would retain counsel or counsel would be assigned was resolved, claiming that providing immediate discovery would somehow "build[] delay into this case." Docket Item 46 at 14.

---

[9] Howard Hinkle was also charged with Dillon Anderson who has since had his charges dismissed. *See* Magistrate no. 23-mj-05219-MJR, Docket Item 20

The government made no comment about how long the discovery process would take, or that hard drives would have to be provided by the defendants, or that it would be seeking a protective order at some point.

A status conference was set for January 31, 2024.

At that status conference, counsel for Mr. Gogolack, who was charged five months earlier, made a detailed request regarding the need for a discovery deadline:

> Mr. Gogolack has been on the complaint since August. We don't have basic discovery in the case.
>
> I know the Government has made several representations at various detention hearings about discovery that they have, but we're in a position where we're unable to evaluate any of that because we don't have it, Judge.
>
> So I'd ask that you set a discovery deadline before you set any other scheduling order and we can come back at a status conference at some point in the future and set motions deadlines, but I would ask for a discovery deadline first.
>
> Dkt. 66 at 30.

Even though by January 31, 2024, 26 days had already passed since the filing of the indictment, and 167 days had passed since Mr. Gogolack was initially charged, the government opposed setting a discovery deadline unless the Court was also going to set a deadline for motions, even though there was no explanation for why those two deadlines would need to be set at the same time. Docket Item 66 at 30-31.

A further status conference was set for February 23, 2024.

3. The Discovery Scheduling Order

On February 23, 2024, 49 days after the filing of the second superseding indictment, the Court held a status conference. The government had still not provided a single page or a single byte of discovery other than the minimal material provided to some defendants in conjunction with detention hearings.

At the status conference, the Court proposed that a discovery deadline be set. Feb. 23, 2024 Transcript at 3. The Court proposed a generous 60-day deadline.[10] Feb. 23, 2024 Transcript at 6.

In response to this Court's suggestion, the government asked for 90 days. It provided two reasons for its request.

> The first reason is this case involves a significant amount of discoverable material. It's a significant undertaking. *There's an agent from the FBI who has been essentially exclusively assigned to that task,* but the resources that that requires are significant. And so as opposed to setting a shorter deadline and rushing things for lack of a better word, I'd ask that we set 90 days and allow a thorough review and production of discovery.
>
> The other reason is as the Court indicated, it would be helpful to have a final determination regarding this death penalty issue before we all come back and before motion practice begins, and I think kicking this out 90 days versus 60 days errs on the side of caution with respect to that determination.
>
> Feb. 23, 2024 Transcript at 6-7 (emphasis added).

---

[10] A 60-day deadline would have resulted in a deadline set 109 days after the filing of the second superseding indictment.

In regard to the volume of discovery, to the extent that there was "an agent from the FBI who has been essentially exclusively assigned to that," presumably since charges were first filed in August 2023, 60 days should have been more than sufficient, but nonetheless the government asked for 90. The government referred to it as "an additional 30-day cushion." Feb. 23, 2024 Transcript at 7-9.

Counsel for Mr. Gerace acknowledged that he had no way of knowing what the volume of discovery was, so he could not really argue in opposition to the lengthy timeframe requested by the government.

> I think we're all in a position where we somewhat have to defer to the Government in terms of how long it will take them to produce discovery, but I would note… I've had a number of mega cases where discovery could be produced in 30 to 60 days… obviously almost all of the defendants are in custody. I have concerns about the length of that type of adjournment, but um, given the fact that the Government is the only entity at this point that can describe the volume of discovery and they're saying they need 90 days, um, I don't know that there's much I can do to rebut that.

> Feb. 23, 2024 Transcript at 8-9.

Despite the fact that counsel did not, at that time, question the government's representation that 90 days would be necessary, nor did counsel oppose the request based on the fact that it had no indication as to what the actual volume of discovery is, the government nonetheless felt compelled to respond.

> [I]t's perplexing to hear that counsel has concerns regarding speedy trial when we've had I think three separate status

conferences where counsel hasn't wanted to set a scheduling order in place. To come today and say, hey, that's too long to ask for is contrary to the arguments that have been raised that the arraignment, the status conference after the arraignment. It's inconsistent with arguments previously raised that the Court shouldn't set a scheduling order. So I don't understand.

Feb. 23, 2024 Transcript 9-10

Counsel replied:

Judge, just -- I don't want to have it turned into a back and forth, but I do want to correct the record. At the arraignment, I asked for discovery. I said I think we should put a scheduling order in place. I indicated that I would be a proponent of split -- bifurcating non dispositive and dispositive motions. I specifically said to the Court if we start getting discovery, it can inform us on the size of the case. So that was an application I made.

I believe the Government's response was they thought that would build in delay in some manner. So I just want that to be clear, and obviously, this is an investigation that took place over several months. There is a period of time that precedes the charges where the discovery could be prepared in anticipation of an indictment. Again, I'm not opposing the 90 days. The Government is in the position to say that the volume is that high. My point is merely that defendants are in custody. That's a consideration, and it informs on other considerations the Court has.

Feb. 23, 2024 Transcript 10-11.

Counsel for Mr. Ermin also added "whatever time the Government needs to get us the complete discovery obviously would help us, but the implication that somehow

20

we are here today as a result of delays from defendants is I think inappropriate." Feb. 23, 2024 Transcript at 11.

Ultimately, the Court agreed to grant the extensive 90-day deadline, but it specifically indicated that to the extent possible, the discovery should "be produced sooner than that date" and it should be produced "[o]n a rolling basis so that people can hit the ground running in terms of what they think they need to do." Feb. 23, 2024 Transcript at 12.

This direction by the Court followed an earlier colloquy, where the Court asked if it was possible to do "rolling production during the 90 day period" and the government responded: "I certainly think so, Judge. I think that *there's material that is probably close to ready to go out at this point* because we've obviously been working on it since the return of the indictment." Feb. 23, 2024 Transcript at 10 (emphasis added).

The deadline for discovery was set for May 23, 2024, and a status conference was set for June 3, 2024. Transcript at 12-13.

The Government moved for an exclusion of time. Feb. 23, 2024 Transcript at 16-17. Based on the understanding the government would provide rolling discovery and complete disclosure by May 23, 2024, the Court issued an exclusion of time. See Docket Item 73 ("After some discussion, the court sets a 90-day deadline and sets a follow-up status conference for 6/3/2024 at 2:00 PM to discuss motion schedules. The court directs the government to provide discovery on a rolling basis, to extent possible.").

At no point during the conference did the government state that it intended to seek a protective order or that the defendants would need to provide hard drives at any point in order to receive discovery.

## 4. Requests for Second Counsel

At a status conference on March 8, 2024, Mr. Foti made the request for a second attorney to be appointed to Mr. Gerace. Docket Item 355 at 36-37. Mr. Foti noted that the request was complicated by the fact that the government had moved to disqualify Mr. Gerace's other attorney, Eric Soehnlein, in case no. 19-cr-227.

The Court did not rule on the request for second CJA counsel to be appointed. The Court indicated that it was not going to decide that issue at that time: "I'm not granting that today nor am I denying. I'm just not deciding it." Docket Item 355 at 37.

Since that time, this case has been categorically identified as a mega case by the Circuit and the District. Mr. Hinkle, for example, was appointed a second attorney, Daniel Henry, to represent him. Regardless of whether Mr. Henry's initial appointment was made to serve as learned counsel, his representation was continued pursuant to a non-capital (mega case) budget approved by the Second Circuit's case budgeting attorney and the District Court.

The request for second counsel remained pending while the parties litigated sanctions against the government for violating the Court's Discovery Order, set at the February 23, 2024, status conference.

5. The Violation of the Court's Discovery Order

At no point during the 90 days that followed the February 23, 2024, status conference, did the government provide discovery. Nor did the government move for an extension of the discovery deadline.

For the first time, on May 20, 2024, the government advised defense counsel it would need a hard drive from each of the defendants in order to provide discovery. The government indicated the copying of discovery "upload may take 2-3 days to complete."

The government stated it needed a hard drive containing space for up to 3 terabytes of data. Over the next week and a half, most of the attorneys obtained hard drives and had the drives sent or delivered to the government. None of the defense attorneys received a hard drive back regardless of how quickly each attorney was able to purchase the drive and deliver it to the government.

Instead, on May 29, 2024, for the first time, the government sent an email stating that it would withhold discovery until a "protective order is authorized by the Court." The government's email attached a 5-page proposed protective order.

Days later, at the status conference on June 3, 2024, the government seemed to suggest that the delay regarding the disclosure of discovery was somehow the responsibility of the defense. After the Court established a timeline, including that the government did not request a protective order until over a week after the discovery deadline had already expired, it inquired about the reason for the delay.

The government did not offer much in terms of an explanation for the delay, but it seemingly admitted that part of the reason discovery had not been prepared was because the trial team was engaged in the first trial of Mr. Bongiovanni in *US v Bongiovanni et al*. The government indicated it would release the discovery if a temporary protective order was issued indicating that the discovery could be viewed by "attorney's eyes only," which the defendants reluctantly agreed to.

The government then moved for an exclusion of Speedy Trial time. Because the government failed to produce discovery as directed by the Court and because that delay had prevented the parties from reviewing discovery in advance of the court date, the Court denied the request for an exclusion of time in the interest of justice. See Text Order at Docket Item 122 ("For the reasons set forth by defendants' counsel on the record, I deny the government's request to enter a further exclusion of time from the Speedy Trial Act calendar pursuant to 18 U.S.C. Sections 3161(h)(7)(A) and (h)(7)(B)(iv). As of today, time if no longer excluded from the Speedy Trial Act calendar.")

### 6. The Government's Motion for Reconsideration of the Court's Decision to Deny an Exclusion of Time in the Interest of Justice

On June 5, 2024, just two days after the status conference in which the Court denied the Speedy Trial exclusion, the government filed another motion for an exclusion of time from June 5, 2024, to June 27, 2024.

The motion was for an exclusion of time almost identical to the exclusion requested at the June 3, 2024, status conference which had been denied by the Court. The mere filing of the motion was clearly an attempt to circumvent the Court's ruling by stopping the Speedy Trial clock while the motion was pending.

## 7. Sanctions Litigation

*a. Defendants Move for Sanctions Based on the Government's Violation of the Court's Order*

On June 10, 2024, the defense for Mr. Gogolack and Mr. Gerace moved for a hearing and the imposition of sanctions due to the government's disregard of this court's discovery order. Docket Item 131, 132. Other defendants joined. *See e.g.* Docket Item 135, 137, 140.

The defense for Mr. Gerace argued:

> The government's clearly demonstrated a complete disregard for the Court's Order in multiple respects: (1) the government did not provide rolling discovery at any point during the extensive 90 days afforded to the government to complete discovery production; (2) the government did not request an extension of time to provide discovery after the court-ordered deadline; and (3) the government continued to withhold discovery after the discovery deadline had expired while it raised the issue of a protective order for the very first time.
>
> …
>
> The US Attorney's Office had multiple other AUSAs enter appearances on this case, presumably to assist in managing the case while the trial team was engaged in trial. Those AUSAs were not engaged in the Bongiovanni trial, and there has been no explanation for why they could not oversee the disclosure of rolling discovery.

…

> Finally, in addition to the additional AUSAs who had appeared in this case, there were a team of other individuals involved in the discovery process apparently including a dedicated FBI agent, a Litigation Specialist, and other US Attorney staff.
>
> This team of individuals should have been capable of ensuring that rolling discovery was provided for, and that the discovery deadline was met. The failure to do so is consistent with a lack of supervision by the US Attorney's Office and a disregard for this Court's discovery Order.
>
> Docket Item 132-1 at 26-28.

The defendants requested a hearing to address what appeared to, at best, be gross misconduct or, at worse, strategic delay by the government.[11]

*b. Defense for Gerace Responds to the Government's Motion for an Exclusion of Time*

The requests for a hearing and sanctions were further addressed in the Mr. Gerace's response to the government's motion to exclude time:

> The motion should be denied, but not without first holding a hearing, to resolve issues of fact surrounding the government's failure to produce rolling discovery at any time during the 90 days following the February 23, 2024, status conference, the government's failure to provide discovery by the May 23, 2024, deadline, and the government's failure to propose a protective order until after expiration of the

---

[11] Notably, the government's trial team was clearly stretched thin with the Bongiovanni trials. The delay would give the trial team additional time before the filing of defense motions in this case. Moreover, most defendants were detained after the government aggressively pursued motions for detention. Longer periods of incarceration strategically benefit the government's efforts to pressure defendants into plea agreements including cooperation provisions.

discovery deadline despite its intention to withhold discovery until one had been issued.

Docket Item 148 at 22.

The defense further noted that "after the conclusion of the evidence presented at that hearing, the Court should not only deny the government's motion, but consider sanctions against the government for bringing this motion as a means of circumventing this Court's decision to deny the exclusion of time." Docket Item 148 at 27-28.

*c. The Imposition of Sanctions*

After having fully considered the facts pertaining to the government's willful violation of the Court's Order regarding discovery, the Court issued a Decision and Order, dated July 29, 2024, finding the government acted in bad faith. Docket Item 173 at 5 ("although I had unequivocally ordered production of voluntary discovery by May 23, 2024, the government deliberately decided not to comply with that order… The government's willful violation of my order constitutes bad faith.").

The government filed a Motion to Reconsider which was denied in a Decision and Order, dated August 23, 2024, in which the Court imposed specific sanctions, including: (1) disqualification of the trial team initially assigned to prosecute this case; (2) preclusion of the government providing further argument regarding a protective order; and (3) identifying three months of delay for purposes of constitutional speedy trial. Docket Item 200.

The government brought an appeal of that Order, arguing for the imposition of a less significant sanction. Docket Item 230 at 43.

The District Court did ultimately vacate the imposed sanctions in favor of what might be considered less impactful sanctions, but "it can see why Judge McCarthy did what he did. And the consequence of that—which was a direct result of the government's actions— was a five-month period of delay." Docket Item 310 at 16.

The District Court noted its sanction "may not be perfect, but in light of all the circumstances, this Court finds it is the best solution available at this time." *Id*. at 17. In a footnote immediately following that comment, the Court specified that "[t]his decision and order is without prejudice to the defendants' arguing that the government should be precluded from using certain evidence as a sanction." *Id*. at fn 10.

Notably, the District Court did not make any findings regarding other issues raised by the defense, including: the government's effort to circumvent the Court's denial of a statutory exclusion of speedy trial time; prosecutorial steering (judge shopping); false information in the indictment; or any other issue warranting sanctions.

> The defendants urge this Court to go beyond reviewing the findings that Judge McCarthy made in his two decisions on sanctions and to review the entire history of this case. This Court thinks that is beyond the scope of this appeal and confines its review to Judge McCarthy's findings on bad faith and sanctions.
>
> Docket Item 310 at 10, fn 6.

Not long after the District Court rendered its Decision and Order regarding sanctions, a scheduling order was set for pretrial motions. Docket Item 313.

8. The February 5, 2025, DOJ Memorandum

Before motions were due under the Amended Scheduling Order[12], on February 5, 2025, the Attorney General (AG) issued a memorandum to all DOJ employees implementing Executive Order 14164 entitled "Restoring the Death Penalty and Protecting Public Safety." The memorandum directs that all prior no-seek decisions are to be reevaluated by the AG's Capital Review Committee, which will make a fresh determination concerning whether to pursue capital prosecution, including a determination of whether additional, not-currently-charged capital offenses should be added.  This review is to be completed within 4 months, or in other words, by June 5, 2025.

This case was the subject of an earlier "No Seek" decision during the Biden Administration, and thus, the case would be subject to "a fresh determination concerning whether to pursue capital prosecution, including a determination of whether additional, not-currently-charged capital offenses should be added."

A status conference was held on February 10, 2025, where the appointment of learned counsel and capital resources was discussed. Docket Item 355 at 48. The

---

[12] The defendants had requested one adjournment of the motion scheduling order for approximately 30 days. Docket Item 340, 346. The Court granted the request and issued the Amended Scheduling Order. Docket Item 345.

government opposed the appointment of capital resources, but acknowledged that "if the Court wants, it can—it always has the right to assign two attorneys and that—that would be up to you." Docket Item 355 at 53.

As the discussion continued, the defense for Mr. Gerace and Mr. Ermin revisited the earlier motions to have second counsel appointed based on the size and complexity of the case, and requested that the Court appoint second counsel based on mega case status, but select counsel who would qualify as Learned Counsel to assist in navigating the review process for the prior No Seek decision.

In other words, it was requested that Mr. Gerace and Mr. Ermin receive the same benefit of two attorneys that Mr. Gogolack was receiving through his representation by the Federal Defender's office or that Mr. Hinkle was receiving based on a non-capital (mega case) budget approved by the Circuit's case budgeting attorney and the District Court in this case.

The Court determined that it was appropriate to appoint second counsel to Mr. Gerace and Mr. Ermin.

The government moved for reconsideration (Docket Item 355) even though it has had *nine* different government attorneys enter appearances on the docket in a 13-month span, and at least six have actively made arguments in court or filed submissions during that timeframe. The government should not have standing to even weigh in on

appointment of counsel,[13] but nonetheless, the government's motion is still pending at this time.

In the meantime, the defendant's appointed attorneys have worked together to prepare the non-dispositive pretrial motions, below, which demonstrate the complexity of the case and the need to provide each defendant with two attorneys in addition to the relief requested below.

## II. MOTIONS REGARDING THE INDICTMENT

### A. Motion for a Bill of Particulars

The Federal Rules of Criminal Procedure provide in pertinent part that: "[t]he court may direct the government to provide a bill of particulars. The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits." Fed. R. Crim. P. 7(f).

Rule 7(f) allows the defense to seek a bill of particulars to identify with sufficient particularity the nature of the charges pending against him so that he can adequately prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should

---

[13] In the defendants' Response, it noted "[t]he CJA Guidelines make clear that the government has no role in the determination of defense funding under the Criminal Justice Act and this Court's discretion regarding who does, or does not, represent any defendant in any case. See 18 U.S.C. § 3006A(e)(1); see also Guide to Judiciary Policy, Vol. 7, Part A ("CJA Guidelines"), § 310.30(a)" and "an application for the appointment of additional counsel, as opposed to primary or first counsel, is considered an "other service[] necessary to adequate representation," CJA Guidelines § 310.10.10, and the application is made under 18 U.S.C. § 3006A(e), see CJA Guidelines § 310.30 (Ex Parte Applications)." Docket Item 360 at 16-17.

he be prosecuted a second time for the same offense. *United States v. Pirk*, 282 F.Supp.3d 578, 580 (W.D.N.Y. 2017) (*quoting United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)).

A bill of particulars serves to amplify the pleading—i.e. the indictment—and accordingly, the government will be "strictly limited to proving what it has set forth in it." *Id*. (*quoting United States v. Germain*, 33 F. App'x 5645, 566 (2d Cir. 2002)). A bill of particulars is required only where the charges of the indictment are "so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Benventre*, 646 F. App'x 73, 79 (2d Cir. 2016) (*quoting United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004).

When considering a motion for a bill of particulars, the Court may consider factors such as: (1) the complexity of the charges; (2) the clarity and level of detail in the indictment; and (3) the degree of discovery available to the defendant. *United States v. Shoher*, 555 F. Supp. 346, 349 (S.D.N.Y. 1983).

Generally, if the information the defendant seeks is provided in the indictment or in some acceptable alternate form, a bill of particulars is not required. *United States v. D'Amico*, 734 F. Supp.2d 321, 335 (S.D.N.Y. 2010) (*quoting Bortnovsky*, 820 F2d at 572).

Ultimately, the test is whether the information sought is necessary to the defense—not whether it is helpful or useful. *See United States v. Cobb*, 555 F. Supp.3d 4, 8 (W.D.N.Y. 2021) (*quoting Mitlof*, 165 F. Supp.2d at 569).

