IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

      v.                                                  23-CR-99-LJV

SIMON GOGOLACK, et al,

                 Defendants.

---

**DEFENDANTS RESPONSE TO THE GOVERNMENT'S
MOTION TO RESCIND THE REFERRAL ORDER AND TO
SCHEDULE A TRIAL DATE**

Defendants, by and through counsel, provide the following memorandum in response to the government's motion to rescind the order referring pretrial matters to the Magistrate Judge and to schedule a trial date, filed on May 28, 2025. Docket Item 435.

The Table of Contents is as follows:

**I. INTRODUCTION** ...................................................................................................................... 2

**II. INACCURACIES IN THE GOVERNMENT'S MOTION** ............................................................ 5

   A. MISREPRESENTATIONS REGARDING HISTORICAL LITIGATION OVER SECOND COUNSEL ................................ 6

     *1. Howard Hinkle's motion for second counsel.* ................................................................ 6

     *2. Right to Second Counsel* ................................................................................................ 7

     *3. Blatantly False Representations Regarding Determination of Second Counsel* ............... 8

     *4. Failure to Acknowledge the Decision to Continue Second Counsel for Mr. Hinkle* ......... 9

   B. MISREPRESENTATIONS REGARDING THE GOVERNMENT'S ATTEMPTS TO INSERT ITSELF IN DETERMINATIONS OF SECOND COUNSEL ................................................................................................................ 11

     *1. The government fails to recognize the reason that learned counsel was appropriately appointed following the Feb. 5 memorandum* ................................................................................. 12

     *2. The government mischaracterizes the record regarding the Magistrate's deferral of the government's Motion for Reconsideration* ............................................................................... 14

*3. Upon actual review of the government's arguments against appointment of second counsel, they were appropriately disposed of* ................................................................................................ *15*

**III. TIMING OF THE GOVERNMENT'S MOTION** ..................................................................... **19**

**IV. PROSECUTORIAL STEERING** ............................................................................................ **28**

**V. JUDICIAL ECONOMY AS A PRETEXT** ................................................................................ **32**

**VI. GOVERNMENT MISREPRESENTS EVENTS BEFORE MAGISTRATE JUDGE MCCARTHY** ...... **36**

**VII. CONCLUSION** ..................................................................................................................... **39**

## I. INTRODUCTION

On January 9, 2024, this Court issued a Text Order of Referral to the Magistrate Judge in this case pursuant to 28 U.S.C. Section 636(b)(1)(A, B). Docket Item 28 (hereafter "Referral Order").[1] On May 28, 2025, the government filed a motion to rescind this Court's Referral Order. Docket Item 435.

If not the first, it appears this may be one of the only times the government has ever moved to vacate a referral order in this district. The government's motion seeks to steer first impression of legal issues in this case away from Magistrate Judge McCarthy on the pretext that the government is concerned about judicial economy and speedy trial. However, the government did not move to rescind the Referral Order during the year-and-a-half after its entry through the argument of non-dispositive motions on May 21,

---

[1] Orders of referral like the one issued in this case are issued in virtually every criminal case in this District. The use of magistrate judges to assist in weeding through most pretrial motions has been considered the most efficient and effective way to manage judicial resources in this District. It resolves many legal issues before the Magistrate without further judicial review. It permits the Magistrate to preside over some of the most time-intensive pretrial proceedings, including evidentiary hearings. It allows the Magistrate to preside over many pretrial appearances until the matter is approaching trial.

2025. More to the point, the government did not move to vacate the Referral Order until the oral argument during which Magistrate Judge McCarthy found a sufficient basis to review grand jury minutes *in camera*. The government filed its motion 497[2] days following the issuance of the Referral Order on the second superseding indictment, immediately after Magistrate Judge McCarthy's decision to review the grand jury minutes and after prosecutors represented they would speedily comply with the Judge's order.

A week after the Magistrate Judge's decision, the government acknowledged for the first time that *Brady* information exists which has not been disclosed. The government previously turned over 36,000 documents and other digital evidence pursuant to its discovery obligation; but it was not until Magistrate Judge McCarthy stated he would review the grand jury transcripts that prosecutors expressed their intention to provide the defense with information they believed could qualify as *Brady.* And on June 3, 2025, the government turned over another 4,000 documents and additional digital evidence.

Despite the government's direct and indirect criticism of Magistrate Judge McCarthy, the record shows that Magistrate Judge McCarthy has admirably fulfilled his judicial duties in a case fraught with challenges, almost all of which are of the government's creation. He has ruled against the defendants on a substantial number of

---

[2] 615 days from the initial order following the initial indictment of defendant Gogolack on September 9, 2023 (Docket item 14).

issues[3], but he has also ruled against the government on key issues when appropriate to do so.[4]

With its current motion, the government is attempting to circumvent the referral order so that it, rather than the District Court, can control which judge will first hear the pretrial issues. This strategy follows evidence of prosecutorial steering in the manner in which charges were filed with the Court Clerk's office at the beginning of this case. After its resistance to turning over grand jury transcripts was met with skepticism by the Magistrate Judge, perhaps it is no surprise that the government is again searching for a more favorable audience –this time in the form of the District Court Judge who pulled back on the severity of sanctions imposed earlier in the case when the government violated Magistrate Judge McCarthy's discovery order.

The judicial administration of this case is clearly within this Court's discretion and the defense will abide any order issued by the Court; but the Court's independent authority should not be exercised simply because the government requests it, and given

---

[3] For example, the non-dispositive motions contained hundreds of pages of memoranda in support of the defendants' motions. Magistrate Judge McCarthy decided almost all of the motions in the government's favor. Even on the issue of grand jury disclosure, he merely ordered the minutes be provided to chambers for *in camera* inspection and indicated disclosure to defense counsel would depend on what he reviews.

[4] Even when the Magistrate Judge McCarthy has ruled against the government, he has denied parts of the defendants' motions. On sanctions, the defendants sought dismissal or hearings, which were denied. On grand jury minutes, Mr. Gerace's counsel argued that grand jury minutes should be released to defense counsel, because counsel can identify material falsehoods or omissions in the testimony that the Magistrate might not be able to recognize. The Magistrate only ordered *in camera* review at this stage, though the government appears to be exceedingly concerned about what the minutes will reveal to the Court.

the inordinate amount of context that the government omitted from its motion, the defense felt it necessary to file a response that augmented the government's recitation of the record. Therefore, the first section of this response addresses the factual and/or procedural inaccuracies contained in the government's motion. In that way, the Court will have a more complete and honest record by which to judge the history of prosecutorial steering in this case and, hopefully, dissuade similar future attempts.