The defense request here is not made because additional factual information would simply be helpful; rather, it is made because it is necessary to determine issues of potential double jeopardy and to understand the nature of the crimes alleged against the defendants and determine whether they are legally sufficient. The granting of a bill of particulars rests within the sound discretion of the Court. *United States v. Panza*, 1141, 1148 (2d Cir. 1984).

The first three counts of the Second Superseding Indictment charge obstruction, witness tampering and witness retaliation all pertaining to acts allegedly intended to prevent Ms. Quinn from testifying in the grand jury or retaliating against her for cooperating with federal law enforcement.

Count 1, Obstruction, is preceded by an "Introduction" [pp.2-8] alleging:

- Gerace owned Pharoahs Gentleman's Club (PGC);

- that he employed co-defendant Ermin to manage the club;

- that Ermin is the national president of the Outlaws M.C.;

- the Outlaws M.C. is a violent 1% club;

- Gerace was charged in two other federal cases that were joined for trial in 2024 (he has since been convicted in 19-cr-227 of sex trafficking and narcotics offenses at PGC; and in 23-cr-27 with witness tampering and distribution of cocaine);

- 19-cr-227 involved Gerace's employment of Outlaws M.C. members at PGC;

- Crystal Quinn was a former PGC employee, friend and cleaning lady for Gerace and she was associated with members of the Outlaws M.C.;

- On February 3, 2023 Crystal Quinn was charged by Criminal Complaint (23-MJ-11 ) for sending Facebook messages to threaten a witness against Gerace. A copy of the Second Superseding Indictment in 19-cr-227 was attached to Quinn's complaint;

- On February 16, 2023 Quinn attended a proffer with FBI agents and provided information about Gerace;

- On February 27, 2023 and March 7, 2023, Quinn attended proffers and provided the FBI with information about Gerace and the Outlaws M.C.;

- On March 9, 2023 Quinn testified in the grand jury which returned an indictment on March 23, 2023 in 23-cr-37 against Gerace for witness tampering and distribution of cocaine;

- On March 24, 2023 Gerace was arraigned on 23-cr-37 and ordered detained after hearings on March 24th and 27th;

- On April 3, 2023, Quinn entered into a pretrial diversion agreement and formal cooperation agreement with the U.S. Attorney's Office  which required her to cooperate in Gerace's then-pending cases. Pursuant to the pretrial diversion agreement she was supervised by the U.S. Probation Office  and the criminal complaint against her was dismissed by the U.S. Attorney's office on April 6, 2023;

- On May 10, 2023 the U.S.Attorney's office filed its witness list under seal pursuant to a protective order in 19-cr-227 and 23-cr-27 which were joined for trial. Crystal Quinn was listed as a government witness ;

- On May 31, 2023, the Court denied Gerace's May 24, 2023 motion to re-open his detention hearing and he remained in custody;

- Gerace Attorney 1  represented him from June 15, 2021 – September 6, 2023 on 19-cr-227 & 23-cr-27. Attorney 2 who testified in the grand jury was an "unwitting attorney that Gerace Attorney 1 used to send messages to Crystal Quinn in February 2023 ;

- The Rare Breed M.C. is a support club of the Outlaws M.C. and "has a relationhip with Gerace and PGC";

- Outlaws and Rare Breed have congregated at PGC and PGC has sponsored events including the R.B.M.C. "Blues Cruise"; and

- Roncone, Knight Gogolack and Hinkle are associated with the R.B.M.C. Gogolack knew Crystal Quinn from growing up with her in Depew, New York. Roncone hosted a weekly Thursday night poker game at the RBMC until the clubhouse was destroyed by fire; thereafter Hinkle hosted it at the Wellsville Fire Hall.

### 1. Count 1

Count 1 alleges defendant Mr. Gerace, Mr. Ermin, Mr. Roncone, Mr. Knight, Mr. Hinkle and Mr. Gogolack conspired to obstruct justice [18 U.S.C. 371, 1503].

Paragraphs 3-5 outline the "manner and means" of the conspiracy pursuant to 18 U.S.C. §1503 and include allegations that defendants carried out the conspiracy to keep Quinn from testifying against Gerace by, inter alia,

- Causing Attorney 2 to text Quinn while she was represented by another attorney  to prevent her from testifying against Gerace;

- Causing dead rats to be placed at Quinn's residence;

- Causing motorcycle club members/associates to threaten her; and

- Concealing the relationship between Gerace, Ermin, O.M.C. and R.B.M.C. to prevent information from being presented to the July 2023 grand jury.

 "It was part of the conspiracy that Gerace Attorney 1 would make efforts to prevent Crystal Quinn from becoming a government witness" [¶6].

The indictment does not state whether the government claims Attorney 1 is an unindicted co-conspirator for purposes of the co-conspirator exception to the hearsay rule.

Courts consider the following factors when determining whether the government should be required to provide a defendant with the names of unindicted co-conspirators: (1) the number of co-conspirators; (2) the duration or breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice or bill of particulars; (4) the volume of pretrial disclosure; (5)the potential danger to co-conspirators and the nature of the alleged criminal conduct; (6) the potential harm to the government's investigation. *United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000).

Here, the defense should be informed of whether the government considers Attorney 1, his investigator, and Attorney 2 to be unindicted co-conspirators. If the government intends to call them as witnesses or if the substance of any statements attributable to those individuals are introduced through another witness(es), there are co-conspirator hearsay issues, issues regarding attorney-client privilege, and other admissibility issues that will need to be litigated prior to trial.

For example, if the government's allegations are based on protected attorney-client communications with Mr. Gerace (as opposed to other defendants' communications with Attorney 1), there would be issues regarding the government's obtaining and use of such communications.

The government should identify whether Attorney 1, his investigator, and Attorney 2 are considered unindicted co-conspirators through a bill of particulars. *See United States v. Santiago*, 174 F. Supp.2d 16, 34-37 (S.D.N.Y. 2001) (court granted a

"narrowly tailored" bill of particulars where defendant charged in only one count of a multi-count indictment which provided "sparse details" of defendant's role in the conspiracy and did not name his unindicted co-conspirators).

The indictment does not state what "efforts" Attorney 1 made on Gerace's behalf.

The indictment does not state whether Gerace communicated with Attorney 1 or instructed him during the course of Attorney 1's representation of him to make such efforts.

Therefore, the defense requests that the government be required to provide specific information about whether Attorney 1 undertook efforts to prevent Quinn from testifying on his own as part of his strategy for representing Gerace and whether the basis of the government's allegation is that Gerace instructed or communicated with Attorney 1 about Quinn.

The government also alleged Mr. Gerace engaged in non-criminal activities in connection with his pending cases including advising others of the witnesses who were expected to testify against him [¶7] although not accusing him of violating a protective order in that regard; meeting with Mr. Ermin to discuss and monitor developments in Gerace's case [¶8]; along with Mr. Gogolack, Mr. Knight, and Attorney 1 to advance a "false public narrative" that Quinn was suicidal .

Paragraphs 17-107 allege specific "Overt Acts" in furtherance of the conspiracy.

With respect to acts undertaken by Mr. Gerace, the indictment alleges:

- On April 4, 2023, while Gerace was detained at the Niagara County Jail, Ermin came to visit him [¶19]

- After his motion to re-open his detention hearing was denied on May 31, 2023, Gerace made statements (1) Fuck the rats; 2) all rats should die; (iii) no matter what, anybody can get touched because when all this is over I have very serious people to tie up my loose ends [¶21]

- On July 6, 2023 Ermin again visited Gerace in the Niagara County jail [¶29]

With respect to Mr. Gerace, the indictment alleges various acts undertaken by his

attorney including:

- On February 16, 2023 Gerace Attorney 1, knowing that Quinn was represented by counsel, caused Attorney 2 to offer to represent Quinn because Attorney 1 "was concerned that the feds might be trying to intimidate [Crystal Quinn] or even just bring [Crystal Quinn] in for questioning" [¶17]

- On May 24, 2023, Attorney 1 moved to re-open Gerace's detention hearing [¶21]

- On June 20, 2023, Attorney 1 filed a trial witness list that named two relatives of the assigned District Judge as Gerace defense witnesses. This resulted in the trial being adjourned and the District Judge recusing himself. The witness list also identified Quinn as a defense witness. By doing so the Attorney "circumvented the provisions of a protective order which prohibited attorneys for Gerace from revealing to Gerace the government's witnesses' names and from providing Gerace with the government's witness list"

- Attorney 1 was not available in September 2023 when the new district judge wanted to schedule trial so it was postponed until October 2023.

- On August 11, 2023 Attorney 1's investigator was instructed by him to interview Crystal Quinn's mother and friend to obtain statements that would advance a narrative that Quinn died of suicide . Both her mother and a friend denied Quinn was suicidal [¶¶76-77]

- On August 14, 2023, the investigator drafted affidavits drawn from the interviews and gave them to Attorney 1. Attorney 1 edited the affidavits to

reflect that Quinn had been suicidal [¶¶78-80]. Thereafter Attorney 1 caused Quinn's mother and friend to sign the affidavits which contained statements they never made . Attorney 1 then prepared an affidavit which contained false statements about his relationship with Investigator 1 and the manner in which the statements were obtained.

- On August 15, 2023, Attorney 1 filed his affidavit and those of Quinn's mother and friend as part of Gerace's motion to be released from custody [¶81]

Beginning on July 22, 2023, Mr. Gogolack, Mr. Knight, and Mr. Hinkle engaged in various communications and Mr. Gogolack contacted Mr. Quinn [¶¶30-36]

On Thursday, July 27, 2023, Ms. Quinn drove Mr. Gogolack from Depew to Wellsville using her mother's car and attended the R.B.M.C. poker game at Wellsville Fire Hall after which they went to Mr. Hinkle's nearby cabin [¶¶37-44]

On July 28, 2023, Ms. Quinn went to Mr. Gogolack's residence at 296 Scott Avenue in Wellsville. He walked over to Mr. Knight's residence and while he was gone Ms. Quinn was confronted by "bikers" who threatened her. Mr. Gogolack returned and told Ms. Quinn he would protect her. On July 31, 2023, Mr. Gogolack "intentionally provided Ms. Quinn with a lethal dose of fentanyl" [¶¶45-47]

Paragraphs 48-75 allege various actions by Mr. Knight, Mr. Hinkle and Mr. Gogolack intended to conceal the manner of Ms. Quinn's death.

Paragraphs 82-107 allege various communications between Mr. Ermin, Mr. Gogolack, Mr. Roncone and Mr. Knight.

*a. Double Jeopardy*

The defendants requests a bill of particulars as to Count 1 based on the incorporation of facts from 19-cr-227 (sex trafficking and narcotics offenses at PGC) and in 23-cr-27 (witness tampering and distribution of cocaine).

Because the indictment specifically references Mr. Gerace's involvement in those two cases, the defense requests notice from the government of what specific facts or evidence from those cases it would intend to introduce in its case-in-chief in this case.

A bill of particulars is necessary because such evidence raises double jeopardy concerns. Mr. Gerace has already been tried and convicted of federal crimes charged in those cases.

*b. Legal Sufficiency*

A bill of particulars is "a more specific expression of the activities the defendant is accused of having engaged in which are illegal." *United Sates v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991)

The instant indictment is limited to February 2023 - August 1, 2023.

A bill of particulars is necessary because Count 1 does not specify a single illegal act that Mr. Gerace, Mr. Ermin, or Mr. Hinkle undertook in furtherance of the conspiracy in 23-cr-99.

Although the indictment is rife with allegations that defendants spoke to each other at various times, it is void of information regarding the content of those

communications and how/why those communications could be perceived as being made in furtherance of a conspiracy.

The indictment is devoid of any facts regarding how Mr. Ermin, Mr. Gerace, or Mr. Hinkle allegedly participated in the conspiracy. It does not contain any statement(s) attributed to any of these individuals commanding, procuring, ordering, requesting or otherwise indicating his intent to join a conspiracy to kill, assault, or threaten Ms. Quinn or to prevent her from testifying or cooperating with law enforcement.

In its current form the indictment fails to allege how Mr. Ermin, Mr. Gerace, or Mr. Hinkle committed a crime. It is unknown whether this can be cured by the provision of a bill of particulars but the defense is requesting one to determine whether a motion to dismiss the indictment should be filed on legal sufficiency grounds.

## 2. Count 2

Count 2 charges a witness tampering conspiracy in violation of 18 U.S.C. §1512(k). It alleges a time frame of March 2023 through August 1, 2023 (Quinn's death) and adopts the allegations in the "Introduction" and Count 1.

Count 2 is both duplicitous and multiplictous.

*a. Duplicity*

Count 2 is also duplicitous. It specifically incorporates the entirety of the allegations contained in the "Introduction" section, as well as the entirety of Count 1, including all of the "Overt Acts" purportedly undertaken by Mr. Gerace.

By doing so, Count 2 (and Count 3 which is similarly worded) is duplicitous because the same charges are alleged in separate counts.

Specifically, Count 2 alleges in five subparts

- defendants intended to kill Crystal Quinn to prevent her from testifying in 19-cr-227 and 23-cr-37 and to prevent her from communicating with law enforcement [subparagraph a; §§1512(a)1) and 1512(j)];

- to use physical force to prevent her from testifying in 19-cr-227 and 23-cr-37 and to prevent her from communicating with law enforcement [subparagraph b; §§1512(a)(2) and 1512(j)];

- to intimidate, threaten or corruptly persuade and prevent her from testifying in 19-cr-227 and 23-cr-37 [subparagraph c; §§1512(b)(1) and 1512(j)];

- to intimidate, threaten and corruptly persuade her to withhold testimony in 19-cr-227 and 23-cr-37 [subparagraph d; §§1512(b)(2)(a) and 1512(j)]; and

- to intimidate, threaten and corruptly persuade her and prevent her from communicating with law enforcement [subparagraph e; §§1512(b)(3)].

*a. Multiplicity*

Count 2 is multiplicitous as it charges more than one crime in a single count. The defense reserves the right to move to dismiss one or more of the subparts either before or after trial, and once discovery is completed.

3. Count 3

Count 3 charges a witness retaliation conspiracy in violation of 18 U.S.C. 1513(f). It adopts the allegations in the "Introduction" and Count 1 and alleges a time frame of March 2023 through August 1, 2023 (Quinn's death).

Count 3 contains 3 subparts which allege the defendants conspired to:

- kill Crystal Quinn to retaliate against her for testifying in the grand jury in 23-cr-37 [18 U.S.C. §1513(a)(1)(A);

- kill Crystal Quinn to retaliate against her for providing information to law enforcement [18 U.S.C. §1513(a)(1)(B); and

- knowingly causing bodily injury to Crystal Quinn to retaliate against her for testifying in the grand jury in 23-cr-37 and for providing information relating to law enforcement.

Count 3 is multiplicitous as it charges the same crime in one count. If the defendant is convicted, defense reserves the right to move to dismiss one or more of the subparts.

Similar to Count 2, Count 3 is also duplicitous.

Any duplicity may or may not be cured by a bill of particulars. The defendant requests that the government specify the act(s) supporting each subpart of those counts as the conduct forming the basis for a conviction pursuant to Count 2 could also serve as the basis for a conviction under Count 3. The similarity of the counts is what necessitates the bill of particulars.

## B. MOTION TO STRIKE SURPLUSAGE

The defendants requests an order pursuant F.R.Cr.P. 7(e) striking as surplusage paragraphs that do not allege any improper or criminal conduct.

The inflammatory aspects of the second superseding indictment, and resulting press coverage, add to the fundamental prejudice of the so-called "speaking indictment" filed by the government in this case.

The second superseding indictment in this case goes far beyond the Fed.R.Crim.P. 7(c)(1) requirement of a "plain, concise and definite written statement of the essential facts constituting the offense(s) charged". That is, the "Introduction" and "Manner and Means" and, for the Section 371 conspiracy, the "Overt Acts" sections in particular do more than simply track the statutory charging language. If the defense had asked for this "who, what, where" information in a bill of particulars, the government would routinely deny the request as inappropriate.

By design the government's speaking indictment in this case advances its theory – one not reserved for opening statements but rather intended for the news media or jury pool. *See* United States Attorneys' Bulletin July 1998 ("An indictment…is an advocacy tool…'Speaking indictments' are more effect because they help notify the defense, court and jury of the Government's theory").

The defense concern is two-fold; initially that the second superseding indictment necessitates a motion for change of vicinage in that the jury pool in the Buffalo Division has already been subjected to pervasive news reports about the government's theory of Crystal Quinn's death as a murder linked to Mr. Gerace. Secondarily, if the District Court reads the indictment to the jury as part of its preliminary instructions or lets the trial jury take a copy of the indictment into the deliberation room, it will be exposed to the government's one-sided view of the case. Additionally, the prejudice flowing from the

superfluous language supports Mr. Gerace's severance argument and his argument for

access to the grand jury transcripts.

As the U.S. Court of Appeals for the Second Circuit said:

> Indeed, while it is permissible … to send the indictment into the jury room, the practice is hardly mandatory, and not all trial judges follow it, particularly when the indictment does not merely state the statutory charges against the defendant, but additionally contains a running narrative of the government's version of the facts of the case, including detailed allegations of facts not necessary for the jury to find in order to address the elements of the charged offenses. In most cases, the judge's instructions regarding the issues to be addressed by the jury and the elements of the offenses charged, which may include a reading of the legally effective portions of the indictment, will more than suffice to apprise the jury of the charges before them".

> *United States v. Esso*, 684 F.3d 347, 352 n.5 (2d Cir. 2012); *United States v. Cadden*, 2016 U.S. Dist. LEXIS 58706 *28- 29 (D.Mass. May 3, 2016) ("the potential for prejudice inherent in the structure of indictment … is not insurmountable … as is its practice in the case of "speaking" indictments, the court will not have the indictment read to the jurors, nor will the jury be given a copy for its perusal during their deliberations); *United States v. Roy*, 609 Fed. Appx. 15 *18 (2d Cir. 2015) (no legal requirement that jurors be provided with a copy of an indictment); *United States v. Kelly*, 349 F.2d 720, 765 (2d Cir. 1965) (court found no prejudice, given cautionary instruction, but noted, "This indictment was too long, too detailed and too involved for us to suppose reading it would be helpful to the jury."); *see also United States v. Watts*, 934 F. Supp. 2d 451, 491-92 (E.D.N.Y 2013) (court elects to read to the jury only a summary of the four counts with which the defendant is charged at the opening of trial).

Language that is irrelevant to the allegations and/or prejudicial should be stricken as surplusage under Fed.R.Crim.P. 7(d). For example, the reference to Mr. Gerace's prior case numbers and charges relating to Pharoah's Gentleman's Club (PGC) is really 404(b) evidence of pertaining to Mr. Gerace's motive to retaliate against Quinn. It is not included in the indictment as "notice" of any charge, since motive is not an element of the offense.

The defendants are left in a position of having too much nonessential information amounting effectively to having the government's closing argument contained in the charging instrument with the prejudicial effects of same extending to both the grand jury and a potential jury; and yet he has too little information within the mass of nonessential allegations to fully understand the government's theory about the specific conspiratorial acts the government alleges he undertook.

The use of speaking indictments, sparking inflammatory media coverage and providing a second government closing argument in the jury deliberation room, should be circumscribed by the Court. As the U.S. Court of Appeals for the D.C. Circuit put it:

> Despite the all too common use of 'speaking' indictments, the function of a federal indictment is to state concisely the essential facts constituting the offense, not how the government plans to go about proving them.

> *United States v. Edmond*, 924 F.2d 261, 269 (D.C. Cir. 1991) (citation omitted).

Therefore, the defense is moving to strike the portions of the second superseding indictment referenced above; and further reserves its right to supplement this argument as it continues to review of discovery materials in this case.

The inclusion of these paragraphs prejudices the defendants through innuendo and unsupported undertones or implications of conduct that is not criminal. *See United States v. Farmer*, 583 F.3d 131, 135 (2nd Cir. 2009).

None of the allegations in these paragraphs are relevant to, or support, the charges in the indictment, nor to they support the commission of any other criminal offense; rather, they are merely "inflammatory and prejudicial" and should be stricken on that basis. *United States v. Mulder*, 273 F.3d 91, 99 (2nd Cir. 2001); *United States v. Courtney*, 257 F.2d 944, 947 (2nd Cir. 1958).