## II. INACCURACIES IN THE GOVERNMENT'S MOTION

The majority of the government's submission is devoted to what is entitled "Procedural Background." It is less procedural history and more a list of grievances focused on the assignment of second counsel for two of the defendants and scheduling issues pertaining to motion practice.

The government has often addressed procedural points in the litigation as a launching pad to reiterate arguments previously made to the Magistrate, many of which were appropriately addressed and disposed of in the first instance. Although the issue of second counsel has already been decided (with the government foregoing any appeal) it is clear the government would like second counsel removed in order to gain a strategic advantage by minimizing defense resources.

Mindful that the Court will discuss the government's motion on Monday, June 9, 2025, this section is intended to add context to the information presented by the

government in certain areas and correct a number of misrepresentations before the Court addresses the issue with the parties.

<u>A. Misrepresentations Regarding Historical Litigation Over Second Counsel</u>

*1. Howard Hinkle's motion for second counsel.*

Although the government generally glosses over the procedural history involving the appointment of Mr. Hinkle's second counsel, the government does reference the initial motion in footnote 1, representing that "Defendant Hinkle filed to appoint learned counsel on January 24, 2024." Docket Item 435 at 3, n 1. The defendant's motion requested "appointment of learned counsel *or a second attorney*." Docket Item 47 at 1. At that time, Mr. Hinkle was represented by a single attorney who argued the following:

> *Given the complexity of this case and the amount of defendants, even if the government were to affirmatively state that they were not going to seek the death penalty, Mr. Hinkle argues that the appointment of a second attorney is necessary to provide the effective assistance of counsel.* In this case, the government has publicly acknowledged the complexity of this case and the many challenges both the government and the defendants have had in moving the previous indictments to trial. To say that this has been a challenging process would be an understatement. *Given the complex factual and legal issues, the appointment of a second attorney would be prudent for all the defendants in this case, especially because the government has several attorneys prosecuting it.*

Docket Item 47 at 3 (emphasis added).

Initially, the Magistrate Judge granted the motion for learned counsel to Mr. Hinkle and directed that learned counsel also be appointed to Mr. Gogolack. Docket Item

54; *see also* Docket Item 69 (Text Order appointing Daniel J. Henry, Jr. as learned counsel). The Court reserved on learned counsel for Mr. Gerace and Mr. Ermin, because financial eligibility had not yet been determined. Docket Item 54.

*2. Right to Second Counsel*

The government notes that the "decision not to seek the death penalty terminated Gerace and Ermin's statutory right to learned counsel." Docket Item 435 at 4. The government cites *United States v. Douglas*, 525 F.3d 225 (2d Cir. 2008).

While it may true that the statutory right under 18 USC 3005 ceases, the government's argument lacks relevant context. The termination of a statutory right to learned counsel, does not terminate the court's discretion to appoint second counsel under 18 USC 3006A and the Sixth Amendment. Indeed, the relevant passage from *Douglas* clarifies that point:

> Finally, we emphasize that the question on this appeal is whether the district court erred in requiring Douglas to proceed with only one government-funded attorney once it became clear that he would not be subject to the death penalty. Our conclusion that § 3005 does not entitle a defendant to a second attorney under these circumstances would not preclude a district court, in its discretion, from maintaining the dual appointment in a future case out of a "concern for fairness at the trial of a criminal offense," *United States v. Durant,* 545 F.2d 823, 827 (2d Cir.1976). "[N]o right ranks higher than the right of the accused to a fair trial." *United States v. King,* 140 F.3d 76, 81 (2d Cir.1998) (internal quotation marks omitted).
>
> *Douglas*, 525 F.3d at 238.

*3. Blatantly False Representations Regarding Determination of Second Counsel for Gerace*

The government turns to a false representation that it has previously made before the Magistrate Judge and now repeats before this Court, claiming that the Magistrate Judge denied Mr. Gerace's request for second counsel based on the fact that this is a mega case.

In regard to the request by Mr. Gerace the government makes the following claim:

> On March 8, 2024, the Magistrate Court formally assigned Gerace's previously retained attorney, Mark Foti, Esq., as CJA counsel. After assigning Mr. Foti, the Magistrate Court denied the request to appoint second counsel and stated: "Okay. As you all know, the Government, I think, a week ago today advised that the death penalty issue is now off the table. So at this point, I think Mr. Foti is -- is adequate and we'll proceed on that basis." See Trans., at 3:15-19, 4-5, Mar. 8, 2024 (emphasis added); see also ECF No. 94.
>
> Docket Item 435 at 4.

However, review of the relatively short transcript from March 8, 2024, clearly shows that following the government's selective quote of the Magistrate Judge, Mr. Foti discussed the need for second counsel while recognizing learned counsel was no longer the basis for such an appointment. Docket Item 358 at 3-4. Mr. Foti noted that the request was complicated by the fact that the government had moved to disqualify Mr. Gerace's other attorney, Eric Soehnlein, in case no. 19-cr-227. Docket Item 358 at 4. The Magistrate Judge indicated that he would take it "under consideration." *Id*.

More specifically, the Magistrate Judge made it clear that he was not ruling on the request for second CJA counsel to be appointed at that time. The Magistrate Judge plainly stated: "I'm not granting that today nor am I denying. I'm just not deciding it." *Id*.

In addition to misrepresenting the record regarding the Magistrate Judge's decision on the defense request to appoint second counsel, the government also omits the fact that the Magistrate Judge tied his decision regarding second counsel for Mr. Gerace to the decision whether to continue second counsel for Mr. Hinkle.

> And you are correct that in this case, I appointed, I believe, Mr. Henry as co-counsel for Mr. Bogulski, but that was at the point at which it was still potentially a death penalty case.
>
> So I may rescind that. I haven't yet and I may continue it. *If I do continue it, I probably would look favorably on your application, but I'm just not deciding any of that today*.
>
> Docket Item 358 at 4-5 (emphasis added).

### 4. Failure to Acknowledge the Decision to Continue Second Counsel for Mr. Hinkle

After the footnote referencing Mr. Hinkle's motion "to appoint learned counsel," the government does not review any further procedural history pertaining to Mr. Hinkle until April 2025.

That is an glaring oversight given what transpired in Mr. Hinkle's case: Dan Henry, Jr. was continued as second counsel to Mr. Hinkle pursuant to the fact that this is a mega case.

As this Court knows, Mr. Hinkle's counsel submitted a "non-capital mega case budget" for review by the Second Circuit's case budgeting attorney. The case budgeting attorney approved a non-capital budget that included two attorneys. That budget was then submitted to this Court for approval. This Court and the Circuit appropriately approved the non-capital mega case budget which authorized two attorneys.