Defendant therefore moves for an order striking paragraphs of the indictment on that constitute surplusage.

## III. MOTIONS FOR DISCLOSURE

### C. MOTION FOR RULE 12 NOTICE

Rule 12(b)(4)(B) establishes a procedure for notifying a defendant of the Government's intent to use certain evidence at trial. The express purpose of this procedure is to give notice to the defendant so that he may make motions to suppress such evidence if appropriate.

The defendants requests a Rule 12(b)(4)(B) notice to ensure the defendant is afforded an opportunity to submit pretrial motions regarding such evidence in accord with Rule 12(b)(3)(C).

Specifically, Rule 12(b)(4)(B) provides that at the defendants request, in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C), he may request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16.

The government has not filed a notice stating what evidence or statements it intends to use at trial. The defendants requests that the Court direct the government provide Rule 12 notice to the defendants identifying all evidence it intends to in its evidence-in-chief at trial. Fed. R. Crim. P. 12(b)(4)(B).

To facilitate the progress of this case and avoid the need for pretrial hearings on the eve of trial, defendant requests that the Court order the government to file a Rule 12(b) notice particularizing the evidence that it will seek to offer at trial, so that the defendant may make timely suppression motions, if the same are appropriate and warranted.

Along these lines, to expedite dispositive motion and hearing practice, Magistrate Judge Pedersen has issued scheduling orders providing that:

> By the close of voluntary discovery, the government shall file with the Court and serve upon all counsel a notice pursuant to Rule 12(b)(4) of the Federal Rules of Criminal Procedure. *The notice shall specifically and separately list all items of evidence*

> (including physical evidence, statements made to law enforcement and identification evidence) that may be subject to a motion to suppress.
>
> See e.g., United States v. Ferrari, et al., 23-cr-06107-EAW-MJP, Dkt. Nos. 62-66 (emphasis added).

With respect to the volume of discovery in this case and the need for a Rule 12 notice to streamline pretrial practice, counsel for Mr. Gerace noted at a status appearance on February 23, 2024, that:

> I've had a number of mega cases where discovery could be produced in 30 to 60 days. So if it's going to take 90 here, that should indicate to the Court the volume of discovery and the complexity of discovery is [ ] significant . . . I would also ask that if the volume of discovery is that significant, would the Court – the Government specifically be ordered to provide Rule 12 notice for each defendant so we can further determine in terms of motion practice out of the discovery we've been provided, the volume of the discovery that we've been provided, what items are subject to suppression, which items are we going to have motion practice on.
>
> Dkt. 124 at 13.

The discovery produced to date is approximately 3 terabytes of data. For reference, a 1 terabyte (1,000 gigabyte) hard drive can hold around 250,000 documents, assuming an average file size, or approximately 85 million standard Microsoft Word documents, or  100,000 to 250,000 photos taken with a smartphone, or 250 movies or 500 hours of HD video, or about 6.5 million document pages stored as Office files, PDFs, or presentations. See Jim Donnelly, How Much is a Terabyte?, available at https://massive.io/file-transfer/how-much-is-one-terabyte/.

Much of the discovery reviewed by the defense to date appears to have little or no direct relationship to Mr. Ermin, Mr. Gerace, Mr. Hinkle, or their alleged commission of the crimes charged in the indictment.

A Rule 12 notice would expedite the defense review of discovery – separating the wheat from the chaff, if you will – avoiding the need to request extensions to review material not directly relevant to the defendant, streamlining pretrial motion and hearing practice, and facilitating a speedy trial, which the government claims to be interested in even though its actions often suggest otherwise.

For these reasons, the defendants move for a Rule 12 notice describing the items or evidence in the discovery provided that the government intends to introduce against the defendants at trial that the defendants must prepare for.

Specifically, it does not appear that the defendants have not received notice that the government intends to offer at trial evidence of statements made by Mr. Ermin, Mr. Hinkle, or Mr. Gerace to law enforcement personnel.

Likewise, it does not appear that the government has not indicated that it intends to introduce any evidence that Mr. Ermin, Mr. Hinkle, or Mr. Gerace were identified as a perpetrator of any of the offenses charged, by a witness who viewed the defendant or a photograph of him, or otherwise participated in any pretrial identification procedure.

Again, if it is discovered that the government intends to offer such evidence, motion practice would be needed and identifying that evidence prior to the filing of dispositive motions would prevent delay when this case is approaching trial.

The government has not supplied a Rule 12 notice indicating that it intends to introduce any tangible evidence seized from the defendants, even though search warrant were executed at Mr. Ermin and Mr. Hinkle's homes as part of the investigation into this matter, and property was removed from the home during the execution of the warrant.

Defendants therefore request that the Court direct the government to file Rule 12 notice describing all evidence which it intends to introduce at trial, including any tangible evidence seized during the execution of a search warrant at defendants' homes. Defendant further requests an order reserving his right to challenge, assuming the existence of standing to do so, the lawfulness of the seizure of any tangible evidence described in the government's Rule 12 notice.

## D. MOTION FOR RULE 16 DISCOVERY

### 1. Rule 16.1 Conference and Request for Court Action

As discussed in the Background, the government was supposed to provide discovery on a rolling basis and conclude discovery disclosure by May 23, 2024. Instead, the government provided what it purported to be all discovery, at once, after the discovery deadline.

However, despite the representations that the delayed discovery disclosure ensured full discovery, it quickly became clear that the government had not provided full discovery. Counsel for Mr. Hinkle identified body worn camera footage that was missing. The government subsequently disclosed filings from Case No. 19-cr-227. There remain many other items that the defense needs to file dispositive motions, such as search warrant applications, which the government has not turn over.

For the reasons which follow and pursuant to Fed. R. Crim. Pro. 16.1(b), the defense respectfully requests that the Court order the government to provide an updated and detailed index to the discovery; or reproduce all of the discovery in a format which does not require each individual folder to be opened in order to search the text contained therein.

## 2. Discovery is Extremely Voluminous

The government has supplied the defense with approximately 33,600 documents, voluminous digital evidence (cell phones/jail calls) and thousands of pages of excel spreadsheets, much of it inconsequential to the government's case in chief.

Based on review of the material, the defendants believe there are other pertinent materials that the government has not yet provided.

Discovery was sent in 4 different formats; data (does not appear to be a usable format), Images (pdf), Native (in whatever format the document was received, for e.g. Excel spreadsheet, jpeg, Word, .csv (tabular format/chart), html (internet file), emails,

etc.), or OCR (text file). Digital Evidence Items Provided natively include Audio/Video files, Surveillance, jail calls, body cam videos, and recorded interviews.

The rough indexing system is not useful. Each aggregated section is named. However, even though there are multiple individual folders within a given section, those folders are not labeled.

For example, there is a subsection entitled "FBI/Criminal Histories" that ranges from GOV-00000366 to GOV-00000533 (167 pages), but there are 13 different pdf folders within that range which are not broken down or identified by the name of the person whose criminal history is in that particular folder.

Another example, is a section entitled "FBI/Evidence_Items/SSTF_OMC/Scanned Evidence/41 Richmond Ave., Lancaster" that ranges from GOV-00004010 to GOV-00006635 (2,625 pages) that has 345 individual folders within that range but, again, the folders are not named. In order to identify what documents are contained in each folder, each folder must be opened individually.

This is an enormou sly and painfully time-consuming process. Because of the way the files were provided, while each individual folder is text searchable once opened, the general labeled file is not text searchable. If the material in each labeled folder was provided as a single format document, we could make it text searchable.

Instead, all pdf files have to be printed (33,600+ pages) so that defense teams can scan them by hand to make them text-searchable. This method is extremely expensive and tediously slow.

There were approximately 425 Excel spreadsheets in the first discovery tranche. Some of the excel spreadsheets containing, for example, call detail records, have up to 42 tabs consisting of thousands of pages even though it is only assigned one bates-number.[14]

There were approximately 50 HTML files in the first discovery tranche. The files in HTML format are internet-based. One of the files marked with a single Bates number is actually 924 pages.

There were approximately 260 .csv files in the first discovery tranche. The files in .csv format print as a chart and one of the files, for e.g., was 500 pages.

*a. Discovery provided on June 4, 2024*

The disclosure made available for defense counsel to pick up on June 4, 2024, contained bates-numbered discovery: Bates-stamped pdfs ranging GOV-00000001 through GOV-00030637.

The attached index is deceiving because some pdf's were one page and only given one bates number, but had "File Provided Natively" on the document page.  You have to go to the "Native" folder to locate the file.  Therefore, even though they are only assigned

---

[14] The Buffalo Copy Store, which private firms often use to print large copy jobs, would not print any of the excel spreadsheets because prior to printing, each and every column and row needs to be adjusted to not only make the printing concise but also readable.

one number (for e.g. GOV-00000270), the associated native file is sometimes thousands of pages; you cannot tell without opening each folder.

*b. Cell Phones*

Some of the phone downloads were provided in .ufdr format only which means they have to be opened on a Windows device using Cellebrite software.

Some of the Cellebrite phone extractions were already created with some page counts being 19,687 pages, 53,385 pages, 4,653 pages, 49,622 pages, 5,001 pages, and 27,820 pages.

The government subpoenaed cell phone records for approximately 67 individual phone numbers. These are unindexed. For example, one folder is labeled "FBI/subpoena/Verizon." The bate number is Gov-00026003-226123 (100 pages). The file name on the government index does not indicate the subscriber. Each of the folders must be opened to view the documents.

| CELLEBRITE EXTRACTIONS | | | | | |
|---|---|---|---|---|---|
| **Name** | **Phone No.** | **Make** | **Cellebrite Rpt.** | | **Extracted pdf** |
| | | | **Full Scope** | | |
| Barber, Courtney | | MX-A63 | X | X | X |
| Barnes, Scott | xxx-xxx-2181 | Motorola 5G Ace | X | | X |
| | | Samsung Android | X | X | X |
| | xxx-xxx-6050 | Motorola G Stylus | X | | |

| | xxx-xxx-7299 | | | | |
|---|---|---|---|---|---|
| Knight, Frank | xxx-xxx-7270 | iPhone 7 Plus | X | | X |
| | xxx-xxx-7270<br><br>xxx-xxx--5586 | Android in Oukitel case | X | X | X |
| | xxx-xxx-7270<br><br>xxx-xxx-0657 | iPhone 12 | X | | X |
| | xxx-xxx-7270 | iPhone 11 | X | X | |
| Ermin, John | | iPhone 12 Pro Max | X | | |
| | | iPhone 14 Pro Max | X | | |
| | | iPhone XR | X | | |
| Gogolack, Simon | xxx-xxx-3061 | Motorola Moto G Pure | X | X | X |
| Hinkle, Howard | xxx-xxx-5479 | Apple iPhone 11 | X | X | X |
| Knight, Frank | xxx-xxx-7270 | iPhone 7 Plus | X | | X |
| | xxx-xxx-7270<br><br>xxx-xxx-5586 | Android in Oukitel case | X | X | X |
| | xxx-xxx-7270<br><br>xxx-xxx-0657 | iPhone 12 | X | | X |
| | xxx-xxx-7270 | iPhone 11 | X | X | |
| | | | | | |
| Quinn, Crystal | xxx-xxx-2928 | iPhone 11 | X | X | X |

| Roncone, Mike | xxx-xxx-7894 | Samsung Galaxy S23 | | | X |
|---|---|---|---|---|---|

| VARIOUS PHONE NUMBERS & CDR/SUB INFO | | | | |
|---|---|---|---|---|
| **Phone No.** | **Carrier** | **Name** | **Sub. Info Only** | **CDR** |
| xxx-xxx-3609 | AT&T | S.A. | X | |
| xxx-xxx-6520 | AT&T | K.S. , D.C. | X | |
| xxx-xxx-5569 | Charter | | X | |
| xxx-xxx-3061 | AT&T | | | |
| xxx-xxx-4933 | AT&T | G.J. | | X |
| xxx-xxx-9234 | Verizon | | | X |
| xxx-xxx-9963 | TMobile | S.Q. | | X |
| xxx-xxx-5262 | Verizon | | | X |
| xxx-xxx-0249 | Verizon | | | X |
| xxx-xxx-8366 | Verizon | | | X |
| xxx-xxx-5050 | Verizon | | | X |
| xxx-xxx-3291 | Verizon | | | |
| xxx-xxx-5546 | Verizon | | | |
| xxx-xxx-5689 | TMobile | | | X |
| xxx-xxx-6822 | TMobile | John Ermin | | X |
| xxx-xxx-5385 | TMobile | R.K. | | X |
| xxx-xxx-8059 | Tracfone | | | |
| xxx-xxx-0478 | Tracfone | J.H. | X | |
| xxx-xxx-3903 | Verizon | | | X |
| xxx-xxx-5569 | Verizon | | | |
| xxx-xxx-9369 | Verizon | | | X |
| xxx-xxx-8059 | Verizon | | | X |
| xxx-xxx-2995 | Verizon | | | |
| xxx-xxx-1186 | Verizon | | | |
| xxx-xxx-1609 | Verizon | | | |
| xxx-xxx-0478 | Verizon | | | |
| xxx-xxx-2519 | Verizon | | | X |
| xxx-xxx-4392 | Verizon | | | |
| xxx-xxx-5279 | Verizon | | | |
| xxx-xxx-2970 | Verizon | | | |
| xxx-xxx-3580 | Verizon | | | |
| xxx-xxx-5310 | Verizon | | | |
| xxx-xxx-8724 | Verizon | | | |
| xxx-xxx-2364 | Verizon | | | |
| xxx-xxx-9673 | Verizon | | | |

| | | | | |
|---|---|---|---|---|
| xxx-xxx-7949 | Verizon | | | |
| xxx-xxx-6391 | Verizon | | | |
| xxx-xxx-5385 | Verizon | | | |
| xxx-xxx-7356 | Verizon | | | |
| xxx-xxx-8418 | Verizon | | | X |
| xxx-xxx-1547 | Verizon | | | |
| xxx-xxx-3877 | Verizon | | | |
| xxx-xxx-0320 | Verizon | | | |
| xxx-xxx-8120 | Verizon | | | |
| xxx-xxx-3061 | AT&T | S.S. | | X |
| xxx-xxx-7161 | TMobile | Crystal Quinn | | X |
| xxx-xxx-9963 | TMobile | | | X |
| xxx-xxx-6335 | Verizon | John Ermin | | X |
| xxx-xxx-9261 | AT&T | K.B. | | X |
| xxx-xxx-9968 | AT&T | N.C. | | X |
| xxx-xxx-1580 | TMobile | | | X |
| xxx-xxx-0018 | TMobile | | | X |
| xxx-xxx-1033 | Tracfone | C.B. | X | |
| xxx-xxx-7894 | Verizon | I.R. | | X |
| xxx-xxx-7347 | Verizon | Howard Hinkle | | X |
| xxx-xxx-7659 | Verizon | | | X |
| xxx-xxx-0465 | Verizon | J.L. | | X |
| xxx-xxx-5275 | Verizon | M.B. | | X |
| xxx-xxx-8391 | Verizon | K.R. | | X |
| xxx-xxx-5279 | Verizon | C.S. | | X |
| xxx-xxx-4280 | Verizon | D.T. | | X |
| xxx-xxx-9966 | Verizon | J.R. | | X |
| xxx-xxx-7115 | Verizon | Howard Hinkle | | X |
| xxx-xxx-9234 | Verizon | Courtny Barber | | X |
| xxx-xxx-7270 | Verizon | Frank Knight | | X |
| xxx-xxx-2519 | Verizon | M.M. | | X |
| xxx-xxx-1833 | Verizon | Frank Knight | | X |

There are approximately 41 phone numbers for which no subscriber is listed. In other words, the defense has the phone number but not the corresponding subscriber's name.

Per the above, the defense requests that the government provide the subscriber names that correspond with the phone numbers for which information was subpoenaed.

*c. Discovery provided on June 24, 2024*

The disclosure provided additional bates-stamped pdfs ranging GOV-00030638 through GOV-00031425.

*d. Discovery provided on March 7, 2025.*

The disclosure provided additional bates-stamped pdfs ranging 00031426 through GOV-00033627.

13 are .csv files which will be a high volume of pages; 3 are Excel spreadsheets; Native files; Google return (in condensed zip files); Howard Hinkle's recorded jail calls from 3/1/24 – 6/12/24; Ermin's jail calls and video visits from 3/2/24 – 6/16/24.

*e. Relevant Jail Calls*

The government has produced recorded jail calls from Mr. Ermin, Mr. Gerace, and Mr. Hinkle. Mr. Gerace, in particular, was continuously in custody during the timeframe of the alleged conspiracy. The defense requests that the government produce any remaining jail calls in its possession and identify those that it intends to rely on at trial.

The government has not provided transcripts of any of the recorded calls; nor is the subject matter identified (just the parties to the call).

Because the government has not identified which jail calls are relevant or provided a transcript for those calls which it intends to use, the defendants are left to review all jail

calls to determine if they could be interpreted by the government as relevant to the conspiracy. That is nearly impossible without some Court directive to the government to identify which calls will be used and to provide transcripts of those calls.

### 3. Evidence Related to Quinn's Cooperation

*a. Reports of Proffers and Quinn Grand Jury Testimony*

The second superseding indictment alleges that Ms. Quinn participated in several proffers with the government after it charged her with intimidating a witness.

No notes or reports from the proffers have been provided to the defendants in this case. There is no reason not to immediately turn her statements over to the defendants. Statements she made at the proffers are material to the preparation of the defense. The government alleges that the information she was providing was the motive for Mr. Gerace to retaliate against her or to try to prevent her from testifying at the grand jury or trial in Case No. 19-cr-227 and Case No. 23-cr-37. Therefore, those statements are discoverable under Rule 16(E)(i-iii) since the content of such documents are in the possession of the government and constitute evidence material to the defense or the government intends to use the item in its case-in-chief.

Furthermore, upon information and belief, Ms. Quinn testified at the grand jury in Case No. 23-cr-37 and entered into a formal cooperation agreement.

The documents are relevant and may also contain *Brady* information and/or *Giglio* material that could be used to cross-examine other witnesses and, as a result, are subject to immediate disclosure.

*b. Quinn's Pretrial Diversion and U.S. Probation File*

According to the docket, Ms. Quinn was released under the supervision of the U.S. pretrial services office. Upon information and belief, Ms. Quinn reported to former USPO Lillian Cullen. Further, upon information and belief, Ms. Quinn was referred for mental health counseling as a condition of her release.

As such her probation file would contain information from the mental health provider. Upon information and belief, Ms. Quinn made disclosures to either the Probation Officer and/or the Mental health counselor that would be considered *Brady* information. Additionally, upon information and belief she made disclosures identifying persons who perpetrated a sexual assault against her several days prior to her death.

The text messages in Ms. Quinn's phone reference these individuals by first name.

The defense requests that any statements taken from these persons by law enforcement or any statements referencing them or the sexual assault incident be immediately disclosed.

Likewise, based on Ms. Quinn's text messages, she may have been stripping or engaging in illegal activity to fund her drug addiction. The government should identify and disclose the names and other contact information regarding anyone Ms. Quinn was

known to have obtained drugs from or for whom she worked as a stripper or in the engagement of any illegal activity in the year before her death. This information is necessary for the defense to advance an alternative perpetrator theory and is therefore "material" to the defense under Rule 16.

*c. Grand Jury Testimony of Quinn's Attorney*

An attorney represented Ms. Quinn with respect to the criminal complaint which was dismissed in April 2023. Ms. Quinn continued to text and communicate after the dismissal until her death on August 1, 2023.

Although the complaint was dismissed, the lawyer continued to represent her with regard to her pretrial diversion agreement as well as the cooperation agreement she entered into with the government. The cooperation agreement required her continued cooperation, including testifying at the trial in this case.