At a status conference in June, after the District Court and Second Circuit had approved of a non-capital mega case budget that included second counsel, the Magistrate Judge indicated it was considering removing Mr. Henry as second counsel. Docket Item 147. Mr. Henry advised the Magistrate Judge of the approved budget and the issue was left unresolved at that time. *Id.*

Mr. Henry filed an "*ex parte* motion to continue as co-counsel." Docket Item 125. The government did not object to the *ex parte* submission or the requested relief. The Magistrate issued a text order indicating "For the reasons discussed in attorney Daniel Henry's ex parte submission 125, he may continue as co-counsel for defendant Hinkle." Docket Item 133.

Thus, Mr. Hinkle was permitted second counsel based on the fact that this is a mega case.[5] Similarly, the Federal Defenders continued the assignment of two counsel for

_____

[5] In the government's motion, it refers to this case as a "purported 'mega case.'" Docket Item 435 at 9. There is nothing "purported" about it. The determination to approve a non-capital mega case budget was made by this Court and the Circuit and recognized by the Magistrate (Docket Item 69), long before the government's recent attempts to insert itself in decisions regarding the appointment of counsel.

Mr. Gogolack.[6]  Mr. Gerace, who was still litigating disqualification motions for one of his attorneys in Case No. 19-cr-227, and Mr. Ermin were the only two defendants charged in Counts 1-3 that remained with one attorney in this case.

### B. Misrepresentations Regarding the Government's Attempts to Insert Itself in Determinations of Second Counsel

In recent months, the issue of appointment of second counsel again moved to the forefront of this case for two reasons: (1) the Office of the Attorney General issued a memorandum on February 5, 2025, indicating that prior decisions not to seek the death penalty under the Biden administration would be reconsidered, renewing the possibility of capital prosecution in this case; and (2) the drafting of pretrial motions necessarily involved a more direct engagement with the voluminous discovery and the complicated nature of the case, reemphasizing the need for second counsel.

A great deal of the government's motion to vacate is premised on the position that the appointment of second counsel was mishandled. However, neither the defense application for second counsel nor the Magistrate Judge's decision to appoint second counsel has engendered delay; rather, it is solely the government's insistence on inserting itself into the Court's analysis that has wasted time.

---

[6] In the leadup to motions, the Federal Defenders determined that two attorneys were insufficient for the complexities of this case and a third attorney noticed her appearance on the docket. Docket Item 400.

*1. The government fails to recognize the reason that learned counsel was appropriately appointed following the February 5th memorandum*

The government acknowledged the issuance of the Justice Department's February 5, 2025, memorandum, but argued "[t]he Attorney General's internal guidance memorandum expressly stated that it conferred no substantive rights upon any defendants, which is consistent with caselaw interpreting DOJ guidance." Docket Item 435 at 6-7.

While the government offers up a footnote of citations in support of its statement, there is no authority or precedence for what the government had indicated it was going to start doing in February 2025, i.e. reconsider its prior decision whether to seek or not seek the death penalty in cases where it had already stated an intention not to do so.

The February 5th memorandum revived the possibility that this case would be considered for capital prosecution, and accordingly, appointment of learned counsel was appropriate again.[7]  At that time, the Magistrate Judge had a history of briefing to rely on in making his determination whether to appoint learned counsel in a case still being reviewed for capital prosecution. *See e.g.* Docket Item 42.

_____

[7] To the extent that the government now implies that because the original decision to not seek the death penalty was later confirmed, there was never any real danger to the defendants supporting the decision to appoint learned counsel or capital resources, that argument would contradict the rhetoric advanced by the executive branch at its highest levels, and it is belied by examples of other cases where prior decisions not to seek the death penalty were recently reversed by the government. There have been at least three cases relating to five defendants where the government has reversed a prior no-seek decisions. *See U.S. v. Cory Spurlock*, 23 Cr. 022 (D.NV); *U.S. v. Wilson Constanza-Galdomez, Edin Valenzuela-Rodriguez, and Jonathan Pesquera-Puerto*, 22 Cr. 409 (D.MD); and *U.S. v. Richard Dangleben*, 23 Cr. 072 (D.V.I.).

The WDNY Revised Plan for Furnishing Representation pursuant to the Criminal Justice Act 18 U.S.C. § 3006A ("hereafter "WDNY CJA Plan")[8] addresses appointment of counsel in capital cases in matters "in which the death penalty *may be* or is being sought by the prosecution" WDNY CJA Plan, XV(B) (emphasis added).

In addition to the CJA Plan's guidance on the issue, there were multiple historical examples from this district where counsel was appointed prior to a decision whether to seek the death penalty. *See. e.g. United States v. Johnny Rounds et al*, 10-cr-00239-WMS-HBS; *United States v. Green et al*, 12-cr-00083-WMS-HBS; and *United States v. Carlos Javier Figueroa et al*, 18-cr-06094-FPG-MJP.

The briefing also provided examples of cases from around the country where learned counsel was appointed before capital prosecution was formally initiated, including over eighty cases where learned counsel was appointed even before the filing of a criminal complaint. Docket Item 42 at 16-19.

Based on the litigation earlier in the case, the Magistrate had already determined the defendants should receive the assistance of learned counsel if there was a possibility of capital prosecution. *See* Docket Item 54, 69.[9]

---

[8] Available at https://tinyurl.com/WDNYCJAPlan.

[9] Despite the cited minute entry and text order confirming that learned counsel was approved, the government falsely claims that the prior request for learned counsel was denied on March 8, 2024. Docket Item 435 at 8. By March 8, 2024, the government had filed intention not to seek the death penalty, and it was generally recognized that the request for learned counsel was now moot.

Despite the government's complaints and attempts to present the same arguments against the assignment of learned counsel approximately one year after the initial no-seek decision, the law of the case supported appointing learned counsel to Mr. Gerace and Mr. Ermin once the government renewed the possibility of capital prosecution.

Thus, when the Magistrate Judge appointed second counsel to Mr. Gerace and Mr. Ermin pursuant to this case's status as a mega case, something this Court and the District had already authorized for Mr. Hinkle, it appropriately selected second counsel (Mr. Thompson and Ms. Meyers-Buth) who would also qualify as learned counsel so they would not have to be replaced by learned counsel if capital prosecution was sought anew. This is the same way the Magistrate Judge had handled Mr. Hinkle's circumstance earlier in the case when it decided to appoint Mr. Henry. This approach was intended to forestall delay not, as the government argued, foster delay.

*2. The government mischaracterizes the record regarding the Magistrate's deferral of the government's Motion for Reconsideration*

The government filed a motion before the Magistrate Judge for reconsideration of his decision to appoint second counsel. Docket Item 355.  At the next status conference on March 5, 2025, the government could not confirm a detailed timeline for a decision regarding capital review in this case. The Magistrate Judge deferred the motion for reconsideration, because the possibility of capital prosecution still provided the need for learned counsel at that time.