Upon information and belief, the government met with and obtained statements from Quinn's lawyer. The defense is not aware whether the attorney was subpoenaed to the grand jury. However, the attorney-client privilege survives her death so any statement made by the attorney regarding Quinn in relation to this case, or any grand jury testimony, may have violated the attorney's obligation not to disclose client secrets. The defense requests that any such statements, or notes/reports of interviews, of the attorney obtained by the government be immediately disclosed.

## 4. Testimony and Evidence Obtained from Gerace Attorney 1's Investigator

Similarly, the government obtained an audio recording made by Gerace Attorney 1's investigator of his interview with Ms. Quinn's mother and a friend. The recording was made during the course of Attorney 1's representation of Gerace and is therefore protected attorney work product.

The defendant requests disclosure of any records, reports, notes, documents or other materials relating to how the government obtained the audio recording.

Additionally, upon information and belief, the investigator was subpoenaed to the grand jury and testified regarding privileged information. Therefore, the defense requests a copy of the grand jury transcript of the investigator be immediately disclosed so that the defense can evaluate whether to file a motion to suppress or seek other relief from the court before trial.

## 5. Additional Discovery

To preserve the invocation of the defendants' statutory and Constitutional rights, the defendants formally moves for the production and/or inspection of the documents and information set forth below, not previously disclosed in the course of discovery to date. These documents are material to the defense pursuant to Federal Rule of Criminal Procedure 16(a)(1)(A-E). Those documents and materials include but are not limited to:

- o All reports regarding the forensic examination of any and all firearms, cell phones or other tangible objects obtained from investigation of the allegations in the Indictment;

o   All reports including forensic or chemical lab reports or analysis performed on controlled substances obtained from investigation of the allegations in the Indictment;

o   All oral, written or recorded statements or testimony of defendants in the government's possession or control, including state and local agencies cooperating with the prosecution of this matter, and reports related to the content of such statements;

o   A copy of inspection of all results and reports of physical or mental examinations in the possession, custody or control of the Government, including any state or local agencies cooperating in the prosecution of this matter, which are material to the preparation of the defense or which are intended for use by the Government in support of its case in chief at trial;

o   A written summary of testimony the Government intends to use under Rules 702, 703 or 705 of the Federal Rules of Evidence during its case in chief at trial;

o   Disclosure of any and all prior similar acts or convictions of a similar nature to the charges in this case, if any, which the Government will seek to rely upon or introduce as evidence at the hearing or trial in this case for any purpose, including proof of knowledge or intent on the part of the defendant and the investigative reports of witnesses concerning such acts;

o   The government's position on the applicable sentence under the Sentencing Guidelines should the defendant be convicted of the offenses charged. Pursuant to *Brady*, *Giglio*, *Kyles*, <u>Avellino</u> and <u>Tate</u>, the defendants specifically requests any and all information which tends attenuate or mitigate defendant's involvement in the offense, including information that would tend to show that:

   • Defendant was a minimal or minor participant in the offense;

   • The defendant demonstrated acceptance of responsibility for the offense;

   • The defendant's assistance in the investigation or prosecution of another who may have participated in the offense;

   • Evidence the defendant committed the offense to avoid a perceived greater harm;

- Evidence the defendant committed the offense because of coercion, duress or entrapment; or

- Evidence the defendant committed the offense while suffering from a reduced mental or emotional capacity.

Defendants requests that all physical evidence, including tape or video recordings made during the investigation of this matter, including recordings that might otherwise be destroyed as part of a normal business practice, be preserved and maintained.

Defendant further requests that the Court direct the Government to make available for inspection and/or copying all audio or visual recordings, surveillance logs, or other documentation and information of any type obtained in the investigation of this pending indictment or felony complaints or indictments pending against all confidential informants, cooperating witnesses, and all others identified in this indictment as known or unknown to the grand jury which document or make reference to conversations including observations of defendant or those identified as others, known and unknown, to the grand jury in this indictment.

The defendants further requests an Order from this Court directing the Government to disclose pursuant to Rule 16 (a)(1)(c) and or permit the defendant to inspect and copy books, papers, documents, photographs, tangible objects, or similar items which are within the possession, custody or control of the Government, specifically including the following:

- o All books, papers, documents or tangible objects the Government plans to introduce as evidence at trial;

65

o Any and all property in the possession of the Government or its agents or seized by the Government or its agents alleged by the Government to belong to the defendant;

o Any and all charts, maps or other diagrams, which the Government intends to use at trial or which the Government or law enforcement are in possession of and which were made or used during the investigation of this matter for the preparation of the instant Indictment;

o The logs or investigative notes of any law enforcement agent prepared in the course of surveillance of any property, vehicle or person in the course of the investigation of the allegations or individuals named in the Indictment; and

o Any and all supporting documents concerning the investigative notes of whatever nature of each and every law enforcement or government agent who participated in the surveillance, search, seizure or arrest of any person, property or vehicle in connection with this Indictment.

## 6. Discovery is Necessary to Ensure Effective Assistance of Counsel

The United States Supreme Court decided two cases which seemed to have far-reaching effects on an attorney's meaningful representation of a criminal defendant. Thus, the Court recognized that the representation during pre- trial proceedings and the obligations of defense counsel are to effectively safeguard those rights before trial. *Missouri v. Frey*, 132 S.Ct. 1399 (2012); *Lafler v. Cooper*, 132 S. Ct. 1376 (2012).

The Court has recognized the need for an attorney to advise an attorney whether to pursue plea negotiations or proceed to trial and the Court recognized the need for defense counsel to obtain and review numerous additional categories of information and discovery which, prior to those decisions, had generally not been made available to the defense until shortly before trial.

The Supreme Court recognized that the overwhelming majority of criminal cases are resolved by plea and, as a result, the pretrial or plea stage is a critical stage in all but a few cases requiring that the defense be provided with information necessary for counsel to effectively assist and advise a defendant at that critical stage of the proceedings, well in advance of trial. Therefore, the defendants move this Court to order the immediate disclosure of the information set forth above in order to enable counsel to effectively advise the defendant during pretrial proceedings.

The defendants urge the Court to order the immediate disclosure of all information sought in this motion and as set forth above so that counsel can effectively assist the defendants with regard to the critical issue of whether to proceed to trial.

### E. Motion for Disclosure of Grand Jury Recordings (Rule 6)

The defendants move for disclosure of the Grand Jury Recordings including all transcripts, pursuant to Federal Rules of Criminal Procedure, Rule 6(e)(3)(E)(ii).

Federal Rules of Criminal Procedure, Rule 6(e)(3)(E)(ii) permits disclosure of the recorded grand jury minutes and transcriptions at the request of a defendant who shows that a ground may exist for a motion to dismiss an Indictment.

Grounds to dismiss exist here based on: (1) false overt acts in the indictment support the conclusion that the grand jury was knowingly presented with false

information; and (2) the evidence presented to the grand jury will determine whether there was prosecutorial steering in the early stages of this case.[15]

The likelihood that the integrity of the grand jury proceedings was compromised by the presentation of false evidence and/or that the grand jury presentation will reveal prosecutorial misconduct present two independent particularized needs for disclosure that outweighs the government's interest in secrecy.[16]

Accordingly, the defense requests disclosure under Federal Rules of Criminal Procedure, Rule 6(e)(3)(E)(ii) with leave to file motions to dismiss as part of the dispositive motions schedule.

## 1. Demonstratively False Allegations in the Indictment

This case is founded on the fictional narrative comprised of multiple connected false theories: (1) Mr. Gerace learned though inappropriate means that Ms. Quinn was a witness; (2) he communicated that information to Mr. Ermin and directed Ms. Quinn be killed; (3) Mr. Ermin accepted that direction and enlisted the assistance of members of the Rare Breed Motorcycle Club to carry out a plan to kill Ms. Quinn; (4) the Rare Breed Motorcycle Club then enlisted the assistance of Mr. Gogolack in the plan to kill Ms. Quinn; and (5) Mr. Gogolack gave drugs to Ms. Quinn with the purpose of killing her.

---

[15] Although striking surplusage might mitigate against unfairly prejudicial allegations in the indictment and a bill of particulars may help resolve ambiguities in the indictment, neither would resolve these two grounds for dismissal.

[16] The Circuit has used the referenced balancing test to decide disclosure. *See United States v. Alexander*, 860 F.2d 508 (2d. Cir. 1988); *United States v. Moten*, 582 F.2d 654 (2d Cir. 1978).

The above-listed theories are dependent on each other. Collectively, they present a story starting with Mr. Gerace, moving through local motorcycle clubs, and ending with an allegation that Mr. Gogolack intentionally killed Ms. Quinn.

The theory that Mr. Gerace inappropriately learned that Ms. Quinn was a government witness is documented in the indictment's overt acts:

> The trial witness list filed or caused to be filed by Gerace Attorney 1 also listed Crystal Quinn as a defense witness. The *listing of Crystal Quinn as a witness for Gerace circumvented the provisions of a Protective Order which prohibited attorneys for GERACE from revealing to GERACE the government's witnesses' names* and from providing GERACE with the government's witness list.

> Docket Item 24 at 16 (emphasis added).

The allegation that the Mr. Gerace's defense team listed Ms. Quinn as a witness for the defense to "circumvent the Protective order" and "reveal" Ms. Quinn as a government witness is clearly false and utterly absurd.

Even knowing this overt act is based on an illogical premise,[17] it is obvious why the government included it. The government wanted to advance a theory that Mr. Gerace became aware that Ms. Quinn was a potential government witness by inappropriate and secretive means, so the government can argue Mr. Gerace was the gatekeeper of this

---

[17] There is no intellectually honest analysis which could support this overt act. Placing someone on a defense witness list obviously does not signal that person to be a government witness. The premise is so absurd, on its face, that it is reasonable to assume the government attorneys, as imaginative as they might be, knew it to be false but included it anyway.

information and would be responsible for sharing it with other individuals such as Mr. Ermin.

In reality, the government had publicly revealed Ms. Quinn to be a cooperating witness during a detention hearing in March 2023 before witness lists were filed in case no. 19-cr-227.

As discussed in the Background (*supra* at p. 6-8), during the defenation hearing the government indicated that it "got a third witness" in regard to an incident that occurred in November 2019, and based on the criminal complaint filed against Ms. Quinn, unsealed in early February of 2023, it was clear that Ms. Quinn was the third witness.

Moreover, the government's comments that it got its third witness in February further identified the witness as Ms. Quinn. The criminal complaint was filed against Ms. Quinn on February 3, 2023. Case no. 23-mj-00011-HKS, Docket Item 1.

The complaint reveals that as of January 24, 2023, Ms. Quinn was served a target letter regarding the November 2019 incident, and that she provided information inconsistent with the government's narrative based on other witness interviews, so Ms. Quinn was not one of the individuals who were already cooperating in regard to that incident as of January 2023. Then she was charged in February. As soon as the

government had returned the indictment and successfully used Ms. Quinn in support of the detention proffer, it dismissed the charges.[18]

Thus, in an effort to detain Mr. Gerace just months before his trial date, the government revealed Ms. Quinn to be a government witness, not just to "Attorney 1" or to Mr. Gerace, but to anyone and everyone who might have an interest in the case, including anyone who may be concerned that Ms. Quinn possessed inculpatory information against them.

Not only is all of this information conspicuously absent from the indictment, the indictment advances the false narrative that Mr. Gerace learned of Ms. Quinn's designation as a government witness when she was included on the defense witness list, which is blatantly false, and the government knows it.

Not surprisingly, the defense for Mr. Gerace has repeatedly pointed out the obvious falsity of the overt act, and the government has had no response.

For example, the government repeated the allegation in a submission to the Court seeking a protective order. Docket Item 156 at 11-12. The defense responded, noting the blatant fallaciousness of the allegation. Docket Item 164 at 11 ("This submission provides the first opportunity to address the falsity of one of the alleged overt acts in the Second

---

[18] By March 3, 2023, the government made a motion in Ms. Quinn's case requesting a Rule 48(b) dismissal date of April 9, 2023 (Case no. 23-mj-00011-HKS, Docket Item 4), a date which would provide enough time to return the new indictment against Mr. Gerace and move for his detention. Once, Mr. Gerace was detained, on April 6, 2023, the government filed an Order of Dismissal dismissing the criminal complaint against Ms. Quinn. Case no. 23-mj-00011-HKS, Docket Item 8.

Superseding Indictment, which is now being used by the government to attempt to procure an inappropriate protective order.")

When confronted with the facts that demonstrate that the allegations in the government's motion and the indictment were blatantly false, unsurprisingly, the government had nothing to offer in reply.

> The defendant spends much of his supplemental filing (Doc. No. 164) attempting to engage in a paper trial of the merits of allegations contained in the Second Superseding Indictment in this case. See e.g. Doc. No. 164 at pgs. 10-17. The government, while it disagrees strongly with the assertions made by the defendant, does not intend to use its reply brief to address such arguments.
>
> Docket Item 167.

When the government's misconduct regarding discovery violations was under review, the defense for Mr. Gerace requested both the Magistrate and the District Court consider the false allegations in the indictment as evidence of further misconduct supporting dismissal.

> Despite the fact that the government had reiterated the allegations in the second superseding indictment as a basis for the protective order, the government quickly retreated discussing the allegations, having nothing to offer to rebut the discussion that they are clearly false, and the government's inclusion of those allegations in both the indictment and its subsequent submissions to this Court are extraordinarily problematic. It seeks further inquiry of this Court, and further consideration in support of a decision to dismiss this indictment, with prejudice.
>
> Docket Item 167.

The government, again, repeatedly dodged addressing the facts that demonstrate the indictment included blatantly false information, which suggests the grand jury was misled during the government's presentation of evidence.

This strategy of avoidance appears to have paid off in that setting. It was not addressed in this Court's Orders imposing sanctions, and when the District Court considered the government's appeal of imposed sanctions, it noted "[t]his Court thinks that is beyond the scope of this appeal and confines its review to Judge McCarthy's findings on bad faith and sanctions." Docket Item 310 at 10, n 6.

The issue does not disappear because the government avoids addressing it. To the contrary, the government's avoidance of the issue only confirms what is obvious: the decision to claim that attorneys revealed Ms. Quinn was a government witness by placing her name on the defense witness list is a fabricated allegation, clearly contradicted by basic logic and the history of this case which the government was a party to.

The intentional inclusion of false allegations in the indictment implies the grand jury presentation was also engineered to present an obviously false narrative, which certainly supports disclosure of grand jury minutes in support of a potential motion to dismiss. Furthermore, the government's decision to include false allegations in the indictment should be perceived as a forfeiture of any interest in secrecy of grand jury proceedings, because the government should have been aware of the risk that the false information would require the grand jury presentation to be reviewed.

## 2. Evidence of Prosecutorial Steering

"The selection of a judge to preside at a criminal trial is a matter of considerable significance to the criminal defendant… he is entitled to have that decision made in a manner free from bias or the desire to influence the outcome of the proceedings." *Cruz v. Abbate*, 812 F.2d 571, 573-74 (9th Cir. 1987)(remanded to "determine whether an abuse of discretion or constitutional violation has occurred" and authorizing the use of "supervisory powers to correct the matter"). "The suggestion that the case assignment process is being manipulated for motives other than the efficient administration of justice casts a very long shadow, touching the entire criminal justice system" *Id.* at 574.

It naturally follows that "a system that allows prosecutorial judge-shopping arguably lacks 'the appearance of impartiality that is required to obtain the confidence of the public and the accused in the system.'" *United States v. Pearson*, 203 F.3d 1243, 1264 (10th Cir. 2000)(quoting *Tyson v. State*, 619 N.E.2d 276, 300 (Ind. Ct. App. 1993). The practice of "prosecutorial steering" is a threat to the "independence of the judiciary." *Id*.

Thus, "[t]he importance of impartiality carries over to the criminal justice system as a whole, including the process of the selection of the judge. Leaving aside the question of the prosecutor's motives, *the mere appearance of partiality, even if unfounded*, greatly undermines the credibility of the criminal justice system." *Francolino v. Kuhlman*, 224 F. Supp. 2d 615, 630 (S.D.N.Y. 2002)(emphasis added).

In the Western District of New York, the government is provided enormous power to influence the assignment of cases through the filing of related case forms. Our district does not have a rule that requires related case forms be automatically disclosed to defense counsel.[19]

In our District, the system is premised on concepts that the government can be trusted to demonstrate the utmost candor associated with these filings and that the government would never selectively submit or withhold the forms for strategic purposes.

*a. The Government is Confronted in March 2024 on its Selective Related Case Filings*

In paragraph 24 of this indictment, the government alleges it was an overt act in furtherance of the conspiracy in Count One that Mr. Gerace's defense counsel filed a witness list that included two individuals who were relatives of the assigned District Judge:

> On or about June 20, 2023, Gerace Attorney 1 filed and caused the filing of a trial witness list that named two relatives of the assigned District Judge as GERACE'S defense witnesses. The listing of the District Judge's relatives as GERACE trial witnesses resulted in the District Judge recusing himself pursuant to 28 U.S.C. 455(b)(5)(iv), and the trial of Case Nos. 19-CR-227 and 23-CR-37, which was then scheduled for August 14, 2023, being adjourned.
>
> Dkt. # 24 at 16.

---

[19] Compare to the local rules for the District Court for the District of Columbia (cited as "D.C.D. LCvR"), which contains a rule for submission of a related case form, which must also be "mailed to all defense counsel along with the notification of the arraignment" so the defendant is provided an opportunity to object. D.C.D. LCvR 40.5 (b)(1). (available at https://tinyurl.com/DCLocalRules).

Based on the substance of that allegation, in Case no. 19-cr-227, the government moved to disqualify Eric Soehnlein, one of Mr. Gerace's lead attorneys, because he was representing Mr. Gerace in June 2023, and among other things, the government alleged the above-listed overt act was an attempt to judge-shop.[20]

On March 15, 2024, during oral argument for the motion to disqualify in Case no. 19-cr-227, the District Court questioned the government about the government's own conduct in this case that suggested possible judge-shopping. Specifically, the Court asked the government about its selective submission of related case filings.

The government responded, claiming it would have been "inappropriate" and "borderline disingenuous" to identify a connection between Mr. Gogolack and the charges pending against Mr. Gerace. Case no. 19-cr-227, Docket Item 825 at 11-12.[21] The government pointed out that the "very first charge… was a drug and gun case." Case no. 19-cr-227, Docket Item 825 at 11-12.

Yet, less than a month later, when Mr. Gogolack was indicted and a District Court Judge needed to be assigned, the government was appearing at the arraignment making public comments about witness tampering. *See e.g.* Dan Herbeck, *Prosecutors say Wellsville*

---

[20] Essentially, the government has alleged that Mr. Soehnlein is a witness to the events that transpired in Case No. 19-cr-227. Indeed, the government indicated that Mr. Soehnlein may be called to testify. In that vein, there is also a reasonable likelihood that the government's trial team would be witnesses in this case, and it is not clear why the government has insisted on having the same trial team prosecute this case.

[21] That assertion was troubling on its face, because when Mr. Gogolack was charged, it was obvious to everyone in the courtroom that this was a related case. *See e.g.* Dan Herbeck, *Judge assigns new attorney to man under scrutiny in Pharaoh's strip club probe*, The Buffalo News, Sept. 7, 2023, https://tinyurl.com/BN090723.

*man tampered with government witnesses*, The Buffalo News, Sept. 14, 2023,

https://tinyurl.com/BN091423 ("'This case is as serious as it gets,' [AUSA] Cooper told the

judge. He added that the charges filed against Gogolack so far 'are only the tip of the

iceberg.'")

Although it appeared that the government's comments in March 2024 were not

entirely candid about the connection between the initial charges against Mr. Gogolack

and the prosecution of Mr. Gerace, the defense did not have any further information at

that time.

After disclosure of the much-delayed discovery in case no. 23-cr-227, the defense

received information that established that even before Mr. Gogolack was charged by

complaint on August 17, 2023, the government had already connected both Mr. Gogolack

and Mr. Gerace, and presumably others, to the investigation into the witness's death.