The government falsely characterizes this decision as the Magistrate court's "revis[ing] its reasoning for keeping them [second counsel] on the case—now holding that they were being kept on as learned counsel." Docket Item 435 at 12.

The initial decision to appoint second counsel on February 20, 2025, was made based on the fact that this is a mega case, consistent with authorization provided by this Court and the Second Circuit. Rather than summarily denying the government's motion for reconsideration at that time, as the Magistrate Judge could have, the Magistrate Judge merely indicated that he was "not addressing the mega case issue at this point." Docket Item 371 ("I'm keeping them [second counsel] in the case at this point, based on the possibility in light of the DOJ memo that it may be death eligible.")

The decision to keep the second attorneys in the case because of the potential capital prosecution and deferring on the government's motion to reconsider does not amount to "revised reasoning." The government's characterization as such amounts to nothing more than unnecessary and unfair criticism of the Magistrate Judge.

*3.  Upon actual review of the government's arguments against appointment of second counsel, they were disposed of appropriately*

After the government provided notice that the decision not to seek the death penalty was confirmed, the Magistrate Judge did permit oral argument on the government's motion for reconsideration. Docket Item 419.

As a threshold issue, the defense argued that the government should have never been permitted to weigh in on the issue of appointment of counsel. In a non-capital case,

when an application for the appointment of additional counsel is made, as opposed to

primary or first counsel, it is considered an "other service[] necessary to adequate

representation," CJA Guidelines § 310.10.10, and the application is made under 18 U.S.C.

§ 3006A(e) [10], *see* CJA Guidelines § 310.30 (Ex Parte Applications).

      The CJA Guidelines make clear that the government has no role in the

determination of defense funding under the Criminal Justice Act. *See* 18 U.S.C. §

3006A(e)(1); *see also* Guide to Judiciary Policy, Vol. 7, Part A ("CJA Guidelines"), §

310.30(a).

      Although the government plays a role at the beginning of criminal proceedings to

identify potential conflicts, it is not afforded standing to otherwise weigh in on who will

be appointed, nor does it have standing to weigh in on subsequent requests and

determinations regarding the allocation of defense resources.

      Nonetheless the government inserted itself into the process of appointing counsel

through its motion for reconsideration and then once again summarized the same

arguments in its motion to rescind the referral order:

> Among the government's many arguments were that the
> Magistrate Court erred in reversing his previous
> determination that one attorney was sufficient, and that
> assigning additional attorneys at this late juncture would
> significantly disrupt proceedings and the progress of the case.
> The government also argued that assigning additional

---

[10] Defendant Joseph Bongiovanni, for example, was procedurally appointed associate counsel upon direct application to the District Court. Case. No 19-cr-227.

attorneys only to defendants Gerace and Ermin, when all
defendants are charged in Count 1, risked a public perception
that certain defendants will be assigned extra resources when
similarly situated defendants in this case—and in other
serious cases— are not.

Docket Item 435 at 11.

To the extent the government was permitted to present these arguments to the

Magistrate Judge, despite a lack of standing to do so, they are easily responded to:

- Government argument that "the Magistrate Court erred in <u>reversing</u>
his previous determination that one attorney was sufficient":

As discussed above, the Magistrate Judge was clear that he was not

deciding that issue. The Magistrate Judge still did not have a full

understanding of the scope of discovery or the complexities of this case at

that time, and the Magistrate Judge clearly stated he had not made a

decision one way or another in regard to Mr. Gerace's request for second

counsel. Later, the Magistrate Judge made the decision to continue second

counsel for Mr. Hinkle, a decision that the Magistrate Judge had indicated

would likely signal second counsel for other defendants.

- Government argument that "assigning additional attorneys at this late
juncture would significantly disrupt proceedings and the progress of the
case":

This argument was based entirely on conjecture and has been proven false.

With the assistance of additional counsel, the defendants filed extensive

non-dispositive motions and have worked through several issues that had not yet been resolved. If anything has disrupted the proceedings, it is need to constantly divert from the schedule and progress of the case to deal with issues like the one now before the Court.

- Government argument that "assigning additional attorneys only to defendants Gerace and Ermin, when all defendants are charged in Count 1, risked a public perception that certain defendants will be assigned extra resources when similarly situated defendants in this case—and in other serious cases— are not":

The government made this argument despite the fact that Mr. Gerace and Mr. Ermin were appropriately able to question why the other two defendants charged in counts 1 through 3 had multiple attorneys, but Mr. Gerace and Mr. Ermin were limited to one each. To the extent that the government references other cases, that too was addressed at oral argument when it was pointed out that there is currently only one other case in this District where in less than one year nine different government prosecutors had appeared: *US v Gendron*. There have been at least six prosecutors who have filed submissions on the docket, and at least four who have argued on the government's behalf at court appearances, all within the first year following the indictment. Furthermore, there has not been a rise of complaints from other defendants about second counsel being assigned in this case or to other defendants, such as Joseph Bongiovanni, who was out

of custody at the time that two attorneys were appointed to him. Nor did it happen when Mr. Hinkle was appointed a second attorney earlier in this case, without objection from the government.

The criticisms of the Magistrate Judge's decision to appoint second counsel are inappropriate and entirely misplaced, particularly when this Court and the Second Circuit found it appropriate to authorize second counsel for one of the defendants earlier in the case pursuant to a non-capital mega case budget.

### III. TIMING OF THE GOVERNMENT'S MOTION

Pointing out that this case has been pending for over a year, the government only now feigns concern for "judicial economy", ironically in a lengthy, 25-page submission.

The government's actions belie its stated reasons for bringing the motion. The government says the motion was brought out of alleged concerned for the defendants' speedy trial rights, but the government itself continues to create unnecessary delay. It says the motion seeks to "preserve judicial economy" (Docket Item 435 at 2), but the entire first half of the motion is spent indirectly asking the district court to reconsider the Magistrate Judge's finding that this is a "mega-case" deserving of two lawyers for certain defendants.

A week after the government told Magistrate Judge McCarthy that "We all know there's been mudslinging in this case" [tr. 5/21/25 , p.100], and asserting it was "trying to stay out of the mudslinging by emphasizing the legal standards," the government repeats

three times in the first 15 pages a misinterpretation of remarks made in jest by the Magistrate Judge to disparage him (while, in an ingratiating manner, complimenting the district court's work ethic)[11]. Docket Item 435 at 1, 4, 15.

The government's protestations about avoiding delay come immediately on the heels of oral argument of non-dispositive motions where the Magistrate Judge ordered the government to turn over grand jury transcripts for *in camera* inspection. Rather than simply complying with its obligations as it indicated it would on-the-record, the government filed a motion to try to prevent review by the Magistrate Judge by asking the District Court to rescind its referral order. Previously criticized for bringing serial motions to reconsider the Magistrate Judge's decisions, it now circumvents that procedure altogether in favor of seeking a friendlier forum. And by doing so it once again begets the delay of which it complains.