*b. Despite the Government's Comments in March 2024, the Government Had Immediately Connected the Witness Death Investigation to the Prosecution of Mr. Gerace*

As discussed in the Background (supra at p. 12-15), the FBI's involvement in the

investigation underlying *US v Bongiovanni et al* was documented under a specific Case

ID: 58A-BF-3179872.

When Ms. Quinn's death was reported, the government immediately identified

that investigation as being related to *USA v Bongiovanni et al* and Peter Gerace, Jr. The FBI

created a "sub file" for the death investigation of witness using the Case ID "58A-BF-

3179872-DEATH QUINN," a subset of the CASE ID used in relation to *USA v Bongiovanni et al*.

That information was not known to the defense in May 2024. Because the government had not provided rolling discovery as directed by this Court, the defense had no discovery from case no 23-cr-99 at that time. When the government made discovery available the following month, buried at bate stamp 00010744, there is the FD-1057, dated August 11, 2023, that shows the investigation into Ms. Quinn's death was identified as a related to case no 19-cr-227 even before Mr. Gogolack was charged by complaint, and over a month before he was indicted and a District Court Judge was assigned.

While the government claimed that the initial charge against Mr. Gogolack was a "drug and gun case," the early investigation into Mr. Gogolack was clearly focused on the witness death, and all FBI efforts to investigate Mr. Gogolack were tagged with the Case ID "58A-BF-3179872-DEATH QUINN," the file number used regarding the investigation for *Bongiovanni et al* and Peter Gerace, Jr. (*see supra* at p. 14, n. 8)

Also provided in the delayed discovery was the video of a custodial interview of Mr. Gogolack on August 2, 2023. Mr. Gogolack was arrested by a local police agency in apparent coordination with Federal agents. He was taken into custody and questioned

by the agents. The interview almost exclusively focused on the investigation regarding the witness death.

Moreover, in the discovery was the warrant for Mr. Gogolack's residence, issued on August 5, 2023. It referenced multiple violations, including "Title 21, United States Code, Sections 841(a)(l)(resulting in death)" and indicates all of the violations "are more particularly described in the application and affidavit for this warrant which is incorporated herein by reference."

> I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
>
> **See Attachment B , Particular Items to be Seized, attached hereto and incorporated herein by reference as through set forth fully herein.**
>
> All of which are evidence, fruits, and instrumentalities of a violations of Title 18, United States Code, Sections 4, 1001, 922(g)(1); 922(g)(3); 924(c)(1)(A); 1513(a)(1); and Title 21, United States Code, Sections 841(a)(1)(resulting in death) and 846, and all of which are more particularly described in the application and affidavit for this warrant which is incorporated herein by reference.

The government has not disclosed search warrant applications in the discovery, but even without the ability to review the application, the face of the warrant indicates that the government was proffering information alleging probable cause that Mr. Gogolack was involved in criminal conduct associated with the witness death as early as August 5, 2023.

Thus, even if the government chose to initially hold back charges against Mr. Gogolack related to the witness death, the discovery reveals that the government was investigating Mr. Gogolack almost exclusively with the purpose of advancing the investigation into the witness death, and indeed, the efforts to advance that investigation

were being documented by the government under Case # 58A-BF-3179872-DEATH QUINN.

When the government told the District Court, in a public proceeding on March 15, 2024, that it did not submit related case filings for Mr. Gogolack to inform the Court of a connection to Mr. Gerace, it argued that it would have been "borderline disingenuous" to connect the two cases. However, the government knew that in August 2023, even before Mr. Gogolack was first charged, the FBI was pursuing the investigation against Mr. Gogolack under the same case ID associated with Mr. Gerace and *Bongiovanni et al*. The government was in possession of official documentation detailing the investigative efforts into Mr. Gogolack were officially labeled as being related to case no. 19-cr-227 from the beginning. Yet, the government declined to submit a related case form in *USA v. Gogolack* when the complaint was filed in August 2023, and it again declined to submit a related case form when the indictment was filed in September 2023.

That discovery reveals the clear implication that the government did indeed engage in prosecutorial steering, or judge-shopping, by declining to file a case-related form when Mr. Gogolack was first charged even though it later denied it.

*c. Grounds for Dismissal*

Similar to the government's decision to include false information in the indictment, the defense for Mr. Gerace has proffered in earlier submissions the evidence of prosecutorial steering, or judge shopping, early in this case.

As discussed earlier, the Court's decision regarding sanctions were tailored to the intentional violation of the Court's discovery order, and like the false information in the indictment, they did not address the prosecutorial steering. Accordingly, the District Court declined to consider the issue, finding it was beyond the scope of the appeal of the sanctions decisions at that time.

Similar to the government's inclusion of false information in the indictment, the prosecutorial steering issue has still has not received judicial review, but the appearance that the government attempted to influence judge selection in this case greatly undermines the credibility of the criminal justice system if not addressed.

Although there is already evidence which supports the conclusion that there was deliberate prosecutorial steering in this case, it would be appropriate to order the disclosure of grand jury minutes, so the defense can accurately review what information the government had solicited at the grand jury prior to the indictment of Mr. Gogolack, when it declined to file a related case form.

F.  MOTION FOR PROMPT DISCLOSURE OF BRADY MATERIAL AND INFORMATION

Pursuant to the prosecution's obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392 (1976), *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375 (1985) and *Kyles Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995), the Due Process Protection Act (PL 116-182) and the Standing Order in the United States District Court for the Western District of New York, the defendants moves the

Court for the prompt disclosure of all exculpatory and/or impeaching material in the prosecution's possession, custody or control or which is otherwise known to the prosecution, including, but not limited to, the following:

a. Any and all information and/or material which tends to exonerate the defendants or which tends to show that he did not knowingly commit any offenses alleged in the indictment;

b. Any and all evidence which tends to impeach the credibility of any prospective government witness (including co- defendants), including, but not limited to:

i. Any and all records or information revealing prior criminal convictions or guilty verdicts or juvenile adjudications, including but not limited to, relevant "rap sheets" of each witness the prosecutor intends to call at trial;

ii. Any and all records and information revealing prior or subsequent    misconduct, unethical conduct, criminal acts or bad acts of any witness, including co-defendants, the prosecutor intends to call at trial;

iii. Any and all allegations of prior or subsequent misconduct, unethical conduct, criminal acts or bad acts of any witness, including co-defendants, the prosecutor intends to call at trial of which the prosecutor knows or through the exercise of reasonable diligence should have reason to know;

iv. Any and all consideration or promises of consideration given during the course of the investigation and preparation of this matter by any law enforcement officials, including prosecutors or agents, police or informers, to or on behalf of any witness, including co-defendants, or on behalf of a relative of any such witness or co-defendant, the government intends to call at trial, or any such consideration or promises expected or hoped for by any such witness, or relative of any

witness, at any future time. Such "consideration" refers to anything which arguably could be of value or use to a witness, or relative of the witness, including but not limited to: formal or informal, direct or indirect, leniency; favorable treatment or recommendations or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, civil, administrative, regulatory, disciplinary or other matter involving the state or federal government or agency thereof, any association, (including legal association), any other authority, or other parties; civil, criminal or tax immunity grants; relief from forfeiture; payments of money, rewards or fees, witness fees and special witness fees; provisions of food, clothing, transportation, legal services, alcohol or drug related rehabilitation services or other benefits; placement in a "witness protection" program; informer status of the witness; letters to anyone informing the recipient of the witness' or the relative's cooperation; recommendations concerning licensing, certification or registration; recommendations concerning federal aid or benefits; promises to take affirmative action to help the status of the witness or co-defendant, or relative of the witness or co-defendant, in a profession, business or employment or promises not to jeopardize such status; aid or efforts in securing or maintaining the business or employment of a witness, or a relative of the witness; and anything else which arguably could reveal any interest, motive or bias of the witness in favor of the prosecution or against any defendant or which could act as an inducement to testify or to color his testimony;

v. Any and all statements -- formal and informal, oral or written -- by the prosecution, its agents and representatives to any person (including counsel for such persons) whom the prosecution intends to call as a witness at trial pertaining in any way to the possible or likely course or outcome of any government action -- state or federal, civil or criminal or licensing, matters against the witness, including co-defendants, or anyone related by blood or marriage to the witness;

vi. Any statements read or made by the government to the

departments of pre-trial services or probation in connection with the prosecution or conviction of any prosecution witness or potential prosecution witness;

vii. Any and all threats, express or implied, direct or indirect, or other coercion directed against any witness, or against a relative of such witness, whom the prosecutor intends to call at trial; criminal prosecutions, investigations, or potential prosecutions pending or which could be brought against any such witness, or relative of such witness; any probationary, parole, deferred prosecution or custodial status of any such witness, or relative of such witness; and any civil, tax court, court of claims, administrative, or other pending or potential legal disputes or transactions involving any such witness, or relative of such witness or co-defendant, and the state or federal government, any agency thereof or any regulatory body or association or over which the state or federal government, agency, body or association has real, apparent or perceived influence;

viii. A list of any and all requests, demands or complaints made of the government by any witness, including co-defendants, which arguably could be developed on cross-examination to demonstrate any hope or expectation on the part of the witness or co-defendant for favorable governmental action in his behalf or on behalf of a relative of such witness (regardless of whether or not the government has agreed to provide any favorable action);

ix. With respect to each witness and/or co-defendant the government intends to call at trial, or any member of the immediate family of any such witness, copies of all indictments, complaints or informations brought against such person by the federal, or any state or local government, all administrative, disciplinary, regulatory, licensing, tax, customs, or immigration proceedings brought by the federal, or any state or local government, or by any regulatory body or association, and, state what counts or actions have been the subject of guilty pleas, convictions, consent decrees, dismissals, or understandings to

dismiss at a future date; the date or dates on which pleas of guilty, if any, took place; and the names of the judges or hearing officers before whom such pleas were taken. If the government does not have copies of all indictments, complaints, or proceedings, state the dates and places of arrests, hearings, indictments, and information, the charges brought, and the disposition of those charges or matters so far as it is known to the government;

x. With respect to each witness and/or co-defendant, the government intends to call at trial, or any member of the immediate family of any such witness, a written summary of all charges or proceedings which could be brought by the federal, or any state or local government, but which have not or will not or which the witness believes have not or will not be brought because the witness is cooperating with or has cooperated with the government, or for any reason. Include copies of all memoranda of understanding between the government and its witnesses, whether by way of a letter to the attorney for a witness or otherwise;

xi. Any material not otherwise listed which reflects or evidences the motivation of any witness and/or co- defendant either to cooperate with the government or any bias or hostility against any defendant; the existence and identification of each occasion on which a witness has testified before any court, grand jury, administrative, regulatory, disciplinary body or other association, or otherwise officially narrated herewith, in the investigation, the indictment or the facts of this case, and any testimony, statements or documents given by the witness regarding same;

xii. All judicial proceedings in any criminal cases, and all regulatory, association or disciplinary proceedings of which the government knows or through the exercise of reasonable diligence should have reason to know in which testimony by any person has been given, regarding the misconduct, criminal acts or bad acts of any witness the government intends to call at the trial of this action;

xiii.  Any statements or documents, including but not limited to, judicial, regulatory, administrative, disciplinary, association or grand jury testimony, or federal, state or local tax returns, made or executed by any potential prosecution witness or co-defendant in the trial in this action, which the prosecution knows or through the exercise of reasonable diligence should have reason to know, is false;

xiv.  Any and all records pertaining to any civil lawsuits, arbitration proceedings or other proceedings between any defendant and any witness, or any company with which any defendant or any government witness may have been affiliated, including, without limitation, records or statements pertaining to the investigation, conduct and disposition of such litigation;

xv.  Copies of all medical and psychiatric reports known to the prosecutor or which can reasonably be known to the prosecutor concerning any witness and/or co- defendant the prosecutor intends to call at trial which may arguably affect the witness' credibility or his ability to perceive, relate or recall events;

xvi.  All documents and other evidence regarding drug or alcohol usage and/or dependency by any individual the government intends to call as a witness at trial, including but not limited to records relating to treatment of such individual in any federal, state, city or military drug or detoxification program;

xvii.  Any written or oral statements, whether or not reduced to writing, made by any potential prosecution witness and/or co-defendant which in any way contradicts or is inconsistent with or different from other oral or written statements he has made;

xviii.  Any requests prepared by the prosecution for permission to grant formal or informal immunity or leniency for any witness and/or co-defendant, whether or not such request was granted;

xix.   The same records and information requested in items (i) through (xviii) with respect to each non-witness declaring whose statements will be offered in evidence at trial pursuant to Fed. R. Evid. 806;

xx.   Copies of any and all records of law enforcement agencies reflecting intradepartmental disciplinary action taken against any law enforcement official or agent who will testify at trial;

xxi.   Copies of any and all records of any law enforcement or other governmental   agency   reflecting any commendations, awards or recognition or any kind, or requests for any commendations, awards or recognition of any kind made to or by any government agent or law enforcement officer for any work, action or conduct in connection with the investigation and prosecution of this case.

c.   The name and address and written or oral statements made by any person, including co-defendants, with knowledge and information concerning the events charged in the indictment and whose version of the same events is contrary to, or non-supportive of, the accusations set forth in any indictment or complaint filed against the defendants.

d.   The name and address and any written or oral statement made by any persons and/or co-defendants the government reasonably believes has information helpful to the preparation of the defense.

e.   The name and address and any written or oral statement made by any witnesses or co-defendants to the offense charged in the indictment whom the government does not intend to call as witnesses in this case.

f.   The name and address and any written or oral statement made by any witnesses or co-defendants who has provided a physical description of the shooters, including the type of clothing they were wearing and their location immediately before shots were fired, if their statement is inconsistent with other witnesses' statements or is inconsistent with the Government's theory of the case.

g.   Any information about the victim in the possession, knowledge or

control of the Government that may suggest that other individuals had
a motive, plan or opportunity to do harm to the victim.

Due process, as the Constitutional phrase has been interpreted, requires that the
government not suppress evidence favorable to a defendant or discrediting to its own
case, and, upon request, that it disclose to the defense all such information. *Brady v.
Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392
(1976); *Pyle v. State of Kansas*, 317 U.S. 213, 63 S.Ct. 177 (1942).

The requirement of disclosure extends to candor by the Government witnesses as
well as matters which relate more directly to guilt or innocence. *Giglio v. United States*, 405
U.S. 150, 92 S.Ct. 763 (1972); *Napue v. People of the State of Illinois*, 360 U.S. 264, 79 S.Ct. 1173
(1959). *See also, Williams v. Dutton*, 400 F.2d 797 (5th Cir. 1968), cert. denied, 393 U.S. 1105,
89 S.Ct. 908 (1969).

The Brady Rule grew out of a realization by the Supreme Court that the
defendant's abilities for acquiring evidence are disproportionate to those of the
government. Most defendants have neither the manpower nor the access and contacts
available to the government in its investigation of crime. Thus, the prosecution is obliged
to share the proceeds of its discovery with the defense where that evidence is favorable
to the latter's cause. Indeed, the importance of *Brady* has been so strongly enforced that
the Supreme Court, in *United States v. Bagley*, 473U.S. 667, 105 S.Ct. 3375 (1985),

unequivocally extended the duty of disclosure to information which may be used by the accused for impeachment at trial.

## 1. The Government Misconstrues its Brady Obligations

On December 27, 2024, co-defendant Scott Barnes pled guilty to Count 27 of the second superseding indictment which charged Barnes with being a felon in possession of firearms [18 U.S.C. §922(g)(1)].

Prior to entry of the plea, on November 29, 2024 [dkt #315], the government filed an "Advisory Regarding Search Warrant Affidavit" as to Scott Barnes which reads in relevant part [pp.1-2]:

> The undersigned counsel, as well as Assistant United States Attorney Joseph M. Tripi, have reviewed the 346-page search warrant packet related to the search of 417 Northumberland and have determined that the government is not obligated to disclose the affidavit pursuant to Brady/Giglio or 18 U.S.C. § 3500 for the following three reasons: First, there is no Brady material in the search warrant affidavit related to Mr. Barnes's two firearm charges. That is, there is no material in the affidavit that makes it less likely that Mr. Barnes's was a felon in possession of a stolen firearm, as charged in the Second Superseding Indictment. See United States v. Hunter, 32 F. 4th 22, 30–31 (2d Cir. 2022). Second, there is no Giglio material in the search warrant affidavit relevant to Mr. Barnes's case because neither the affiant-agent nor any source of information/confidential source/cooperating witness will be testifying at Mr. Barnes's trial. In other words, the search warrant affidavit does not contain any statements from any person who might be testifying in Mr. Barnes's trial and, therefore, does not contain any impeachment evidence that may be used by the defense. See United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001). Third, and relatedly, because

neither the affiant-agent nor any source of information/confidential source/cooperating witness will be testifying at Mr. Barnes's trial, 18 U.S.C. § 3500 does not require the affidavit's disclosure.

The government found it had no Brady obligation since "there was no material in the affidavit that makes it less likely that Mr. Barnes's [sic] was a felon in possession…" In other words, no exculpatory material.

The government then states that there is no Giglio material "because neither the affiant-agents nor any source of information/confidential source/cooperating witness will be testifying at Mr. Barnes's trial." That is, the warrant contained no statements from anyone the government expected to testify at the trial "and, therefore, does not contain any impeachment evidence that may be used by the defense".

If the government meant that whether information qualifies as Giglio material hinges upon whether it anticipates the witness will testify at trial, that is a misstatement of its obligations under Brady/Giglio.

For purposes of *Giglio*, "a "witness" is not only a testifying witness; it also means a non-testifying hearsay declarant whose out-of-court statement the government seeks to introduce at trial and who is subject to impeachment pursuant to Federal Rule of Evidence 806. *See United States v. Jackson*, 345 F.3d 59, 70-71 (2d cir. 2003) (". . . a contrary conclusion would permit the government to avoid disclosure of exculpatory or impeachment material simply by not calling the relevant witness to testify"). *United States v. Coleman*, 2022 WL 1025034 (WDNY, April 6, 2022) (19-cr-221-RJA); *United States v.*

90

*Percoco*, 16-CR-776, 2018 u.S. Dist. LEXIS 232236, *4 n.1 (S.D.N.Y. 2018); *United States v. Perez*, 10-cr-441, ___ Dist. LEXIS 24444, *11-12 (S.D.N.Y. Oct 20, 2005) ("…The issue does not turn on whether the declarant is testifying in court, but whether the declarant's credibility has been put into issue and can be attacked").

In *Coleman*, Judge Arcara cited other examples in our district in which the government misconstrued its Brady/Giglio obligations; *United States v. Tyshawn Brown*, 19-cr-222-EAW; *see also United States v. Parks*, 19-cr-87-LJV.

The Second Circuit has made clear that what constitutes Giglio material does not depend on whether the witness will testify.

Based on the incorrect statement of the law governing Brady/Giglio above, the defense has concerns that the government still has misconceptions about its obligations. In a recent filing in a former co-defendant's case, the government described its understanding of its Brady and discovery obligations.

Despite the cautionary language used in both districts, recently there have been a number of cases in which the government has neglected to provide Brady material in time for the defense to make use of it. *See e.g. US v. Parks*, Case No. 19-cr-00087-LJV-JJM, Dkt. # 966 at 2 ("And this is not the first case in recent memory to call into question the government's discovery practices in this District… [T]his Court cannot look the other way and permit such discovery violations—at best serious errors in judgment by the government—to persist when liberty interests are at stake.")

2. <u>Timing of Disclosure</u>

Effective preparation for trial is the cornerstone of effective representation of criminal defendants and disclosure of information which, in any of a variety of ways, impeaches the witness' credibility is consequently required before trial in order to enable effective preparation. As the Court in *United States v. Pollack* pointed out:

> Disclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure.
>
> *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976) (internal citations omitted).

The need for pre-trial disclosure of Brady material has been highlighted in several cases.

In *United States v. Ali Sadr Hashemi Nejad*, 18-cr-224 (S.D.N.Y. Sept. 16, 2020), the Government's failure to timely disclose potentially exculpatory documentation and its failure to alert defense counsel to the late disclosure of potentially exculpatory information resulted in the trial court vacating the conviction of defendant, dismissing the case with prejudice, and conducting a judicial inquiry into the conduct of the prosecution.