The government told the Magistrate Judge it would speedily comply with turning over grand jury transcripts (and additional discovery) but its subsequent actions contradict that representation.

---

[11] "[T]he government understands that this Court has, for a long time, operated under a merciless docket, and that the Court and its staff have been working extraordinarily hard on several important and high-profile cases. Nevertheless, this Court has stated that its schedule will never get in the way of justice—an admirable promise in the face of an often-daunting docket." Docket Item 435 at 19.

The government gave the appearance of wanting to be transparent before the Magistrate Judge before it reversed course with the instant motion to rescind the referral order:

> Mr. Tripi: Judge, it would be our intention, just to clarify, we intend to give you all the Grand jury transcripts and all the exhibits underlying the transcripts…If there's more than just the testimony of the witnesses and the evidence, I'm sure you'll clarify for us what you want…We'll give you everything that we have. If there needs to be more ordered, I assume you'll let us know.

> [tr o/a 5/21/25 pp. 103-104]

At the end of the hours-long argument, the Magistrate Judge indicated an intent to set a dispositive motion date far enough out such that he would have sufficient time to review the grand jury in light of having criminal duty in June. The government did not request that the Magistrate Judge stay his order to produce the grand jury transcripts so it could take the issue up with the District Court; instead, telling the Magistrate Judge it would "get it [the transcripts] right to you". Once again, what the government said proved to be different than what it did:

> Magistrate Judge McCarthy: [And] I've got to get and review the Grand Jury material. I don't know how voluminous that is.

> Mr. Tripi: Voluminous, Judge, we'll get right on getting it consolidated to get it to you…I would like to have them at least consolidated and ready by early next week to make sure we have everything to get it out the door by the end of next

week. ..But I hope there'd be some flexibility there just because it's been a while on the volume and I don't know what other matters people who have the technical expertise to consolidate that stuff have on their plates right now. So I want to get right on it, I want to get it right to you but—

Magistrate Judge McCarthy: But I'll be looking at transcripts, right?

Mr. Tripi: You'll be looking at transcripts and then exhibits. There's at least some—there's at least one audio recording that you'll get…video recordings…You'll have them because if you read a transcript and you want to see the exhibit, you'll have it.

[tr o/a 5/21/25 pp. 152-154]

In addition to the grand jury disclosure, at the May 21, 2025 argument, the government disputed the defense allegation that it was in possession of undisclosed *Brady* material. [tr o/a 5/21/25 pp. 148-151]. Tellingly, since the argument, the government has now provided a summary of *Brady* information for two unnamed witnesses that it has assumedly been aware of since the indictment was returned. While the Government repeats the refrain that the defendants have had all the discovery in the case for a year, it is silent regarding why it has failed to "promptly" disclose *Brady* information in contravention of the Due Process Protections Act and the local rules (*see also* tr. o/a 5/21/25 p. 137, Magistrate Judge reminds government of the court's Rule 5(f) disclosure order). As this Court knows, other districts provide clearer deadlines in their local rules. For example the United States District Court for the Northern District of New York requires

prosecutors to turn over *Brady* information within 14 days of a defendant's arraignment [see L.R. N.D.N.Y. 14.1].

During the oral argument, the defense elaborated on its understanding that the government had concluded Quinn was murdered without reviewing the full panoply of her mental health records to determine if there was an alternative explanation for her death:

> Ms. Buth: So, for example, I took the government's response that they didn't have any mental health records to mean that they hadn't interviewed the probation officer who was supervising Miss Quinn because certainly the probation officer had access to mental health records. And if they were to interview the probation officer and reduced that to writing, I take that to mean they have no report and they've not talked to any witness at all about Crystal Quinn's mental health. Because if they do have that as part of a report, it's not *Jencks*, its *Brady*"
>
> Mr. Tripi: "How is it *Brady*?"
>
> [tr. o/a 5/21/25 p.147]

The answer is obviously because Ms. Quinn's serious mental health issues may provide evidence material to a defense that Quinn committed suicide, including:

- Quinn's references to recent suicide attempts;

- her claim she was raped less than two weeks before her death (and sent photos of her underwear in a plastic bag and discussed how upsetting it was to her mother when Quinn told her);

- her addiction and contemporaneous use of narcotics; and

- her fear of federal authorities putting her back in jail were all contained in the summary of her text messages in the month preceding her death (see Ex. A attached to defendant's joint non-dispositive motions).

By publicizing his belief that Ms. Quinn committed suicide, Gerace Attorney 1 was accused of asserting a "false narrative" and his conduct was cited as an overt act in the indictment[12]. Because it is characterized as a "false narrative", the defense is allowed to explore the extent to which the government considered or investigated the circumstances of Quinn's death, or failed to do so. The indictment reflects the government's theory that Quinn was murdered; any information inconsistent with the government's theory, such as that consistent with suicide or accidental overdose, is *Brady* material.

On May 21, 2025, the government disputed that they were in possession of undisclosed Brady. [tr o/a 5/21/25 pp. 148-151]. However, a week later, on May 29, 2025 prosecutors said in an email to defense counsel:

> As you will soon see, <u>some of the potential *Brady*</u> is contained in statements from witnesses whom we harbor no concerns about witness tampering or retaliation. In those instances, you will be receiving the 302 or ROI, or at least a summary of the witness's statements and their identity, and we have no

---

[12] The defense sought a bill of particulars as to whether the government considered Gerace Attorney 1 to be a co-conspirator. The motion was denied by the Magistrate Judge. The defense did not seek Gerace Attorney 1's identity; rather if the government considers him a co-conspirator that implies some shared intent such that his acts may be imputed to Mr. Gerace. Since the indictment relies heavily on overt acts undertaken by Attorney 1, if those acts are not alleged to have been illegal or if they cannot fairly be imputed to Mr. Gerace, the indictment may be subject to attack.

> objection to your disclosing the statement or the witness's
> identity to your clients" and "[w]here *Brady* information
> contained within 3500 material does not trigger…witness
> safety issues…we would **not** ask that you treat it AEO
> (emphasis added).

So there can be little doubt that the government currently possesses undisclosed *Brady* material.  But for it being withheld, we would not now be discussing the government's terms for a protective order for *Brady* material. The *Brady* order was first entered October 4, 2023, more than 18 months ago. [5, 30]. There have been at least three tranches of discovery to date.  This delayed "rolling" discovery and late *Brady* disclosures make defense counsel's job much more difficult.  *See Leka v. Portundo*, 257 F.3d 89, 102 (2nd Cir. 2000) ("The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing.  And the defense may be unable to assimilate the information into its case") *citing U.S. v. Polisi*, 416 F2d 573, 578 (2nd Cir. 1969) ("We must look to the prejudice to the accused of the suppression, in its effect upon his preparation for trial.")