Several other courts have held similarly. *See also,United States v. Bejasa*, 904 F.2d 137, 140 (2d Cir. 1990), *cert. denied*, 498 U.S. 921, 111 S.Ct. 299 (1990) (a government file which contained impeachment material regarding a prosecution witness should have

been produced "prior to" the witness' testimony); *Gorham v. Wainwright*, 588 F.2d 178 (5th Cir. 1979) (under certain circumstances, delayed revelation of discoverable evidence may deny a defendant an effective defense); *United States v. Opager*, 589 F.2d 799 (5th Cir. 1979) (harm was done by the pre-trial failure of the government to disclose the whereabouts of the informant; crucial importance was given to pretrial opportunity to interview and/or investigate potential witness); *Grant v. Alldredge*, 498 F.2d 376, 381-382, n.5 (2d Cir. 1974) (failure of government to disclose before trial that bank teller picked out photograph of another individual was error); *United States v. Baxter*, et al., 492 F.2d 150 (9th Cir. 1973), cert. denied, 416 U.S. 940, 94 S.Ct. 1945 (1974) (delay in turning over requested favorable evidence is unconstitutional when delay in disclosure substantially prejudiced the preparation of the defense); *Clay v. Black*, 479 F.2d 319 (6th Cir. 1973) (per curiam) (pre-trial disclosure of an FBI scientific report would have permitted defense to establish necessary claim of custody to introduce certain blood stains); *United States v. Polisi*, 416 F.2d 573 (2d Cir. 1969) (the importance of Brady is to measure the effects of the suppression upon the defendant's preparation for trial); and *Hamric v. Bailey*, 386 F.2d 390 (4th Cir. 1967) (to be effective, disclosure must be made at a time when disclosure would be of value to the accused).

An Order mandating the timely production of such materials and reminding the prosecution of its obligations under Brady and its progeny is now mandated by the recently passed Due Process Protections Act.

Numerous district courts have ordered such timely or early discovery. *See United States v. Thevis*, supra (delaying disclosure of Brady materials useful for impeachment until the night preceding the testimony is insufficient); *United States v. Five Persons*, 472 F.Supp. 64 (D.N.J. 1979) (by adoption of a standard order, district judges declared that the rights to due process and a fair trial require availability of Brady material within 10 days after arraignment); *United States v. Goldman*, 439 F.Supp. 337 (S.D.N.Y. 1977) (if exculpatory evidence is produced for the first time at trial, defendant may not have an adequate opportunity to effectively utilize the material; all Brady material to be provided "immediately"); *United States v. Dillard*, 419 F.Supp. 1000 (N.D. Ill. 1976) (in light of complex decisions of strategy and preparation, it is better practice to require disclosure in advance of trial); *United States v. Quinn*, 364 F.Supp. 432 (N.D. Ga. 1973), aff'd on other grounds, 514 F.2d 1250 (5th Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430 (1976) (Jencks Act timetable cannot control release of information to which defendant is constitutionally entitled).

The United States District Court for the Southern District of New York has a standing order under the Due Process Protections Act which differs from the language in that used in the Western District.

The defense respectfully requests that the Court issue an additional order pursuant to the Due Process Protections Act similar to that used in the Southern District of New York requiring prompt disclosure of all potential Brady/Giglio material. The

defense has a good faith belief that the government is in possession of statements from at least one witness who it proffered which is exculpatory to one or more of the defendants.

## 2. Production of Impeachment Evidence

Mr. Ermin, Mr. Gerace, and Mr. Hinkle have itemized likely sources of impeaching information within the knowledge or reach of government counsel. *United States v. Agurs, supra.* Disclosure of this information is necessary in order for defense counsel to conduct an appropriate investigation and to conduct interviews and otherwise prepare for such trial proceedings as jury selection, opening statements and cross-examination.

At issue, from an impeachment standpoint, are the general principles of crediting and discrediting witnesses. McCormick has identified "five main lines of attack upon the credibility of a witness":

> The first, and probably the most effective and most frequently employed, is an attack by proof that the witness on a previous occasion has made statements inconsistent with his present testimony. The second is an attack by a showing that the witness is partial on account of emotional influences such as kinship for one party or hostility to another, or motives of pecuniary interest, whether legitimate or corrupt. The third is an attack upon the character of the witness. The fourth is an attack by showing a defect of capacity in the witness to observe, remember or recount the matters testified about. The fifth is proof by other witnesses that material facts are otherwise than as testified to by the witness under attack.
>
> 1 McCormick on Evidence §33, at 111-12 (4th ed. 1992) (footnotes omitted).

Discovery should extend to production of so-called "rap sheets" of the witnesses as well as any information concerning criminal conduct of prospective witnesses. Indeed, in requiring the production of this type of information, the Court in *United States v. Osorio*, 929 F.2d 753, 761 (1st Cir. 1991), described the government's obligation as "a constitutionally derived duty to search for and produce impeachment information . . ."

The Supreme Court has recognized ". . . that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. at 419, 115 S.Ct. at 1555 (1995). The Kyles decision was followed by the Second Circuit in *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("the individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation").

*Kyles* was also followed by the Ninth Circuit in *United States v.Hanna*, 55 F.3d 1456 (9th Cir. 1995). The *Hanna* Court vacated the conviction and remanded for an evidentiary hearing to explore "inconsistencies" between the arresting officer's testimony and his conversations with fellow officers. Id. at 1460- 1461.

In that regard, the defendants specifically request the substance of any and all inducements, promises, compensation or consideration, broadly defined, which the government has held out to witnesses or which a witness subjectively anticipates to receive in exchange for testimony or assistance.

The government has a constitutional obligation to disclose any and all consideration which is held out to a witness or which the witness subjectively hopes for and anticipates since such consideration directly gives rise to the inference of bias or interest. *See, generally, United States v. Mayer*, 556 F.2d 245 (5th Cir. 1977) (cross-examination of a prosecution witness who has had prior dealings with the prosecution or other law enforcement officials "ought to be given the largest possible scope [citation omitted];" conviction reversed). Id. at 248.

A common example of such matter which must be disclosed to the defense is the making of promises or the holding out of other inducements for a witness to cooperate and testify against the defendant. *See, e.g., United States v. Sanfilippo*, 564 F.2d 176 (5th Cir. 1977); *Annunziato v. Manson*, 566 F.2d 410 (2d Cir. 1977); *Boone v. Paderick*, 541 F.2d 447 (4th Cir.), *cert. denied*, 430 U.S. 959, 97 S.Ct. 1610 (1977); and *United States v. Tashman*, 478 F.2d 129 (5th Cir. 1973).

The duty of the government to disclose this information is an affirmative one and the ignorance of one prosecutor as to promises made to a government witness by another prosecutor does not excuse the failure to disclose. *Giglio v. United States*, *supra*. The obligation to disclose includes the total compensation or benefits paid to or expected by each witness. *United States v. Leja*, 568 F.2d 493 (6th Cir. 1977). The government must disclose both "the stick and the carrot," including threats to prosecute. *United States v. Sutton*, 542 F.2d 1239 (4th Cir. 1976).

Numerous examples exist which make the principle of "consideration" clear. *United States v. Sutton, supra* (witness rendered a statement as an inducement to government informant); *United States v. Antone*, 603 F.2d 566 (5th Cir. 1979) (witness' attorneys fees paid by State of Florida); *United States v. DiCarlo*, 575 F.2d 952 (1st Cir. 1978), cert. denied, 439 U.S. 834, 99 S.Ct. 115 (1978) (assistance in the business world); *United States v. Garza*, 574 F.2d 299 (5th Cir. 1978) (information provided would result in no other indictments, heroin conspiracy indictment dismissed, bond in prior conviction on appeal would be lowered); *United States v. Croucher*, 532 F.2d 1042 (5th Cir. 1976) (error to refuse defense counsel to cross-examine informer about prior arrests, other than ones resulting in convictions for felonies or misdemeanors involving moral turpitude); *United States v. Bonanno*, 430 F.2d 1060 (2d Cir. 1970), *cert. denied*, 400 U.S. 964 (1971) (failure to disclose outstanding indictment); and *Patriarca v. United States*, 402 F.2d 314 (1st Cir.), cert. denied, 393 U.S. 1022, 89 S.Ct. 633 (1969), *rehearing denied*, 393 U.S. 1124, 89 S.Ct. 987 (1969) (information provided would be brought to the attention of prosecution in other pending action; family assigned to protective custody). These examples, of course, are only intended to make the principle clear and do not exhaust the range of possibilities.

The defendants have moved for specific information regarding the prior occasions when each witness gave testimony or otherwise made statements relative to the facts in this action. Witnesses' statements which are at least, in part, exculpatory and/or important for impeachment should be produced. *United States v. Miller*, 529 F.2d 1125 (9th Cir. 1976),

*cert. denied*, 426 U.S. 924, 96 S.Ct. 2634 (1976); *United States v. Quinn, supra*; *United States v. Five Persons, supra*; and *United States v. Thevis, supra*. Witnesses' statements or other information which has been recorded on so-called 302 forms by agents of the government which contain exculpatory material should also be disclosed. *Brady v. Maryland, supra*.

Likewise, the defnedants' request for the substance of all occasions known to the government on which an informer, accomplice or co-conspirator has previously testified, even if no direct relationship to the instant case is apparent, should be granted.

A defendant should be afforded the widest possible latitude in investigation and cross-examination. In *Johnson v. Brewer*, 521 F.2d 556 (8th Cir. 1975), the point was clearly illustrated. There, a defendant was charged in an Iowa proceeding with a drug offense. The conviction was obtained with the involvement of a paid informer who had worked in such a capacity in other jurisdictions, including Michigan. In light of the witness' modus operandi and his desire to maintain a continuing relationship as an informant with the law enforcement agencies, and his bias, it was a denial of due process to have refused to provide the defendant access to the informant's testimony in an earlier proceeding involving a separate drug sale in Michigan. Similarly, it amounts to a denial of due process in this instance to refuse to provide the requested information in this case.

It has also been held that where a government employee serves as a prosecution witness, the defendant is entitled to have access to his or her government personnel file in order to ascertain whether there is information within it which could be of impeaching

nature. *United States v. Deutsch*, 475 F.2d 55, 58 (5th Cir. 1973), *rev'd on other grounds*, *United States v. Henry*, 799 F.2d 203 (5th Cir. 1984). Similarly, in *United States v. Morell*, 524 F.2d 550, 552-55 (2d Cir. 1975), the Court of Appeals held that defense counsel were entitled to impeaching information in the confidential file of an informant witness. *See also, United States v. Beekman*, 155 F.2d 580 (2d Cir. 1946).

In sum, the right of counsel for the accused to confront, cross-examine and impeach is cherished and remains the means by which "the scope and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105 (1974) (Burger, C.J.). Our specific requests for impeaching information are highly material for precisely this venerable mission. *See, generally, United States v. Opager*, 589 F.2d 799 (5th Cir. 1979). Therefore, the prosecution should be ordered to disclose the requested information or to show good cause for their failure to comply. *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392 (1976); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).

It is respectfully requested that defendants' motion for the immediate and continuing disclosure of all Brady material be granted.

## 3. Production of Information Inconsistent with the Government's Theory of the Case

The factual allegations set forth in the Government's filing go not only to the defendants innocence and guilt, but also to the degree of culpability in the event of a conviction. Indeed, if proven as true, the allegations against the defendants are likely to warrant heavy punishment.

As the Court is aware, in addition to issues of innocence and guilt, the Brady Rule extends to exculpatory evidence relating to potential punishment. *United States v. Young*, 916 F.3d 968 (4th Cir. 2019); *Comstock v. Humphries*, 796 F.3d 701 (9th Cir. 2015).

Upon review of the Government's recent filing, it appears the Government's trial narrative may come from eyewitnesses who were allegedly present at relevant locations.

Based on the record in this case, it is clear the Government is in possession of statements and materials that call into question the validity of the Government's factual theory.

Because of the import of those statements to both the guilt and punishment phase of the case, the Brady rule mandates disclosure of all statements, testimony, information or other materials that call into question the Government's articulated narrative.

### G. MOTION FOR EARLY DISCLOSURE OF JENCKS MATERIAL

The defendants respectfully requests immediate disclosure of *Jencks* material (18 U.S.C. 3500). As the Court will understand, this case is factually complex in that the proof that will be offered at trial relies on statements of eyewitnesses.

In cases such as this in the Western District of New York, it is common that *Jencks* material consisting of several thousands of pages of testimony and reports is withheld until 30-60 days before trial.

However, early disclosure of Jencks material allows defendants to proceed to trial with full knowledge of the allegations against them and a complete opportunity to

prepare for trial. With respect to the Government's interests, early disclosure of Jencks

materials ensures the integrity of any plea or conviction obtained at trial.

In the Western District of New York, it is customary that the Government agree to

the early disclosure of Jencks material to ensure adequate time for trial preparation by

counsel. *See, e.g., United States v. Wilson*, et.al., 15- cr-00142 (W.D.N.Y. 2018).

 In that case, at least one of the same prosecutors as in this case, voluntarily

provided early Jencks disclosure approximately six months ahead of the scheduled trial.

That facilitated some defendants deciding to take plea deals; for the remaining trial

defendants it permitted the early filing of motions *in limine* which narrowed the potential

issues for trial by allowing the court to vet them in advance.

In this case, there is a protective order to ensure discovery materials are

safeguarded. Moreover, given the gravity of the case and the length of time anticipated

to trial, we assume the Government's investigation is complete. Therefore, the defendants

requests the Court to order the Government to deliver to counsel immediately the

following:

- any statement, however taken or recorded, or a transcription thereof, if any, made by the witness(es) to a grand jury;

- any written statement made by a witness that is signed or otherwise adopted or approved by the witness;

- any stenographic, mechanical, electrical or other recording transcription thereof, which is a substantially verbatim recital of an oral statement made by the witness and recorded contemporaneously with the making of such oral statement;

- any and all rough notes of witness interview(s) taken or obtained in any investigation of the defendant including federal, state, local and other investigations whether or not the contents thereof have been incorporated in official records;

- any notes and memoranda made by government counsel during the interviewing of any witness intended to be called by the government in its direct case. *Goldberg v. United States*, 425 U.S. 94, 101-108 (1976); and, all surveillance reports made or adopted by a witness. *United States v. Petito*, 671 F.2d 68, 73 (2d Cir. 1932).

## IV. MOTIONS FOR CHANGE OF VICINAGE AND SEVERACE

### H. MOTION FOR CHANGE OF VICINAGE

The Western District of New York is administratively divided into two divisions; one in Buffalo, which encompasses Niagara County and Erie County, and the other in Rochester, which includes Monroe and outlying counties.

Mr. Ermin, Mr. Gerace, and Mr. Hinkle, move for change of vicinage, and respectfully request an Order directing the trial to be held in Rochester, NY.

### 1. Background

In September 2023, the government filed a motion for intradistrict transfer. Case no. 19-cr-227, Docket Item 619.

The government's motion was made before they made a motion to disqualify one of Mr. Gerace's counsel, which resulted in public allegations against one of Mr. Gerace's attorneys, alleged to be a witness in this case. The government's motion was also made

before it charged the indictment in this case, advancing false allegations of a conspiracy to kill a witness. The government's motion was also made before the Bongiovanni guilty verdicts were publicized.

Even before all of that, the government stated "(h)ere, this case is easily the most heavily covered federal criminal case in Buffalo, and it has received substantial publicity that will undoubtedly affect public perception of the case… By any metric, the media coverage is ramping up, and there is no end in sight. As a result, it is highly unlikely that the 'effects of the publicity will dissipate before trial.'" Case no. 19-cr-227, Docket Item 619 at 4-5.

At the time the government made the motion, it argued that the case had already "reached a critical point in which the interests of justice would be best served by transferring the trial to Rochester, New York," but the most prejudicial publicity would occur later.

Mr. Gerace's attorneys never disputed the overwhelming publicity that already existed at that time, but the defense opposed the motion at that time based on the burden it would put on the defense and the belief that the case was in a posture where the prejudice from existing publicity could be dealt with based on extensive and careful *voir dire*.

Before the trial in Mr. Gerace's case, the defense noted that it would have considered a different position "if it had known that the government would file a motion

to disqualify counsel, which would receive heavy publicity, and the government would file an indictment charging Mr. Gerace with a conspiracy to kill a witness in early January 2024, shortly before the trial had been scheduled to commence." Case no. 19-cr-227, Docket Item 1293-1 at 7.

Then, the Gerace trial proceeded in the shadow of the Bongiovanni trial, in which Mr. Bongiovanni was convicted of several corruption-related counts, but acquitted of any counts associated with Mr. Gerace. Mr. Gerace's defense expressed a concern that the coverage of Mr. Bongiovanni's guilty verdict was not nuanced enough to distinguish between the counts related to Mr. Gerace and the counts related to others, and any exposure to the news coverage, direct or indirect, would draw the wrong conclusion that the Bongiovanni jury had found evidence of conspiracy between the two, when it had not.

Sure enough, the jury at Mr. Gerace's trial convicted him of conduct that Mr. Bongiovanni was appropriately acquitted of among other conduct. Like every part of this case[22], the verdict received extensive coverage, even recently, when WGRZ channel 2 ran an interview of one of the jurors from the Gerace trial, in which the juror insinuated that he found it "outrageous" that the defense did not call witnesses to the stand.

---

[22] The sensationalized nature of government allegations about Gerace's alleged ties to "Italian Organized Crime", alleged drug and sex trafficking involving his strip club Pharoah's located adjacent to the Buffalo airport, the suicide of a respected state court judge alleged to have been an associate of Gerace, as well as the murder of Gerace's former employee Crystal Quinn, all received top billing on most local media outlets for the past several years.

The sentencing that is scheduled to occur later this year will receive additional media coverage, continuing the prejudicial pretrial publicity that continues to compound in and around Buffalo, NY.

Counsel for Mr. Gogolack have filed an Excel spreadsheet listing demonstrating how saturated the Buffalo news market has been by coverage of criminal cases involving Mr. Gerace. While not complete, the exhibit contains news stories during the prosecutions of Mr. Gerace. These stories appeared in the Buffalo News, the single major newspaper in the Buffalo area, as well as on local Buffalo television news and radio stations.

Mr. Gerace's mugshot has appeared prominently on in news stories accompanying news articles/stories with allegations about his ties to Italian Organized Crime, acts of intimidation, bribing law enforcement officials, his close association with judges and with national officers of an alleged violent motorcycle gang, and his conviction for drug and sex trafficking crimes. Most, if not all of these references would be precluded from the trial in his pending case.

In regard to this case, as is the government's custom in our district in high-profile cases, it filed a so-called speaking indictment. In a case such as this, where there is enormous publicity regarding a defendant, even prior to the filing of an indictment, the speaking indictment clearly prejudices the public against the defendant since the defendant lacks the ability to respond in kind to the allegations.

Aside from the publicity in Buffalo about Gerace, the Outlaws Motorcycle Club has also been a subject of notoriety in Buffalo. For example, as part of its "Crystal Quinn series", the Buffalo News ran a lengthy article about other deaths with which the Outlaws M.C. has been involved across the country. See "Pharoah's case isn't the first that linked an Outlaws leader to a witness' death", Buffalo News, Dan Herbeck (January 30, 2024)

Therefore, in the Buffalo market there is widespread prejudicial publicity about both Mr. Gerace and the public coverage of the Outlaws Motorcycle Club and other "1%" biker gangs, that contributes to his inability to get a fair and non-biased jury in Buffalo.

Despite the abundance of negative publicity about Mr. Gerace and the Outlaws Motorcycle Club in Buffalo media markets, there has been minimal national attention, and little if any in the Rochester area.

Gerace now moves for an intra-district ("vicinage") transfer pursuant to a Fed. R. Cr. Pro. 18 seeking to have the trial moved from Buffalo to Rochester for trial.