The fact that the litigation of non-dispositive motions resulted in oral argument that led the government to immediately turn over 4,000 more pages of discovery, including *Brady* information, underscores the wisdom of Magistrate Judge McCarthy's decision to bifurcate motion practice.

As Chief Judge Wolford counseled in the following colloquy with prosecutors in *United States v. Tyshawn Brown*, 19-cr-222 (tr. o/a 9/17/20):

[Defense Attorney]: May I say one thing? I think the confusion of the government is that Brady and Giglio are two separate and distinct things. And I think your Honor is probably well aware that *Brady* is the umbrella that encompasses all; *Giglio* falls under *Brady*. And so if there is *Giglio* materials, they fall under the scope of *Brady*. That is my understanding.

The Court: I agree with you.

[Defense Attorney]: I would say that is not the government's understanding.

The Court: I mean, the government is interpreting *Giglio* to be *Jencks*, and that is not correct. They are -- they can overlap, certainly, but one is derived from the Constitution and comes from the *Brady* obligations, whereas the other is the Government's obligation under the statute to produce any prior statements of the witness.

*Brown* involved former DEA Agent Bongiovanni's handling of a confidential informant and the government's withholding Brady material. Shortly after the argument, the government dismissed the drug charges against the defendant.

More recently, Judge Vilardo further clarified the government's *Brady* obligation:

"Under *Brady*, the government must disclose "evidence favorable to an accused … where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Material that is "favorable to the accused" includes not only evidence that tends to exculpate a defendant, but also information that impeaches the credibility of the government's witnesses. *United States v. Bagley*, 473 U.S. 667- 676-77 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

\*\*\*\*

The government's insistence that it was not required to disclose a government witness's statement because that statement was demonstrably false is troubling. The government's position that because it has answers to defense arguments that certain evidence is exculpatory it need not disclose that evidence to the defense is troubling.

As this Court noted above and as it has noted previously in this case, when assessing whether evidence might be exculpatory or valuable to the defense, the government seems to have looked at the evidence narrowly through adversarial eyes and not generously as *Brady* and its progeny counsel. All that is troubling".

Decision and Order, 19-cr-87, Docket Item 872 at 17, 28 (unsealed at dkt #966)][13]

Based on this recent history of District Courts counseling the government about its *Brady* obligation, the government should have no questions about the contours of it in this case. Yet, rather than simply disclosing that which it is required to by law, the government has once again attempted to deflect attention away from these issues. It is using the instant motion as a pretextual vehicle to blame both the Magistrate Judge and defense counsel for delay, to hurl lightly covered invectives, and distract from its own lack of compliance.

---

[13] Cf. tr o/a 5/21/25, p. 148: "So my point is we have Brady, exculpatory. We have Giglio, impeachment. And then we have Jencks reports. But if you have Brady or Giglio in a Jencks report, you can't hide behind Jencks and not turn that over. So, what I'm asking is for the government to go through all of the interviews that they have, all of the witness statements and if there is any Brady or Giglio within those statements, to turn those over to us promptly."

The District Court should be wary of a party trying to gain advantage by insulting one judge and flattering another. Law should be governed by reason not manipulation; here the latter is evident in both the timing and substance of the government's motion. A search for truth should never lead prosecutors to seek to avoid a duty or give the impression they may be strategically withholding evidence unfavorable to their case.

## IV. PROSECUTORIAL STEERING

The government's motion to rescind the referral order is a thinly disguised effort to engage in prosecutorial steering better known as "judge shopping."  This is now the third attempt by federal prosecutors to influence who will preside over motions and other legal determinations in the first instance.

Initially, within days of the death of Crystal Quinn, law enforcement began an investigation into her death. At the time she was a federal cooperating witness in the prosecution of Joseph Bongiovanni and Peter Gerace under indictment 19-cr-227. The government's initial investigation acknowledged the link between the Gerace indictment and the death of Crystal Quinn, however the government intentionally chose not link the investigation to the prosecution of indictment 19-cr-227 by failing to file the related case forms for the initial charges against defendant Gogolack, even though both investigations were assigned Case ID "58A-BF-3179872-DEATH QUINN" (Docket Item 410-1 at 13-14).

At an appearance in U.S. v. Bongiovanni et al, on March 15, 2024, the District Court confronted the government on its selective case filings.

THE COURT:

I'm sorry, there were cases filed that were clearly related to
this case without related case forms from your office, right?
The -- the Gogolack case, and several others that are related to
Gogolack. In fact, the ones that were related Gogolack were
filed with related case forms after Gogolack was filed, related
after it was assigned to Judge Sinatra, then related case forms
were filed.

Now, the fact that related case forms were not filed in
Gogolack and the other cases related to the Gerace case, that
can't possibly be an attempt to judge shop, can it?

Case no. 19-cr-227, Docket Item 825 at 10-11.

After discovery was provided in this case, it was clear that even before Mr.
Gogolack was charged by complaint on August 17, 2023, the investigation into Ms.
Quinn's death had already been identified as related to the investigation of Mr. Gerace
(see, Docket Item 188 [Redacted] at 34).

On September 6, 2023, less than three months after indictment 19-cr-227 was
reassigned to Judge Vilardo from Judge Sinatra (Docket Item 537), the government filed
a motion seeking an intra-district transfer to Rochester of Gerace indictments 19-cr-227
and 23-cr-37, citing overwhelming publicity and judicial economy justifying a change of
vicinage (Case nos. 19-cr-227 and 23-cr-37, Docket Item 618). While the government
acknowledged in its motion that a change of vicinage does not require reassignment of
that case to another judge (*id*. at 21-23), in its recent opposition to the defendant's motion
for change of vicinage, it reveals that it apparently believes that judicial reassignment

would result from a change of vicinage (Docket Item 423 at 61) revealing the unstated purpose in its prior motion for change of vicinage based on the same arguments the defendants now make, but with a far less compelling factual record.

Which brings us to the government's current motion to remove the case from Magistrate Judge McCarthy, in which it cites, allegedly in support of judicial economy, the proliferation of motions for reconsideration which in turn require district court review. But of the nine reconsideration motions that the government cites as delaying these proceedings, only two were filed by the defense. The remaining seven motions for reconsideration were filed by the government, in furtherance of the government's penchant for refusing to accept and relitigating any ruling it deems wholly or partially unfavorable, despite the absence of any new legal standard or claim of overlooked facts justifying reconsideration. The government's attempt to relitigate, for at least the fourth time, the magistrate's appointment of second counsel for three defendants in its most recent motion illustrates its abject refusal to accept rulings that it disagrees with, unnecessarily delaying the proceedings while it beats a dead horse.