2. Basis of District Court's Decision and Order

Vicinage under the Sixth Amendment governs the area from which a jury is selected. It is distinct from the venue provision of Article III of the United States Constitution which regulates the district location of trial. Judge Vilardo, of the Buffalo Division, is assigned to preside over the trial of this case.

The trial, which is expected to last two to three months, was scheduled in the Buffalo Division based on the situs of the crimes in Erie, Niagara and Allegany Counties.

The driving time from the federal courthouse in Rochester to the Buffalo federal courthouse is approximately one hour and twenty minutes .

Mr. Gerace's federal court conviction in 19-cr-227 likely would not be admissible at Gerace's trial and yet was the subject of many recent news accounts. It is not just garden variety pretrial publicity.  This is unique in that he is charged with conspiracy to murder a government witness who worked as a stripper at his club where John Ermin was employed as the club manager and other motorcycle gang members were alleged to frequent.

In Buffalo and surrounding areas, the public has been subject to constant coverage of a link between Mr. Gerace, Outlaws Motorcycle Club and violence. The defense anticipates the government will try to use that as a building block in this federal murder trial by arguing he is guilty of ordering Ermin to murder Crystal Quinn. If the jury in any way uses that to buttress the government's case, it is completely unfair to the defendants. The suggested remedy is simply transfer it to the Rochester division of the District.

## 3. Legal Standard

A denial of an intra-district transfer is subject to an abuse of discretion review. "[A] trial court has broad discretion in deciding where to fix the location of the trial which will not be overridden on appeal as long as the court gives "due consideration" to the factors listed in Rule 18." *United States. v. Balistrieri*, 778 F.2d. 1226, 1229 (7th Cir. 1985).

A motion to change the district of a federal trial (venue) is governed by Fed. R. Crim P. 21 while a motion to change intra-district location (vicinage) is governed by Fed. R. Crim P. 18.  While the text of Rule 18 does not expressly refer to pre-trial publicity as a factor for vicinage transfer, courts have consistently held that such a consideration is proper along with enumerated factors of convenience of parties and prompt administration of justice".  *United States v. Lipscomb*, 299 F.3d. 339-42, 340 (5th Cir. 2002).

In analyzing the pre-trial publicity the Court must employ the more flexible standards appropriate to change of vicinage rather than the standards used in venue change cases.

There is a clear disparity of the pre-trial publicity between the Rochester area of the district and the Buffalo area and the uniquely prejudicial aspect of the publicity regarding Mr. Gerace's prior federal conviction and the ongoing publicity associated with the Outlaws Motorcycle Club.

## 4. Venue publicity v. Vicinage Publicity

The analysis begins with the Sixth Amendment Right to a fair trial. *Skilling v. United States*, 561 U.S. 358, 377 (2010); U.S. Const. Amend. VI.  The judge noted that before jury selection, a defendant who raises a constitutional challenge to venue "must make a showing of presumed prejudice arising when prejudicial publicity so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community."

Under a vicinage analysis, which is a far less drastic remedy than a change of venue, the district court is not bound by Rule 21 analysis regarding pre-trial publicity. For example, in *United States v. Wittig*, 2005 U.S. Dist. LEXIS 5736 (Dist. Kansas 2005), the district court denied defendant's motion for change of venue under Rule 21(a) on pre-trial publicity grounds. The district court, however, granted a change of vicinage. The district court concluded that "the transferee division offered a potential venire less tainted by adverse publicity and community prejudice than the transferor division."

Further, the *Wittig* court determined that there was a sufficient population in the transferee division that had little or no recognition of the defendants and the allegations such that an intra-district transfer to the transferee division (only 60 miles from transferor division) remained a viable and effective way of complying with the "Constitutional mandate for a fair and impartial jury." *Id* at 31.

*United States v. Addonizzio*, 451 F.2d. 49, 62 (3rd Cir. 1971), similarly recognized the difference in the vicinage standards regarding pre-trial publicity and venue changes. In Addonizio the Third Circuit upheld the trial court's transfer from Newark to Trenton within the District of New Jersey as "the proper exercise of the trial courts discretion conferred by Rule 18," despite the opposition of all of the defense counsel, who were located in Newark. *Id*. ("the concentrated public interest and pretrial publicity in the case in the Newark area and the facilitation of the jury selection process in Trenton outweighed the consideration of convenience for defendants").

The Rule 21(a) requirement for a change of venue is that the court must transfer the proceeding to another district if so great a prejudice against the defendant exists that the defendant could not obtain a fair trial. Rule 21's mandate that a case "must" be transferred does not remove the court's discretion under Rule 18. The court still "may" transfer the case within the district after balancing the applicable factors

### 5. The administrative impact of holding trial in Buffalo compared to Rochester.

As noted above, there is a stark disparity between the pre-trial publicity in Rochester area and the Buffalo area. The government cannot rebut this fact. In fact, they requested this very relief earlier in the Gerace prosecutions, before the escalation of coverage associated with the government's motion to disqualify counsel and the trials of Mr. Bongiovanni and Mr. Gerace. Such a consideration is properly given weight and used in the balancing test for vicinage changes.

The defense understands that there are administrative considerations associated with the requested relief and concerns that transfer could cause delay.

*In re Chesson*, 897 F.2d 156 (5th Cir. 1990), the court noted that the "prompt administration of justice" factor in Rule 18 vicinage transfers involves more the impact of the transfer on the trial at issue. "The prompt administration of justice includes more than the case at bar; the phrase includes the court's docket generally. The court must balance not only the effect the location of the trial will have upon the defendants and their

witnesses, but it must weigh the impact the trial location will have on the timely disposition of the instant case and other cases."

Mindful of that point, the defense recognizes, the District Court's docket is already congested due to having presided over the back-to-back-to-back trials in U.S. v. Bongiovanni, 19-cr-227, and the forthcoming death penalty trial scheduled for September 2025, so if it administratively facilitates the requested relief, the defendants would consent to administrative transfer to a judge in the Rochester division. Calendar congestion and convenience for the available judges can be legitimate factors in deciding a motion to change vicinage.

The decision to request this relief is not made lightly. The decision to transfer impacts the defense as it does the prosecution. Indeed, in other cases a change of vicinage was considered, at least some of defense counsel opposed the relief. The universal agreement among defense counsel in this case demonstrates recognition of the absolute need for change of vicinage. The motion is made jointly between Mr. Ermin, Mr. Gerace, and Mr. Hinkle, and it is understood that the Federal Defender's Office will join based on their review of the extensive pretrial publicity.

## I. MOTION(S) FOR SEVERANCE

Mr. Ermin, Mr. Gerace, and Mr. Hinkle move for severance in two respects: (1) severance of offenses, i.e. Counts 1-3 from Counts 4-28; and (2) severance of defendants.

The grounds for severance of offenses are discussed below.

In regard to severance of defendants, each individual defendant has his own reasons for why severance is necessary to avoid undue prejudice. Thus, counsel for each defendant will file a separate submission identifying individual grounds for severance of defendants.

Because the historical practice of severance litigation in Buffalo is left to the District Court Judge, the individual submissions will adopt the arguments below and supplement them with further arguments focused on each defendant's need for severance from his co-defendants.

1. Applicable Law

Two rules of the Federal Rules of Criminal Procedure are relevant to analysis of severance: (1) Rule 8, which deals with legality of joinder of offenses and defendants; and (2) Rule 14, which deals with severance based on the prejudice of joinder of offenses or defendants.

Issues related to the propriety of joinder under Rule 8 and relief from prejudicial joinder under Rule 14 "are quite different in nature… the former is a question of law… [while] the grant of relief under rule 14 of these rules lies within the discretion of the trial judge…" *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980)

*a. Fed. R. Crim. P. 8*

In regard to Rule 8, the Court must determine whether joinder is legally proper:

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

(b) Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8

Notably, "the language of 8(a) does not allow joinder on the same basis as 8(b); the words 'same or similar character' are omitted from 8(b)." *United States v. Jones*, 880 F.2d 55, 61 (8th Cir. 1989).

The distinction was addressed by the Court of Appeals for the D.C. Circuit:

Joinder of all the appellants in one indictment appears to have been authorized by Rule 8(b), because all were charged with the same conspiracy. Joinder of the separate charges against Cupo and Decker that they got merchandise by false pretenses was also authorized by 8(b), because these offenses were alleged to be parts of the same conspiracy. *But joinder of the separate charges against Carbonaro, Palmer and Pelletreau, that they got automobiles by false pretenses, was not authorized unless these offenses also were in effect alleged to be parts of 'the same act or transaction or the same series of acts or transactions constituting an offense or offenses.' That these offenses were 'of the same or similar character' as the conspiracy is not enough to permit joinder of the charges against the several defendants alleged to have*

> *committed them.* See *Ward v. United States*, 110 U.S.App.D.C. 136, 289 F.2d 877 (1961); *United States v. Welsh*, 15 F.R.D. 189 (D.D.C.1953); *Williamson v. United States*, 310 F.2d 922, 197 n. 16 (9th Cir. 1962) (dictum); *United States v. Haim*, 218 F.Supp. 922, 930 (S.D.N.Y. 1963). See also *Ingram v. United States*, 272 F.2d 567, 570 (4th Cir. 1959). When similar but unrelated offenses are jointly charged to a single defendant, some prejudice almost necessarily results, and the same is true when several defendants are jointly charged with a single offense or related offenses. Rule 8(a) permits the first sort of prejudice and Rule 8(b) the second. *But the Rules do not permit cumulation of prejudice by charging several defendants with similar but unrelated offenses.*
>
> *Cupo v. United States*, 359 F.2d 990, 992–93 (D.C. Cir. 1966)(emphasis added).

Thus, while counts of a same or similar character may be properly joined against a single defendant, under subdivision (b), the joinder of defendants must be founded on allegations that the defendants "participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8.

*b. Fed. R. Crim. P. 14*

Even when joinder is legally permissible, it "in no way detracts from the rights of individuals to avoid prejudicial joinder. The trial court can always entertain a motion to sever under Rule 14 to determine prejudice to individual defendants." *Haggard v. United States*, 369 F.2d 968, 973 (8th Cir. 1966). A defendant's constitutional right to due process and a fair trial cannot be eviscerated in the interest of judicial convenience.

Rule 14 is presented as follows:

(a) Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

(b) Defendant's Statements. Before ruling on a defendant's motion to sever, the court may order an attorney for the government to deliver to the court for in camera inspection any defendant's statement that the government intends to use as evidence.

Fed. R. Crim. P. 14

A trial should be severed under Rule 14 if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

A defendant can be unfairly prejudiced by the admission of evidence against a co-defendant which would not be admissible against the defendant. *See United States v. Figueroa*, 618 F.2d 934, 946-47 (2d Cir. 1980); *see also Zafiro*, 506 U.S. at 539 (severance is appropriate when "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.'); *see also United States. v. James*, 2007 WL 1579978, *2 (E.D.N.Y. May 31, 2017) ("Spillover prejudice occurs when proof inadmissible against a defendant becomes a part of his trial solely due to the

presence of co-defendants as to whom its admission is proper.") (internal quotations omitted).

The Second Circuit has recognized that "[t]here is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all." *United States v. Halper*, 590 F.2d 422, 430-31 (2d Cir. 1978)

The Court "has a continuing duty at all stages of the trial to grant a severance if prejudice does appear." *Schaffer v. United States*, 362 U.S. 511, 516 (1960).

While the "court has the authority to tightly control its docket," it "also has an obligation under Rule 14 to insure against undue prejudice from the trial of two or more offenses in a single proceeding." *United States v. Wirsing*, 719 F.2d 859, 866 (6th Cir. 1983).

## 2. Improper Joinder of Offenses Under Rule 8

The charges in the 28-count indictment group into four categories: (a) the murder of a federal witness; (b) narcotic trafficking/use of firearms in furtherance of narcotic trafficking; (c) false statements made to law enforcement; and (d) kidnapping of two victims wholly unrelated to the charged murder.

Mr. Ermin is charged in the first 3 counts with obstruction, witness tampering and retaliation with respect to Ms. Quinn, and one *unrelated* count of possessing a firearm while being an unlawful user of a controlled substance. Mr. Gerace is only charged in the

first 3 counts with obstruction, witness tampering and retaliation with respect to Ms. Quinn. Mr. Hinkle is charged in the first 3 counts with obstruction, witness tampering and retaliation with respect to Ms. Quinn, and *unrelated* counts charging marijuana and firearm offenses.

The current indictment includes a number of other defendants, charged with different conduct, and with disparate involvement in the facts underlying this case. Any trial would be lengthy, factually complex, and require the introduction of evidence relevant to some co-defendants that is not relevant or admissible as to others.

The Court should sever the first set of charges, contained in Counts 1-3, stemming from the alleged conspiracy to murder of Ms. Quinn, from the remaining 25 counts, which are listed as follows with the defendant(s) charged in each count listed in parenthesis:

- Count 4: distribution of fentanyl resulting in death (Gogolack)

- Count 5: making false statements to the FBI on August 3, 2023 (Knight)

- Count 6: engaging in a narcotics conspiracy between July 2, 2023 and October 17, 2023 (Gogolack, Barber, Byrd)

- Count 7: maintaining a drug-involved premises at 296 Scott Ave. in Wellsville, New York from July 2, 2023-August 8, 2023 (Gogolack)

- Count 8: possession of firearms in furtherance of drug trafficking from July 2, 2023-August 8, 2023 (Gogolack)

- Count 9: felon in possession of a firearm and ammunition from July 2, 2023-August 8, 2023 (Gogolack)

- Count 10: unlawful user of controlled substances in possession of a firearm and ammunition (Gogolack)

- Count 11: kidnapping of victim 1 on March 14, 2023 - March 15, 2023 (Gogolack, Barber)

- Count 12: kidnapping of victim 2 on March 14, 2023 - March 15, 2023 (Gogolack, Barber)

- Count 13: tampering with a witness (victim 1) by sending threatening message on August 14, 2023 to prevent grand jury testimony (Gogolack)

- Count 14: tampering with a witness (victim 1) by sending a threatening message on August 14, 2023 to induce the witness to withhold testimony from the grand jury (Gogolack)

- Count 15: tampering with a witness (victim 1) by sending a threatening message on August 14, 2023 to prevent the witness from communicating with law enforcement about the commission of a federal offense (Gogolack)

- Count 16: tampering with a witness (victim 2) by sending threatening message on August 14, 2023 to prevent grand jury testimony (Gogolack)

- Count 17: tampering with a witness (victim 2) by sending a threatening message on August 14, 2023 to induce the witness to withhold testimony from the grand jury (Gogolack)

- Count 18: tampering with a witness (victim 2) by sending a threatening message on August 14, 2023 to prevent the witness from communicating with law enforcement about the commission of a federal offense (Gogolack)

- Count 19: manufacture and possession with intent to distribute 100 or more marijuana plants on October 24, 2023 (Hinkle)

- Count 20: maintaining a drug involved premises in 2023 until October 24, 2023 at 4290 Donovan Road, Alma, New York (Hinkle)

- Count 21: possession of firearms in furtherance of drug trafficking on October 24, 2023 (Hinkle)

- Count 22: felon in possession of firearms on October 24, 2023 (Hinkle)

- Count 23: making a false statement to law enforcement on October 24, 2023 (Knight)

- Count 24: unlawful user of controlled substance in possession of firearms on December 7, 2023 (Ermin)

- Count 25: unlawful user of controlled substance in possession of firearms on December 7, 2023 (Roncone)

- Count 26: making a false statement to law enforcement on December 7, 2023 (Roncone)

- Count 27: felon in possession of firearms on Decmeber 7, 2023 (Barnes)

- Count 28: possession of stolen firearm on December 7, 2023 (Barnes)

Of the Courts above, deal with narcotics, kidnapping, and false statement offenses, and there is virtually no overlap with Counts 1-3, other than Court 4 which charges Mr. Gogolack with distribution of a controlled substance causing Ms. Quinn's death, independent of whether it was done as part of the conspiracy charged in Counts 1-3.

The only remaining counts which could be conceivably related to Counts 1-3 are Counts 5, 23, and 26, which involve other defendants allegedly making statements that were misleading to law enforcement. Those counts do not involve any acts by Mr. Ermin, Mr. Gerace, and Mr. Hinkle, and they which would be independently severable due to the prejudicial effect of those charges, discussed in the section below.

All remaining counts, including Counts 6-22, 24-25, and 27-28 bare no connection to Ms. Quinn or the alleged conspiracy addressed in counts 1-3.

Rule 8(a) allows joinder of offenses that are the "same or of similar character." As a corollary to that rule, counts are misjoined when they are not based on the same act or transaction as other charges in the indictment.

Where, as in this case, the counts alleged are not based on the same act or transaction, the counts are not properly joined, and severance is appropriate. *United States v. Shellef*, 507 F3d 82 (2d Cir. 2007); *United States v. Halper*, 590 F.2d 422 (2d Cir. 1978).

There is no conceivable overlap between the conspiracies and the personal drug trafficking activity of Mr. Gogolack or any witness intimidation he allegedly engaged in as part of that drug trafficking activity. Mr. Gogolack alone is charged in Counts 4, 7-10 with substantive drug distribution, maintaining a drug involved premises and possession of firearms. And other than unrelated co-defendant Courtnie Barber, who has now plead guilty, Mr. Gogolack alone is charged in Counts 11-18.

Any activities that Mr. Gogolack was allegedly engaged in outside of Counts 1-3, are completely independent of Mr. Ermin, Mr. Gerace, and Mr. Hinkle, and they are not based on the same act or transaction.

Even the other charges in the indictment against Mr. Ermin and Mr. Hinkle, comprised of firearm or marijuana charges are totally unrelated to Counts 1-3, and present virtually no basis for overlap evidence.

Under Rule 8, arguably, Counts 1-3 were improperly joined with counts 4-28. But even if the joinder appropriately stretched beyond counts 1-3 to include counts that even remotely relate to the death of Ms. Quinn, then it would still be limited to counts 1-5, 25, and 26. All other counts should be severed based on the legal analysis under Rule 8.

3. Undue Prejudice of Joinder of Offenses

Even if the initial joinder of counts is deemed proper, the Court may nevertheless grant severance under Fed. R. Crim. Pro. 14 to order severance of counts or separate trials for defendants or offenses or other relief as justice requires if any defendant is unduly prejudiced by joinder. *United States v. Boney*, 2012 WL 4801889 (D. Del. Oct 9, 2012) (charges properly charged because drug conspiracy charge is part of the same series of acts and transactions as the retaliation charges; defendant's alleged retaliation was an attempt to avoid prosecution on the drug conspiracy charge by murdering the witness who had knowledge of drug-related events).

In other words, if Mr. Ermin, Mr. Gerace, and Mr. Hinkle were alleged to have been involved in Mr. Gogolack's alleged drug trafficking, and Crystal Quinn had knowledge of those charges and they retaliated against her or engaged in efforts to prevent her from informing law enforcement about it, the retaliation and drug trafficking charges would be joined.

Here, the obstruction, retaliation and witness tampering charges are unrelated to almost all counts that follow. The only commonality is that other defendants named as part of the obstruction, retaliation and witness tampering conspiracy, are also named in counts 4-28.

In *Drew v. United States*, 331 F.2d 85,89 (D.C. Cir. 1964), the Court of Appeals for the D.C. Circuit noted that:

- The defendant may become embarrassed or confounded in presenting separate defenses to separate sets of counts;

- The jury may use evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant which leads to finding guilt on those other unrelated charges; or

- The jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. A less tangible, perhaps equally persuasive element or prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct form only one.

Those concerns are particularly poignant in this case. Simply put, a single jury cannot independently evaluate the two sets of conduct, and evidence of co-defendant(s)' acts of violence or narcotic activity will unfairly prejudice the jury's view of the more serious counts in the indictment.

A recent decision by Judge Arcara is instructive. *United States v. Eady*, 19-cr-170 (dkt #480), was a multi-defendant case with seven defendants charged in a 26-count indictment. Defendant Eady moved to sever his case when there were five defendants remaining. The two lead defendants were charged with shooting and killing a federal witness/informant as well as drug and gun-related offenses.