The government's motion to remove the case from the magistrate judge and its motion to stay the provision of grand jury minutes to the magistrate judge followed the Court's order at motion argument (*id*. at 153-154). It does not take much to conclude that this decision is really what precipitated the government's attempt to remove the magistrate judge and, in the meantime, keep the grand jury minutes from him, revealing

its concern not with disclosure of grand jury minutes to the defendants (which the court denied), but even a review of those minutes by the magistrate judge which the government apparently fears could uncover issues that might lead Judge McCarthy to take further action.[14]

As recently as March 12, 2024 the Judicial Conference of the United States strengthened the policy governing random case assignment, limiting the ability of litigants to effectively choose judges. While the conference was focused primarily on civil cases, the thrust of the issues addressed at the conference was to eliminate abuses brought about by steering of cases amongst the judiciary (See, https://www.uscourts.gov/judiciary-news). The government's actions here strongly suggest that this is exactly what it is seeking to accomplish through its most recent motions; which in turn begs the question why the government does not want Judge McCarthy to see in the grand jury minutes.

---

[14] On December 2, 2011, then Chief-Judge William M. Skretny dismissed indictment 09-cr-96, which charged 21 defendants -- members or associates of the Chosen Few Motorcycle Club -- with crimes of violence directed toward the Kingsman Motorcycle Club or its members (Case 09-cr-976, Docket Item 634). Judge Skretny's dismissal followed Magistrate Judge McCarthy's examination of the grand jury minutes based on allegations of prosecutorial misconduct. Judge Skretny found that:

> "In view of, among other things, recent developments *impacting the reliability of certain evidence underlying the pending Indictment* in the above-referenced action, the United States Attorney for the Western District of New York, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure and by leave of Court endorsed hereon, hereby dismisses the pending Indictment in this action, without prejudice." (italics added)

## V. JUDICIAL ECONOMY AS A PRETEXT

Some things remain constant. The Bills dominate the headlines. The Sabres miss the playoffs, and the government tries to relitigate settled issues. Like past attempts, the government couches this motion in terms of judicial efficiency. And like past attempts, the government's actions betray any commitment to efficiency and reveal them to be seeking an advantage by rushing this case to trial before defendants can fully litigate the case or prepare a defense.

Throughout this case, the government has relitigated rulings it perceives as adverse. When the Court appointed second counsel for several defendants, the government moved to reconsider. Dkt. 355. When Judge McCarthy temporarily delayed ruling on that issue, they filed another motion to remove counsel Dkt. 398. When the Court found the government acted in bad faith, the government moved to reconsider. Dkt. 191. When the Court issued an order before the government filed a reply brief that was not mentioned in the scheduling order, the government moved to reconsider. Dkt. 90. When the Court denied the government's oral motion to exclude speedy trial time, several days later, the government filed a written motion asking to do the same. Dkt. 123.

This pattern repeats itself here. Magistrate Judge McCarthy has rejected the government's attempts to use judicial economy as a pretense to set unrealistic deadlines. For example, before non-dispositive motions had been fully briefed, the government filed a motion to set the dispositive motion deadline two weeks from their filing. Docket Item

396 at 10-11. In it, prosecutors advanced similar arguments about the case's pace. *Id*. at 7-8. In response, the defense argued the government's true motive was to seek an advantage in the litigation, not advance judicial economy. Docket Item 415. Magistrate Judge McCarthy rejected the government's request and did not set a dispositive motion deadline. Docket Item 419.

Then, at oral argument for non-dispositive motions, Magistrate Judge McCarthy suggested a mid-to-late-August dispositive motion deadline. Tr. at 153. The government thought that was too long and requested a June 30, 2025 deadline. *Id*. at 155-156. In Solomon-like fashion, Magistrate Judge McCarthy expressed a desire "to set a deadline that reasonably works for everybody" and settled on August 8, 2025. *Id*. at 156, 158.

Realizing that Magistrate Judge McCarthy would likely reject another effort to relitigate scheduling purportedly based on "judicial economy", the government now wants to reconsider which judge should decide the issue. Though the government labels their request a "motion to rescind," in reality, it is asking the Court to reconsider the 17-month-old referral order.

> "Reconsideration of a previous order by the Court is an extraordinary remedy to be employed sparingly." Ortega v. Mutt, 2017 WL 1968296, at *1 (S.D.N.Y. May 11, 2017). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." In re Lettieri, 2024 WL 1076271, at *1 (W.D.N.Y. Mar. 12, 2024). A motion for reconsideration "is not a vehicle for relitigating old issues, presenting the case under new

theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple."

*Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012), as amended (July 13, 2012) (internal quotation and citation omitted).

The government does not try to explain how it meets the applicable legal standard. Docket Item 435 at 16-19. No intervening change in law, new evidence, or need to correct a clear error or prevent a manifest injustice exists. Thus, no basis to reconsider the referral order exists.

Further, the government's actions show it does not care about efficiency. Efficiency requires maximizing outputs relative to inputs. Forcing parties to relitigate settled issues is not efficient.

Efficiency favors promptly litigating the issue. Following the first indictment (September 6, 2023), the Court first referred this case to Magistrate Judge McCarthy. Dkt. 10. The government did not object. After the government superseded the indictment a second time, the Court again referred the case to Judge McCarthy. Docket Item 28. That was January 9, 2024. *Id*. Instead of acting promptly, prosecutors delayed bringing this motion. Seventeen months ago, everyone knew this case would be complex. Everyone knew that the case would generate sustained litigation. If anything, based on who had the discovery at the time of the referral order, the government knew that better than anyone.

Efficiency favors relitigating an issue before parties rely on the order. Everyone has been relying on the referral order for the past 17 months. The parties have been litigating issues before Magistrate Judge McCarthy, he has read and reviewed hundreds of pages of motions, and issues remain pending before him. While the government may not like all of Magistrate Judge McCarthy's rulings, that does not justify their instant request.

Efficiency favors letting the parties work on dispositive motions. Those motions will move the case forward by sharpening issues for trial. But rather than work on those motions, defendants must stop and respond to what is yet effectively another government motion to reconsider. While they do this, the government complains about how long dispositive motions are taking.

The government wants a new definition of efficiency: "give us what we want (a conviction) and give it to us as quickly as possible." If an adverse ruling disrupts that plan, prosecutors waste everyone's time and energy with motions to reconsider.  Once the government's "commitment" to judicial economy is closely examined, its actual motivation becomes clear. If defendants have enough time for a fulsome review of the evidence and to prepare a defense, the government's job becomes harder.