Eady was charged with obstruction of justice for tampering with a witness, victim or an informant (18 U.S.C. §1512(c)(2)) and influencing or injuring an officer or juror (18

U.S.C. §1503) in connection with his grand jury testimony. The government alleged Eady lied in the grand jury when asked to identify witnesses to the shooting.

The Court focused on whether severance was warranted under Fed. R. Crim. Pro. 14 to protect Eady's Sixth Amendment right to a speedy trial and to protect him from spillover prejudice. The government opposed severance arguing limiting instructions would curtail any risk of spillover prejudice.

In conducting his Rule 14 analysis, Judge Arcara considered the factors in *United States v. Gallo*, 668 F. Supp. 736, 749 (E.D.N.Y. 1987): The number of defendants and counts; complexity of the indictment, estimated length of trial, disparities in the amount or type of proof offered against the defendants, disparities in the degrees of involvement by defendants in the overall scheme, possible conflict between various defense theories or trial strategies, and especially prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.

The Court granted Eady's severance motion recognizing that while several of the Gallo factors did not favor severance, other factors "tipped the scale" in favor of granting the defendant's motion.

> The Court's discretionary determination whether to grant severance hinged largely on whether a joint trial posed a danger of spillover prejudice that could not be overcome by limiting instructions.
>
> *Id.* at 11.

The Court held that the rationale in spillover cases cited by the defense (*United States v. Burke*, 789 F.Supp.2d 395 (E.D.N.Y. 2011) and *United States v. Dinome*, 954 F.2d 839 (2d Cir. 1992)) was more persuasive than the cases relied on by the government (*United States v. Cardascia*, 951 F.2d 474 (2d Cir. 1991). Both *Burke* and *Dinome* stand for the principle that spillover prejudice may not be cured by limiting instructions if it subjects defendants to otherwise inadmissible evidence of activities of a violent nature. *Id*. at 14.

In particular, Mr. Ermin, Mr. Gerace, and Mr. Hinkle are not charged with acts of kidnapping against two victims (not Quinn), and there is no way to cure the prejudice of a joint trial.

Furthermore, there is also other prejudice to Mr. Ermin, Mr. Gerace, and Mr. Hinkle in a joint trial. Specifically, they would be tried with the co-defendants who are alleged to have misled law enforcement during the investigation into Crystal Quinn's death. Obviously, whether or not the co-defendants were candid and truthful necessarily requires the introduction and consideration of evidence that is wholly unrelated to Mr. Ermin, Mr. Gerace, and Mr. Hinkle and bears only upon those defendants.

In the event of a single trial, the Government's prosecution of the co-defendants charged with misleading law enforcement will suggest to the jury that any testimony exculpating Mr. Ermin, Mr. Gerace, and Mr. Hinkle or disagreeing with the Government's theory of the case is suspect and untrue because of the potential lies of co-

defendants; and that the facts and circumstances of the murder were such that individuals with personal knowledge were motivated to be less than candid with law enforcement.

For all these reasons, and others, the Court should order severance of Counts 1-3 from Counts 4-28. Further arguments regarding suppression will be made in supplemental submissions by the individual defendants, directly to the District Court.


## V. MOTIONS FOR OTHER NON-DISPOSITIVE RELIEF

### J.   Motion for Preservation of Rough Notes and Other Evidence

The defendants moves for an order of this Court requiring all government agents and officers who participated in the investigation of the defendants in this case to retain and preserve all rough notes taken as part of their investigation whether or not the contents of the notes are incorporated in official records.

This motion is made so the trial court can determine whether disclosure of the notes is required under Brady, Agurs, Giglio and/or the Jencks Act (18 U.S.C. §3500) or the Fifth and/or Sixth Amendments of the United States Constitution.

The defendants also requests an order of this Court requiring the Government to preserve and protect from destruction, alteration, mutilation or dilution any and all evidence acquired in their investigation of the defendants.

K. MOTION FOR F.R.E. 404(B), 608 & 609 NOTICE AND EVIDENCE

The defendants move for notice pursuant to Federal Rules of Evidence 404(B), 608 & 609.

Specifically, in regard to Mr. Gerace, the government claims he was motivated to either obstruct justice, retaliate or tamper with a witness was because Ms. Quinn had cooperated with the government and was anticipated to testify at his trial in 19-cr-227. While those cases involved narcotics trafficking, sex trafficking bribery of a federal official, and witness tampering, all of those acts were alleged to have occurred at Pharoah's Gentleman's Club (PGC) and were in furtherance of Mr. Gerace's operation of the club.

If the jury in this case is made aware that Mr. Gerace was previously charged or convicted of witness tampering, narcotics trafficking or other crimes, it is more likely jurors would convict him in this case based on "propensity" evidence.

Thus, counsel asks the Court to order the immediate disclosure of notice and all material related to evidence the government intends to present pursuant to FRE 404(b) and 807, and well as the Bill of Particulars, sought above, and any government impeachment evidence pursuant to FRE 608 and 609.

L. MOTION TO REVEAL IDENTITY OF INFORMANT(S)

The defendants move this Court, pursuant to the provisions of Rule 16 of the Federal Rules of Criminal Procedure and the Fifth Amendment to the United States

Constitution, for an Order requiring the government to disclose the following information:

> (a) The identity of any and all informants possessing information which may be material to defendant's alleged guilt or innocence;

> (b) The identity of any and all informants who were present at any of the events which are described in the instant indictment;

> (c) Any and all government reports containing information received from any informant referenced above which may be material to the instant case.

This motion is made on the grounds that the informants are percipient witnesses to the allegations contained in the instant indictment, and may also possess exculpatory and exonerating information.

With respect to item (c), the defendants request these reports on the ground that, to the extent he has been unable to review reports containing factual information relayed by that informant, he has been unable to lay proper factual foundation for the disclosure of the informant. At a minimum, defendant seeks to have all reports described above submitted in camera to the Court for review and subsequent disclosure to counsel. In the event that the Court does not compel disclosure of this information and the identities of the informants, defendants respectfully requests that all government reports be sealed and made part of the record in the instant case.

## 1. The Government is Obliged to Disclose the Identity and Whereabouts of Informants and to Make Them Available to the Defense

In *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623 (1957), the United States Supreme Court held that whenever an informant's testimony may be relevant and helpful to the accused's defense, his or her identity must be revealed. The *Roviaro* Court set forth the following general standard for disclosure:

> Where the disclosure of an informant's identity or the contents of his communications is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the privilege must be waived. In these situations, the trial court may require disclosure and, if the government withholds the information, dismiss the action.
>
> *Roviaro v. United States*, *supra*, 353 U.S. at 60-61.

The Court made clear that, while there is no fixed rule with respect to disclosure, four considerations are relevant:(1) the crime charged; (2) the possible defenses; (3) the possible significance of the informant's testimony; and (4) other relevant factors.

The "relevant and helpful" language of Roviaro has been interpreted by the Second Circuit "to require disclosure when it is material to the defense." *DiBlasio v. Keane*, 932 F.2d 1038, 1041-1042 (2d Cir. 1991). The *DiBlasio* Court recognized that:

> The judge must consider a number of factors in determining whether the informant's testimony is material: "the crime charged, the possible defenses, the possible significance of the informant's testimony and other relevant factors."
>
> *DiBlasio v. Keane*, *supra*, *citing*, *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988), *cert. denied*, 489 U.S. 1089, 109 S.Ct.

1555 (1989), *quoting, Roviaro v. United States*, 353 U.S. 53, 77
S.Ct. 623 (1957).

Similarly, the Ninth Circuit requires disclosure of the identity of an informant when he or she is a percipient witness. Thus, in United States v. Cervantes, the Court recognized that a "percipient witness" must be disclosed: The government acknowledges that the informant Duque was a percipient witness to the transaction. It therefore supplied Cervantes with the informant's identity. See, Roviaro v. United States.

In *United States v. Cervantes*, 542 F.2 773, 77 (9th Cir. 1976) (*en banc*). The same result was reached in *United States v. Hernandez*:

> In light of [the informant's] role in the narcotics transaction with which appellants were charged, it cannot be said that disclosure of Smith's identity would not have been "relevant or helpful" to the appellant's defense. Because [the informant] was a participant in the events that were critical to the prosecution's case, no claim could be raised under Roviaro, nor was it raised, that [the informant's] identity could be lawfully withheld from the appellants.
>
> *United States v. Hernandez*, 608 F.2d 741, 744-745 (9th Cir. 1979)( internal citations omitted); *see also, United States v. Miramon*, 443 F.2d 361, 362 (9th Cir. 1971).

The law is also clear that where an informant's testimony is essential to a fair determination, the government may be required to disclose his identity and address, if any. *United States v. Roberts*, 388 F.2d 646 (2d Cir. 1968). *See also, United States v. Anderson*, 509 F.2d 724 (9th Cir. 1975) (within the court's discretion to compel disclosure even when use of the informant goes only to probable cause).

Further, the need for disclosure and production of the informant is mandated when the indictment contains a conspiracy charge and the informant could have information regarding either knowing membership in the conspiracy or possible entrapment. *United States v. Mormon*, *supra*; *Lopez-Hernandez v. United States*, 394 F.2d 820 (9th Cir. 1968); *Alexander v. United States*, 362 F.2d 379 (9th Cir. 1966).

Obviously, it is not the defendants' burden to prove what the informant would actually say if disclosed since the informant's unavailability makes that burden impossible to discharge in all cases. *See, e.g.*, *United States v. Mormon*, *supra*, where disclosure should have been made because the informant "might have corroborated the (defendant's story)." *Id*. at 362. As stated by the Court in *United States v. Day*, *supra*: "No matter how inert his role of participation he might still possess information relevant to a fair determination of the issues".

As to all informants, the defense is entitled to a revelation of their whereabouts and addresses prior to trial so that sufficient investigation into their background can be made. As stated by the Court in *United States v. Hernandez*, *supra*:

> We recognize that the address of a principal witness, as [the informant] most assuredly was, is an integral element of identity for without such information, little meaningful inquiry can be made into the background information affecting credibility.
>
> *United States v. Hernandez*, 608 F.2d 741, at 745 (9th Cir. 1979).

In this case, therefore, the location and present whereabouts of any and all informant(s) must be immediately disclosed so that an investigation may be made into the credibility and background of the informant[s] prior to trial. Further, any purported government assertion that there is some unspecified danger to informant[s] is insufficient to justify withholding the information concerning his or her whereabouts. As Hernandez makes clear, the decision concerning potential "danger" must be made only after an evidentiary hearing. *Hernandez, supra*, 608 F.2d at 745, fn.3.

Finally, the government's obligation is not fully satisfied by merely disclosing the identity and location of the informant(s). The defense here specifically requests that the informant(s) be produced. The Ninth Circuit has held that government has an obligation to "accomplish this or show that, despite reasonable efforts, it was not able to do so". *United States v. Hart*, 546 F.2d 798, 799 (9th Cir. 1976) (*en banc*). *See also, United States v. Cervantes, supra; Velarde- Villa Real v. United States*, 354 F.2d 9 (9th Cir. 1965).

For the reasons cited above, it is apparent that each of the informant(s) in this case is a material witness. The government should be ordered to disclose the identity of that witness and his or her whereabouts, and to make those witnesses available to the defense. Failure to do so would require dismissal of the case.

## 2. Upon a Proper Showing, the Defendant is Entitled to Pre-Trial Access to Prosecution Witnesses

Mr. Gerace recognizes that the general rule is that in a capital case, the accused has a greater constitutional right to require production of the names and addresses of prospective witnesses. *See, e.g., United States v. Cole*, 449 F.2d 194, 198 (8th Cir. 1971), *cert. denied*, 405 U.S. 931, 92 S.Ct. 991 (1972). Additionally, in *United States v. Baum*, 482 F.2d 1325 (2d Cir. 1973), the Second Circuit held that it was reversible error to deny pre-trial disclosure of the identity of a witness to the defendant's similar criminal conduct. *See also, United States v. Allstate Mortgage Corp.*, 507 F.2d 492 (7th Cir. 1974) (rule of *Baum* adopted and approved).

Moreover, an order requiring pretrial disclosure of government witnesses is a proper exercise of judicial authority. *See, United States v. Richter*, 488 F.2d 170, 173-174 (9th Cir. 1973) (affirming the authority of the trial court to order pre-trial discovery of prospective government witnesses); *United States v. Jackson*, 508 F.2d 1001, 1006-1007 (7th Cir. 1975) (a trial court can enter and order sua sponte and without a showing of materiality requiring pre-trial disclosure of prospective government witnesses.

The United States Supreme Court first addressed the disclosure of government witnesses in *Alford v. United States*:

> Cross-examination of a witness is a matter of right. Its permissible purposes, among others, are that the witness may be identified with his community so that independent testimony may be sought and offered of his reputation for veracity in his own neighborhood; that the jury may interpret

> his testimony in the light reflected upon it by knowledge of his environment; and that facts may be brought tending to discredit the witness by showing that his testimony in chief as untrue or biased. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them.

> *Alford v. United States*, 282 U.S. 687, 688, 51 S.Ct. 218, 219 (1931)(internal citations omitted).

Subsequently, in *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748 (1967), the Supreme Court reconsidered the rule of Alford v. United States and held that the failure to disclose the address of a primary prosecution witness was a denial of the defendant's Sixth Amendment right to confront and cross-examine witnesses. The Court stated:

> The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.

> *Id*. at 750.

Therefore, it is the defendant's position that an accused has the right to know the identity and location of prospective government witnesses so that he may interview them prior to trial in order to put such witnesses in proper setting for purposes of credibility and cross-examination.

Based, then, on the reasons cited above, it is respectfully requested that the identity and location of the prospective government witnesses be disclosed and that they be produced by the government prior to trial.

Disclosure of informant information in this prosecution is essential to a fair determination of the charges filed against the defendant. Much of what the government's evidence in this case appears to be is based on eyewitness statements. The defendants are entitled to know whether these government informants, who are or may be criminals based on their proximity to the murder and affiliations with drug and gang activity, have any knowledge of whether the defendants were involved in alleged criminal activity.

In addition, the defense demands the following information about all informants:

- All evidence affecting the issues of bias or credibility;

- Their criminal records, *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980);

- All promises or consideration of any kind given to the informants, *Giglio v. United States*, 405 U.S. 150 (1972);

- Identification of the informants' prior testimony, *Johnson v. Brewer*, 521 F.2d 556 (8th Cir. 1975);

- Evidence of psychiatric treatment of each informant or cooperating witness or person, *United States v. Lindstrom*, 698 F.2d 1154 (11th Cir. 1983);

- Evidence of the informants' narcotic habits, *United States v. Fowler*, 465 F.2d 664 (D.C. Cir. 1972);

- Whether the informants are being compensated, including favorable plea agreements, in return for their cooperation with the government. *United States v. Morell*, 524 F.2d 550 (2d Cir. 1975); and

- A review of the informant file kept by the authorities for each informant.

The inherent unreliability of the testimony of an accomplice or government informant underscores the need for complete disclosure of information relating to credibility. *See United States v. Bagley*, 473 U.S. 667 (1985); *Perkins v. LeFevre*, 642 F.2d 37

(2d Cir. 1981); *United States v. Caldwell*, 466 F.2d 611 (9th Cir. 1972). Put another way, "[t]he use of informants to investigate and prosecute persons is fraught with peril." *United States v. Bernal-Obeso*, 989 F.2d 331 (9th Cir. 1993).

For these reasons, the identities and information requested above should be disclosed by the government to the defendants.

## M. MOTION FOR LEAVE TO JOIN IN CO-DEFENDANT'S MOTIONS

Upon information and belief, the Federal Defender's Office will file pretrial motions on behalf of Mr. Gogolack. Other defendants may also file pretrial motions.

Mr. Ermin, Mr. Gerace, and Mr. Hinkle individually move to adopt any motions or arguments filed by any of their co-defendants to the extent that the relief requested is not adverse to their individual interests.

This motion is made in the interest of judicial efficiency. Permitting Mr. Ermin, Mr. Gerace, and Mr. Hinkle to join in their co-defendants' motions will avoid duplicative filings by defense counsel. Therefore, Mr. Ermin, Mr. Gerace, and Mr. Hinkle ask that they be deemed to join in any motion filed by a co-defendant unless any of them individually give notice to all parties and the Court that they will not join in the motion(s).

## N. MOTION FOR LEAVE TO MAKE OTHER PRETRIAL MOTIONS

The defendants respectfully move the Court for an order allowing them to make further and additional motions which may be necessitated by due process of law, by the

Court's ruling on the relief sought herein, by additional discovery provided by the Government or investigation made by the defense, and/or by any information provided by the government in response to the defendant's demands.

The specific requests contained in these motions are not meant to limit or preclude future requests by the defendant for further relief from this Court as appropriate. The reason additional motions should be allowed is that filing these motions at this time would not be an efficient use of the Court's and the parties' time and resources, as many of these motions may not be necessary based on what evidence the Government does or does not intend to introduce at trial, or by other pre-trial developments in this case. Additionally, other motions may be required depending on the Court's rulings on the motions made supra and other information or documents disclosed by the Government.

Specifically, in addition to the dispositive motions scheduled to follow the non-dispositive motions, the defendants reserve the right to make the following pretrial motions at an appropriate time in the case, in addition to other motions that may be appropriate: (1) motions *in limine* related to evidence the government or defnedants intend to introduce at trial; (2) *ex parte* motions pursuant to Federal Rule of Criminal Procedure 17(b)/(c) for orders allowing the pretrial production of documents; (3) motions pursuant to Federal Rule of Criminal Procedure 15(a) for pre-trial deposition of a witness; (4) motions for pre-trial production of Government summaries pursuant to Federal Rule of Evidence 1006; (5) motions for a supplemental jury questionnaire or for counsel

participation in voir dire; (6) motions for additional peremptory challenges; (7) motion for various non-pattern jury instructions; and (8) *ex parte* motions for authorization of funds for experts and other resources to defend these matters.

For the foregoing reasons, the Court should issue an Order permitting the defendants to make other motions as requested above.

## VI. CONCLUSION

For all of the reasons set forth above, Mr. Ermin, Mr. Gerace, and Mr. Hinkle respectfully request this Court order the relief requested in the Notice of Motion and such other relief that this Court deems appropriate.

DATED:    Orchard Park, New York
          April 16, 2025

                                    s/ Cheryl Meyers Buth
                                    Cheryl Meyers Buth, Esq.
                                    MEYERS BUTH LAW GROUP, PLLC
                                    *Attorneys for Defendant Peter Gerace, Jr.*
                                    21 Princeton Place, Suite 105
                                    Orchard Park, New York 14127
                                     (716) 508-8598
                                    cmbuth@mblg.us

DATED:    Rochester, New York
          April 16, 2025

                                    s/ Mark A. Foti
                                    Mark A. Foti, Esq.
                                    THE FOTI LAW FIRM, P.C.
                                    *Attorneys for Defendant Peter Gerace, Jr.*
                                    16 W. Main Street – Suite 100
                                    Rochester, New York 14614
                                    (585) 461-1999
                                    mark@fotilaw.com

DATED:     Rochester, New York
              April 16, 2025

s/ Donald M. Thompson___
Donald M. Thompson, Esq.
EASTON THOMPSON KASPEREK
SHIFFRIN LLP
*Attorneys for Defendant John Ermin*
16 W. Main Street – Suite 243
Rochester, New York 14614
(585) 423-8290
dmthompson@etksdefense.com

DATED:     Lockport, New York
              April 16, 2025

s/ George V. C. Muscato___
George V. C. Muscato, Esq.
MUSCATO & VONA, LLP
*Attorneys for Defendant John Ermin*
107 East Avenue
Lockport, New York 14094
(716) 434-9177
georgemuscato@gmail.com

DATED:     Hamburg, New York
              April 16, 2025

s/  Daniel J. Henry_____
Daniel J. Henry, Jr., Esq.
Frank Bogulski, Esq.
Attorneys for Howard Hinkle
16 Main Street
Hamburg, New York 14075
(716) 648-0510
dhenry@villariniandhenry.com