This is not even the first time that the government has used demands to set a trial date to gain advantage. When Magistrate Judge McCarthy denied the government's oral motion to exclude speedy trial time following a status conference on discovery, the

government filed a motion two days later asking to exclude time (for the same reasons that Magistrate Judge McCarthy already rejected) and threatening to file a motion to set the case for trial should any defendants object: "Should the defendants object to such an exclusion of time from the Speedy Trial Act, essentially demanding a speedy trial, the government intends to file a Motion to Set a Trial Date to ensure that the defendant's[sic] rights to a speedy trial are scrupulously honored." Docket Items 120, 123-1 at ¶ 34.

Despite claims that bifurcating motions "set[] the case on the least efficient course possible," the government has actually perfected a less efficient course: relitigating just about every adverse ruling. Docket Item 435 at 2. If the Court wants to promote efficiency, it should swiftly deny the government's motion and allow the parties to return working on dispositive motions.

## VI. OTHER MISREPRESENTATIONS BY WHICH THE GOVERNMENT DISTORTS EVENTS BEFORE MAGISTRATE JUDGE MCCARTHY

The government, in its desire to have the referral order to the Magistrate Court rescinded, misrepresents procedural facts and the spirit in which various comments were made by Magistrate Judge McCarthy.

First, the government argues that the defendants never requested bifurcation of discovery motions and only asked for 30 days to file all motions as of January 15, 2025. Docket Item 435 at 12. This is statement is misleading. The defendants did not initially ask for bifurcation because the death penalty was not an issue after the first "no- seek"

was issued.  The case was moving along as a non-capital case until the new presidential

administration took office after  January 20, 2025 and the Department of Justice issued a

memo (February 5, 2025) to reconsider all "no-seek" death penalty cases between January

20, 2021, and January 19, 2025.  That changed the entire posture of the case and put the

defendants back in a potential capital case mode.  It was then that the defendants sought

bifurcation of dispositive and non-dispositive motions while awaiting a decision from the

Department of Justice.  It was not until April 8, 2025, that a "no-seek" notice was issued.

The bifurcated scheduling order was already in place and defense counsel timely filed

non-dispositive motions a week later on April 16, 2025.

Next, the government criticized the Magistrate Court for ruling from the bench on

certain motions, deferring decisions on others and failing to indicate whether "he would

notify the District Court that motions for severance, motions to dismiss, and motions for

a change of vicinage were ripe and ready for adjudication."  Docket Item 435 at 15.  It is

clear the Magistrate Court did not notify the District Court because dispositive motions,

per the Magistrate Court's scheduling order, are not due until August 8, 2025.  In the

interest of judicial economy, the practical approach is for all dispositive motions to be

filed and then the District Court can review any of the Magistrate Judge's

decisions/recommendations that the parties disagree with at one time.

Further, the government points to statements by defendant Ermin's counsel that

"[E]very time Judge McCarthy renders a decision, it goes someplace else for review; "I'm

willing to bet that even this decision ends up in front of Judge Vilardo", to which the Magistrate Court responded, "[P]robably", as a rationale for rescinding the referral order. Docket Item 435 at 14. If that is the case, then 28 U.S.C. §636 would be rendered meaningless simply because the District Court retained *de novo* review power over a Magistrate Judge's decisions.

Perhaps most offensively, the government attempts to weaponize Magistrate Judge McCarthy's trait of "good humor". The bench and the bar all recognize Magistrate Judge McCarthy often uses humor to diffuse tension, to put parties at ease, and to dull the edge of adversarial proceedings in favor of universal civility.

Here, the government, inappropriately, attempts to use Magistrate Judge McCarthy's tongue-in-cheek statement to imply the Magistrate Judge himself wanted the January 2024 Referral Order to be rescinded.

Specifically, the government cites Magistrate Judge McCarthy's light-hearted comment:

> "And if anybody wants to suggest to Judge Vilardo that he take the entire case back for supervision of pretrial proceedings, whether or not that would make him happy, it would not make me unhappy, but we'll leave it at that."

Judge McCarthy had previously tried to streamline the proceedings noting the voluminous filings and number of defense counsel present for argument. It is obvious that his comment was said in jest as Magistrate Judge McCarthy repeatedly encouraged

the parties to attempt to resolve contested issues amongst themselves, saying it would expedite matters as opposed to continually resorting to court intervention.

It is important that the District Court sees what this really is and what the government is attempting to achieve at the expense of a dedicated Magistrate Judge.

## VII. CONCLUSION

In celebration of this Court's 125th anniversary, it recently hosted United States Supreme Court Chief Justice John Roberts. Justice Roberts caused a stir in 2008 by quoting a line from Bob Dylan's "Like a Rolling Stone" in an opinion. In a different song, Dylan describes resentment about an unjust conviction. He said he was ashamed "to live in a land where justice is a game" and where law enforcement seeks to convict a defendant at any cost.  This Court can ensure that the same is not said of the case at bar. For all of the reasons set forth above, the government's motion to rescind the referral order should be denied in all respects.

Dated:, 2025

DATED:       Orchard Park, New York
             June 9, 2025

                                        s/ Cheryl Meyers Buth
                                        Cheryl Meyers Buth, Esq.
                                        MEYERS BUTH LAW GROUP, PLLC
                                        Attorneys for Defendant Peter Gerace, Jr.
                                        21 Princeton Place, Suite 105
                                        Orchard Park, New York 14127
                                        (716) 508-8598
                                        cmbuth@mblg.us

DATED:        Rochester, New York
              June 9, 2025

                                   *s/ Mark A. Foti*
                                   Mark A. Foti, Esq.
                                   THE FOTI LAW FIRM, P.C.
                                   *Attorneys for Defendant Peter Gerace, Jr.*
                                   16 W. Main Street – Suite 100
                                   Rochester, New York 14614
                                   (585) 461-1999
                                   mark@fotilaw.com


DATED:        Rochester, New York
              June 9, 2025

                                   *s/ Donald M. Thompson*
                                   Donald M. Thompson, Esq.
                                   EASTON THOMPSON KASPEREK
                                   SHIFFRIN LLP
                                   *Attorneys for Defendant John Ermin*
                                   16 W. Main Street – Suite 243
                                   Rochester, New York 14614
                                   (585) 423-8290
                                   dmthompson@etksdefense.com


DATED:        Lockport, New York
              June 9, 2025

                                   *s/ George V. C. Muscato*
                                   George V. C. Muscato, Esq.
                                   MUSCATO, DIMILLO & VONA, LLP
                                   *Attorneys for Defendant John Ermin*
                                   107 East Avenue
                                   Lockport, New York 14094
                                   (716) 434-9177
                                   georgemuscato@gmail.com